# EXHIBIT   B

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of:               )          CDC Number D-92538
                          )
RONALD MOORE              )          **RECORDS**
                          )
_____)          **COPY**


CALIFORNIA STATE PRISON

SAN QUENTIN, CALIFORNIA

NOVEMBER 28, 2005

4:30 P.M.


PANEL PRESENT:

Ms. Tracey St. Julien, Presiding Commissioner
Mr. Joseph Johnson, Deputy Commissioner



OTHERS PRESENT:

Mr. Ronald Moore, Inmate
Mr. Scott Handleman, Attorney for Inmate
Mr. Sean Gallagher, Deputy District Attorney
Correctional Officers Unidentified



CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No     See Review of Hearing
_____  Yes      Transcript Memorandum



**Carol Chase, Peters Shorthand Reporting**

ii

## INDEX

PAGE

Proceedings ....................................... 1

Case Factors ..................................... 11

Pre-Commitment Factors ........................... 16

Post-Commitment Factors .......................... 33

Parole Plans ..................................... 38

Closing Statements ............................... 63

Recess ........................................... 68

Decision ......................................... 69

Adjournment ...................................... 76

Transcriber Certification ........................ 77

--oOo--

1

1         P R O C E E D I N G S

2              **DEPUTY COMMISSIONER JOHNSON:**  We are on the

3    record.

4              **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.  The

5    time is 4:30 p.m., and this is a subsequent parole

6    hearing for Ronald Moore.  CDC No. D-92538.  Today is

7    November 28, 2005.  We are at San Quentin State

8    Prison. The inmate was received on August 5, 1988,

9    with a life term starting the same day.  Count One,

10   murder first, Penal Code Violation 187.  And the

11   inmate received a term of 25 years to life with a

12   minimum eligible parole date of July 12, 2000 and

13   three.  And this is from the county of San Mateo, Case

14   No. C17391; is that correct, sir?

15             **INMATE MOORE:**  Yes.

16             **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

17   We're tape recording the hearing, so we're going to go

18   around the room and introduce ourselves.  We'll say

19   our first and last names, spell our last name and then

20   if you could also state your CDC number.  And my name

21   is Tracey St. Julien, S-T, capital J-U-L-I-E-N.

22             **DEPUTY COMMISSIONER JOHNSON:**  Joseph Johnson,

23   J-O-H-N-S-O-N, deputy commissioner.

24             **DEPUTY DISTRICT ATTORNEY GALLAGHER:**  Sean

25   Gallagher, deputy district attorney from the county of

26   San Mateo.  S-E-A-N, G-A-L-L-A-G-H-E-R.

27             **ATTORNEY HANDLEMAN:**  Scott Handleman,

2

1    H-A-N-D-L-E-M-A-N, representing Mr. Moore.

2          INMATE MOORE:  Ronald Joe Moore, M-O-O-R-E.

3    D-92538.

4          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  We

5    also have two correctional officers in the room who

6    are here for security purposes.  And Mr. Moore, are

7    you familiar with the ADA statements, I mean, your ADA

8    rights?

9          INMATE MOORE:  Uh-huh, yes.

10          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  I

11   note that on September 28th you signed -- September

12   the 28th of 2005, you signed a BPT Form 1073

13   indicating that you did not have any disabilities.

14   And is that still correct?

15          INMATE MOORE:  Yes.

16          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

17   did you have any trouble walking into the room today?

18          INMATE MOORE:  No.

19          PRESIDING COMMISSIONER ST. JULIEN:  Are you --

20   you're mobile?  You're fine?

21          INMATE MOORE:  Yes.

22          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  You

23   can go up and down stairs without a problem?

24          INMATE MOORE:  Yes.

25          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

26   how about your vision?  Can you see clearly?

27          INMATE MOORE:  Yes.

3

1           PRESIDING COMMISSIONER ST. JULIEN:  Without

2     glasses?  I notice you don't have any eyeglasses on

3     or --

4           INMATE MOORE:  I have glasses, but just for

5     reading.

6           PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

7     you don't think you'll need them here today?

8           INMATE MOORE:  No.

9           PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

10    any hearing impairments?

11          INMATE MOORE:  No.

12          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

13    I note that you have a high school diploma?

14          INMATE MOORE:  Yes.

15          PRESIDING COMMISSIONER ST. JULIEN:  So have

16    you -- have you had any learning disability --

17    learning disabilities?

18          INMATE MOORE:  No.

19          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

20    what about -- do you know what the Triple CMS and EOP

21    Programs are?

22          INMATE MOORE:  No, not in depth.

23          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  Do

24    you know that they're the Mental Health Services

25    Programs that the department offers?

26          INMATE MOORE:  Uh-huh.

27          PRESIDING COMMISSIONER ST. JULIEN:  So if you

4

```
 1    have depression or some kind of a psychological

 2    issues, those programs would give you some assistance

 3    with that.

 4              INMATE MOORE:  Okay.

 5              PRESIDING COMMISSIONER ST. JULIEN:  And have

 6    you ever been a part of either of those programs?

 7              INMATE MOORE:  No.

 8              PRESIDING COMMISSIONER ST. JULIEN:  Okay.  Have

 9    you ever taken any psychotropic medications?

10              INMATE MOORE:  No.

11              PRESIDING COMMISSIONER ST. JULIEN:  And are you

12    on any -- did you want to say something?

13              ATTORNEY HANDLEMAN:  Yes.  On the matter of

14    mental health.

15              PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

16              ATTORNEY HANDLEMAN:  We -- we were just

17    concerned that he -- that Mr. Moore doesn't have an up

18    dated Psychological Report since May 2000 and two.

19    And we were actually going to request a postponement

20    of the hearing if that's possible.

21              PRESIDING COMMISSIONER ST. JULIEN:  Well,

22    actually 2000 and two isn't old.

23              ATTORNEY HANDLEMAN:  Okay.

24              PRESIDING COMMISSIONER ST. JULIEN:  Interpret

25    the part.

26              ATTORNEY HANDLEMAN:  I just wanted to check on

27    that --
```

5

1        PRESIDING COMMISSIONER ST. JULIEN:  Yeah, I

2  know that things are constantly changing in regards --

3        ATTORNEY HANDLEMAN:  Okay.

4        PRESIDING COMMISSIONER ST. JULIEN:  -- to

5  Psychological Evaluations and -- but it's pretty much,

6  you know, the policy now that if he were -- if he did

7  have psychological issues, you know, if he were in

8  Triple CMS or EOP, something like that, you know,

9  where that mental state would be changing.

10       ATTORNEY HANDLEMAN:  Uh-huh.

11       PRESIDING COMMISSIONER ST. JULIEN:  Then, yeah,

12  you would want to have something more updated to

13  consider.  But if there are no psychological issues,

14  then, you know, now there's even talk of letting them

15  go, having just one done --

16       ATTORNEY HANDLEMAN:  I see.

17       PRESIDING COMMISSIONER ST. JULIEN:

18  -- throughout the term, the entire term of

19  incarceration.  So --

20       ATTORNEY HANDLEMAN:  All right.

21       PRESIDING COMMISSIONER ST. JULIEN:  I've done

22  some with 1999, so 2000 and two is not considered --

23       ATTORNEY HANDLEMAN:  Okay.

24       PRESIDING COMMISSIONER ST. JULIEN:  -- old.

25       ATTORNEY HANDLEMAN:  All right then.

26       PRESIDING COMMISSIONER ST. JULIEN:  And his was

27  (indiscernible).

6

1          DEPUTY COMMISSIONER JOHNSON:  It wasn't

2    negative.

3          PRESIDING COMMISSIONER ST. JULIEN:  Yeah.  I

4    wasn't negative and we can discuss -- there I did have

5    a comment on it, but we can discuss that as the time

6    goes by -- as the hearing goes by.  Okay.  Now, you --

7    are you on any medicines now for any health

8    conditions?

9          INMATE MOORE:  No.

10          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

11    is there any reason why you can't participate today?

12          INMATE MOORE:  No.

13          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And,

14    Mr. Handleman, are you satisfied that your client's

15    ADA rights have been met?

16          ATTORNEY HANDLEMAN:  Yes.

17          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  I'm

18    going to go ahead then and give you an outline of the

19    hearing -- are you cold or nervous or --

20          INMATE MOORE:  I'm a little nervous.

21          PRESIDING COMMISSIONER ST. JULIEN:  Oh, okay.

22    Well, take a deep breath.

23          INMATE MOORE:  Okay.

24          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  The

25    hearing is being conducted pursuant to Penal Code

26    Sections 3041 and 3042 and the rules and regulations

27    of the board of prison terms governing life

7

1    consideration hearings for -- governing parole

2    consideration hearings for life inmates.  The purpose

3    of the hearing today is to consider your suitability

4    for parole.  We'll reach a decision today and inform

5    you whether or not we find you suitable for parole.

6    If you are found suitable, your length of your

7    confinement will be explained to you.  The hearing

8    will be conducted in two parts.  First, I'll discuss

9    with you the crime you were committed for, your prior

10   criminal and social history, your parole plans, and

11   letters of support and opposition.  And then

12   Commissioner Johnson will discuss with you your

13   behavior and programming since your commitment and

14   your Counselor's Report and Psychological Evaluation.

15   You have the opportunity to review your Central File

16   and previous hearing transcripts and, if you need to

17   correct or clarify anything, then please feel free to

18   do so.  When that's done, the district attorney and

19   your attorney will be able to ask you questions.  And

20   this is a nonconfrontational hearing, so the district

21   attorney, actually, will ask his questions through the

22   panel, and then you in turn answer to us.  And then

23   your attorney, the district attorney, and you will be

24   able to make the final statement regarding your parole

25   suitability.  Then we'll recess for deliberations,

26   we'll clear the room.  After we have reached decision,

27   we'll reconvene the hearing and announce that

8

1  decision.  The California Code of Regulations states

2  that, regardless of time served, a life inmate shall

3  be found unsuitable for and denied parole, if in the

4  judgment of the panel the inmate would still pose an

5  unreasonable risk or danger to society if released

6  from prison.  And you also have certain rights.  Those

7  rights include the right to a timely notice of this

8  hearing, the right to present additional documents,

9  and the right to review your Central File.  Excuse me.

10  And, Mr. Handleman, have your client's rights been

11  met?

12        ATTORNEY HANDLEMAN:  Yes.

13        PRESIDING COMMISSIONER ST. JULIEN:  Sorry.  You

14  also have the right to be heard by an impartial panel.

15  And now that you have seen the panel here today, do

16  you have any objections?

17        INMATE MOORE:  No.

18        PRESIDING COMMISSIONER ST. JULIEN:

19  Mr. Handleman?

20        ATTORNEY HANDLEMAN:  It's fine.

21        PRESIDING COMMISSIONER ST. JULIEN:  Okay.

22  You'll receive a copy of our written tentative

23  decision today.  That decision is subject to review by

24  the decision review unit and the entire board unit as

25  a whole.  And it will become effective within a

26  hundred and 20 days.  And it's also subject to review

27  by the governor.  And you'll receive a copy of that

9

1   decision and these hearing transcripts.  Excuse me.
2   And the board no longer has an appeals process, so if
3   you have any objections or complaints about anything
4   that happens here today, you need to file those
5   directly with the court.  And information on how to
6   file a complaint is found in the prison law library,
7   and you'd go through the policy entitled
8   Administrative Appeals, Correspondence, and Grievances
9   Concerning BPH Decisions.  You're not required to
10  admit your offense or discuss your offense if you do
11  not wish to do so.  However, we do accept as true the
12  findings of the Court, and we invite you to discuss
13  the facts and circumstances of the crime if you wish,
14  and we will review and consider any prior statements
15  regarding the crime in determining your suitability
16  for parole.  Commissioner Johnson, is there any
17  confidential information?
18          DEPUTY COMMISSIONER JOHNSON:  No, there isn't.
19          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And
20  have I passed that hearing checklist to you?
21          DEPUTY COMMISSIONER JOHNSON:  It's right here.
22          ATTORNEY HANDLEMAN:  Oh.  (Indiscernible).
23          PRESIDING COMMISSIONER ST. JULIEN:  If you
24  could take a look at that and tell me know if you have
25  all those same documents, and then pass that to
26  Mr. Gallagher.
27          DEPUTY DISTRICT ATTORNEY GALLAGHER:  Thank you.

10

1      PRESIDING COMMISSIONER ST. JULIEN:  And do you

2   have any additional documents?

3      ATTORNEY HANDLEMAN:  Yes.  Actually, Mr. Moore

4   has letters of support from his family which he

5   received too late to get them into the file.

6      PRESIDING COMMISSIONER ST. JULIEN:  Okay.

7      ATTORNEY HANDLEMAN:  There's one from his

8   mother, Evelyn Moore; one from his brother, Willy

9   Moore; and from his nephew, Willy Moore.  The letters.

10      PRESIDING COMMISSIONER ST. JULIEN:  Okay.

11   Thank you.  Thank you.  And I note that I received the

12   hearing checklist back.  And, gentlemen, is that in

13   order?

14      DEPUTY DISTRICT ATTORNEY GALLAGHER:  Yes.

15      ATTORNEY HANDLEMAN:  Yes.  I think it is.

16      PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

17   do you have any preliminary objections?

18      ATTORNEY HANDLEMAN:  No preliminary objections.

19      PRESIDING COMMISSIONER ST. JULIEN:  And will

20   Mr. Moore be speaking with us today?

21      ATTORNEY HANDLEMAN:  Yes.

22      PRESIDING COMMISSIONER ST. JULIEN:  I need to

23   give you an oath, sir.  Do you solemnly swear or

24   affirm that the testimony you give at this hearing

25   will be the truth, the whole truth, and nothing but

26   the truth?

27      INMATE MOORE:  I do.

1          PRESIDING COMMISSIONER ST. JULIEN:   Okay.   I'm

2    going to go ahead and read the Statement of Facts as

3    they appear in the November 2000 and five Board

4    Report.  And that report was prepared by Correctional

5    Counselor One, last name Shaw, S-H-A-W.  And approved

6    by correctional counselor three, Belshaw,

7    B-E-L-S-H-A-W.  And it states that on November 10th of

8    1986, San Mateo Police Department Report states that

9    at approximately 2:00 p.m. an investigating officer

10   responded to a report of a disturbance at a motel on

11   North Bay Shore Boulevard.  Manager of the motel

12   reported that he received a telephone call from a

13   hysterical male asking the police and an ambulance to

14   be sent to Room 229.  The officer found Ronald Moore

15   in Room 229 with the Victim Claire Miller who was

16   unconscious and appeared to have been beaten.  At

17   first, Mr. Moore told the police that he had returned

18   home to the motel room and found the victim nude,

19   unconscious, and apparently beaten.  He said the

20   victim occasionally engaged in acts of prostitution

21   and, when she did so, Mr. Moore left the room.  He

22   said he left on this date for that reason.  The

23   victim, who had been transported to the hospital soon

24   after the arrival of -- the arrival of the police,

25   died of a brain injury suffered during the assault.

26   Eventually, Mr. Moore changed his story and told the

27   officer that he and the victim used crack cocaine by

12

1    smoking it.  They became engaged in an argument.  The

2    defendant said that the victim lied to him about her

3    use of cocaine and seeing other men and having sexual

4    relations with them in order to obtain crack cocaine.

5    Moore said that the argument became a physical

6    altercation between Miller and himself.  As a result,

7    the victim became unconscious, and Moore eventually

8    had to give her CPR.  Later, he determined that he

9    could do nothing more to help her.  Okay.  So how did

10   Cher -- Cheryl receive -- I'm sorry -- Claire -- how

11   did Claire receive the head injury that eventually

12   killed her?  Wait -- did you hit her?  Did she fall?

13   What?

14           INMATE MOORE:  I pushed her.

15           PRESIDING COMMISSIONER ST. JULIEN:  Down?

16   Or --

17           INMATE MOORE:  Away from me.

18           PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

19   then what happened?

20           INMATE MOORE:  We were just engaged in

21   fighting.

22           PRESIDING COMMISSIONER ST. JULIEN:  But how did

23   she get that significant of a force to the head that

24   caused her to die?

25           INMATE MOORE:  We were on -- when we started,

26   we were on the bed, and we started fighting on the

27   bed, and I pushed her away, and she hit the wall.

13

1            PRESIDING COMMISSIONER ST. JULIEN:  Then it

2      must have been a really -- I mean, was it a really

3      forceful push?

4            INMATE MOORE:  Yeah.

5            PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

6      had she been using crack cocaine?  So you both were --

7      had been using crack cocaine that day?

8            INMATE MOORE:  Yes.

9            PRESIDING COMMISSIONER ST. JULIEN:  So were you

10     intoxicated with it?

11           INMATE MOORE:  Yes.

12           PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

13     was she?

14           INMATE MOORE:  Yes.

15           PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

16     what was the argument about?

17           INMATE MOORE:  We began arguing about,

18     actually, seeing other people and being with other

19     people.  And it just kind of --

20           PRESIDING COMMISSIONER ST. JULIEN:  Escalate --

21           INMATE MOORE:  -- escalated from there.

22           PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

23     had you gotten into physical altercations before?

24           INMATE MOORE:  No.

25           PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

26     there was no instrument used?

27           INMATE MOORE:  No.

14

1          PRESIDING COMMISSIONER ST. JULIEN:  A hammer

2  or a --

3          INMATE MOORE:  No.

4          PRESIDING COMMISSIONER ST. JULIEN:  So it was

5  just the force of you knocking her into the wall?

6          INMATE MOORE:  Uh-huh.  It's a very small room.

7  It was just a motel room.

8          PRESIDING COMMISSIONER ST. JULIEN:  Yeah, yeah.

9          INMATE MOORE:  It was very small.  And there

10  was a television at the end of the bed and a dresser

11  at the end of the bed.

12          PRESIDING COMMISSIONER ST. JULIEN:  Yeah.  No.

13  Because it just seems like it would have to take a

14  very significant amount of force to cause that much

15  brain damage.  Okay.  And how long had you known

16  Claire?

17          INMATE MOORE:  Almost a year.

18          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

19  were you working?

20          INMATE MOORE:  No, not at the time.

21          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  Then

22  how were you getting the money to buy the crack

23  cocaine?

24          INMATE MOORE:  Basically, just hustling.

25          PRESIDING COMMISSIONER ST. JULIEN:  So what

26  does that mean?

27          INMATE MOORE:  I was doing -- sometimes I'd do

15

1  yardwork in the neighborhood or sometimes I'd sell

2  drugs.

3      PRESIDING COMMISSIONER ST. JULIEN:  Okay.

4  Well, I think to your credit, you did try to revive

5  her, and you did call for help and very often in my

6  case at least, I see a lot of crimes where they just

7  leave the people for dead.  So did you think that she

8  was dead, or did you think that she had a chance to

9  survive?

10     INMATE MOORE:  Yes, I did.  I did.

11     DEPUTY COMMISSIONER JOHNSON:  You did what?

12     INMATE MOORE:  I did think that she had a

13  chance to survive.

14     PRESIDING COMMISSIONER ST. JULIEN:  And then

15  once you realized that she was dead, what did you

16  think?

17     INMATE MOORE:  As far as I knew, she hadn't

18  expired while she was in the motel room.

19     PRESIDING COMMISSIONER ST. JULIEN:  Mm.

20     INMATE MOORE:  And while I was there after I

21  came to the recognition of what I had done and what

22  had -- what had happened, I -- I tried to, you know, I

23  tried to help her.

24     PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

25     INMATE MOORE:  You know, as much as I could.

26  And as far as I know or as far as I'm aware she was --

27  she was still alive when she left the room.

16

1        PRESIDING COMMISSIONER ST. JULIEN:   Okay.   So

2   the -- did the paramedics came, and they took her to

3   the hospital?

4        INMATE MOORE:   Yeah.   They took her out of

5   there.   Out of the room.

6        PRESIDING COMMISSIONER ST. JULIEN:   And what

7   happened to you?  Did the police come?

8        INMATE MOORE:   Yeah.   The -- there was a --

9   there were -- the police came first into the room --

10        PRESIDING COMMISSIONER ST. JULIEN:   Mm.

11        INMATE MOORE:   -- as far as I remember, and

12   then the paramedics came into the room after the

13   police had gotten there.

14        PRESIDING COMMISSIONER ST. JULIEN:   Okay.

15   Okay.   So how did the drug use start?

16        INMATE MOORE:   Excuse me?

17        PRESIDING COMMISSIONER ST. JULIEN:   How did

18   your drug use start?

19        INMATE MOORE:   How did it start?

20        PRESIDING COMMISSIONER ST. JULIEN:   Uh-huh.

21        INMATE MOORE:   On that particular day or --

22        PRESIDING COMMISSIONER ST. JULIEN:   No.   Just

23   how did you start using -- I mean, how did you start

24   using so many drugs that you -- you know, you didn't

25   have a job.  And you were just -- cause it's not --

26   were you addicted?

27        INMATE MOORE:   Yes.

17

1          PRESIDING COMMISSIONER ST. JULIEN:  Yeah.  So

2   how did you -- how did the drug use start?

3          INMATE MOORE:  Well, I -- it actually came -- I

4   was working at first.

5          PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

6          INMATE MOORE:  And I was actually, I guess a

7   functioning alc -- drug user.

8          PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

9          INMATE MOORE:  'Cause I worked, you know, most

10  of the time.

11         PRESIDING COMMISSIONER ST. JULIEN:  Yeah,

12  'cause didn't you --

13         INMATE MOORE:  I couldn't hold down --

14         PRESIDING COMMISSIONER ST. JULIEN:  Yeah.  You

15  had a -- you graduated from high school.

16         INMATE MOORE:  Uh-huh.

17         PRESIDING COMMISSIONER ST. JULIEN:  You started

18  American River College.  It is a college I went to

19  myself.  And it sounded like you were -- you had an

20  intact family.  You were going along with life.  You

21  were married?

22         INMATE MOORE:  Yep.

23         PRESIDING COMMISSIONER ST. JULIEN:  You had two

24  kids.

25         INMATE MOORE:  Yes.

26         PRESIDING COMMISSIONER ST. JULIEN:  And then

27  what happened?

18

1          INMATE MOORE:  I don't know.  I just went off

2     the deep end.  I just went off the deep end.  When I

3     got down here to the Bay Area, I didn't come for

4     drugs.  Okay.  But I got involved in them after I got

5     down here.  I came down here in about the first part

6     of 1980.

7          PRESIDING COMMISSIONER ST. JULIEN:  With your

8     family?

9          INMATE MOORE:  No.  Just that I was alone.

10         PRESIDING COMMISSIONER ST. JULIEN:  And why was

11    that?

12         INMATE MOORE:  I came down here to work.

13         PRESIDING COMMISSIONER ST. JULIEN:  I mean,

14    were you separated or --

15         INMATE MOORE:  From what?

16         PRESIDING COMMISSIONER ST. JULIEN:  From your

17    wife.

18         INMATE MOORE:  Yes.

19         PRESIDING COMMISSIONER ST. JULIEN:  Okay.

20         INMATE MOORE:  I'd been separated from her for

21    quite a while.

22         PRESIDING COMMISSIONER ST. JULIEN:  Oh, okay.

23         INMATE MOORE:  We were separated after six

24    years of marriage.

25         PRESIDING COMMISSIONER ST. JULIEN:  Okay.

26         INMATE MOORE:  So we were estranged --

27         PRESIDING COMMISSIONER ST. JULIEN:  Okay.

19

1          INMATE MOORE:  -- for all that period of time.
2     And I came alone down here, and I was working down
3     here.  I was working through a temp agency.  And I met
4     some people that did drugs, and I kind of did drugs.
5     I made some bad choices.  You know, it's not -- it's
6     not like they led me into a life of drugs.  It's --
7     it's a choice I made, you know.
8          PRESIDING COMMISSIONER ST. JULIEN:  And why did
9     you make that choice?
10         INMATE MOORE:  Stupidity.  That was very
11    foolish.
12         PRESIDING COMMISSIONER ST. JULIEN:  Well, what
13    else?  How old were you about then?
14         INMATE MOORE:  About 34 or 35.
15         PRESIDING COMMISSIONER ST. JULIEN:  Yeah.  So
16    you weren't a kid.
17         INMATE MOORE:  No.
18         PRESIDING COMMISSIONER ST. JULIEN:  So what --
19    I mean, were you depressed?  Were you finding it hard
20    to get along financially?  What -- 'cause, you know,
21    by that time in life, people usually start settling
22    down, so I'm just interested in what made you start
23    using these things that would --
24         INMATE MOORE:  Mess up my life.
25         PRESIDING COMMISSIONER ST. JULIEN:  Eventually.
26         INMATE MOORE:  Well, I don't know.  I wasn't
27    depressed about anything.  I didn't have a bad

20

1   childhood.  I didn't have a bad life or anything like

2   that.  I just began using drugs because they were

3   there, I guess.

4            PRESIDING COMMISSIONER ST. JULIEN:  So you

5   liked the way they made you feel?

6            INMATE MOORE:  Well, at the time, yeah.

7            PRESIDING COMMISSIONER ST. JULIEN:  Okay. Well,

8   I mean, that's a reason.

9            INMATE MOORE:  It's -- it's just the way it

10  was.

11           PRESIDING COMMISSIONER ST. JULIEN:  Yeah.

12  Okay.  So you started using -- and what kind of drugs

13  did you start with?

14           INMATE MOORE:  Crack.

15           PRESIDING COMMISSIONER ST. JULIEN:  Oh, okay.

16  And so then you were working -- were you still

17  working -- were you still working the temp jobs?

18           INMATE MOORE:  Uh-huh.

19           PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

20  then how did the -- I'm assuming that you escalated in

21  terms of your use.

22           INMATE MOORE:  Yes.  Definitely.

23           PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

24  was that just because of the addiction or --

25           INMATE MOORE:  Well, at first it was more than

26  just recreational.  Okay.  It wasn't really every day

27  at first.  And being in this crowd of people --

21

1           PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

2           INMATE MOORE:  -- that I was with or this

3   particular person that I was with, and I --

4           PRESIDING COMMISSIONER ST. JULIEN:  Claire?

5           INMATE MOORE:  No.  It was another guy.

6           PRESIDING COMMISSIONER ST. JULIEN:  Yeah.

7           INMATE MOORE:  And I'm not trying to justify

8   anything by this, but I was hanging around with this

9   guy.

10          PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

11          INMATE MOORE:  And we started using.  And we

12  just started using regularly all the time.  All --

13  sometimes all day.  Sometimes all day, every day.  And

14  it had escalated to that in a very short time.

15          PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

16          INMATE MOORE:  'Cause the drug doesn't really

17  last that long.

18          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

19  then -- so were you still working or --

20          INMATE MOORE:  Yeah.

21          PRESIDING COMMISSIONER ST. JULIEN:  So at

22  what -- at what point did you meet Claire?

23          INMATE MOORE:  I was still working and I met

24  her at -- in that same motel room -- in the same motel

25  complex where I stayed.

26          PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

27          INMATE MOORE:  And she was with another guy at

22

1    the time, and I went to their house.  I went to their

2    room actually to do drugs --

3            PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

4            INMATE MOORE:  -- and whatever.

5            PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

6            INMATE MOORE:  And I met her and the guy that

7    she was with at that time.  That was about, probably,

8    a year or so before.

9            PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

10           INMATE MOORE:  Well, at least a few months --

11           PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

12           INMATE MOORE:  --  before she and I got

13   together.  And then one day I saw her after, you know,

14   several months after I had seen -- after I had been in

15   their room.  And I saw her and we just kind of hooked

16   up.

17           PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

18   And how would you describe your relationship, because

19   this is about a year, right?

20           INMATE MOORE:  That we were together.  About

21   nine months to a year or so.  It was a good

22   relationship.  It was an open relationship.

23           PRESIDING COMMISSIONER ST. JULIEN:  And what

24   would -- what advantage was that to you?

25           INMATE MOORE:  There was also drugs.

26           PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

27   she always had drugs or she found a way --

23

1          INMATE MOORE:  One of us -- one of us usually

2     had something.

3          PRESIDING COMMISSIONER ST. JULIEN:  Okay.

4          INMATE MOORE:  Or we were about to get

5     something.

6          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

7     you hadn't had a violent -- you hadn't had any kind of

8     physical fights or anything before this day?

9          INMATE MOORE:  No.

10         PRESIDING COMMISSIONER ST. JULIEN:  Okay.

11    Would you describe yourself as a violent person?

12         INMATE MOORE:  No.

13         PRESIDING COMMISSIONER ST. JULIEN:  Had you

14    been violent before?

15         INMATE MOORE:  No.

16         PRESIDING COMMISSIONER ST. JULIEN:  Did you

17    want to hurt her?

18         INMATE MOORE:  No, I don't believe so.

19         PRESIDING COMMISSIONER ST. JULIEN:  So what do

20    you mean you don't believe so?

21         INMATE MOORE:  Well, 'cause a lot of the events

22    of that night are still sketchy in my mind and I --

23    I'm sure I didn't want to hurt her.

24         PRESIDING COMMISSIONER ST. JULIEN:  Did you --

25    there were no -- and I'm -- and I keep asking you

26    this, because I couldn't find it in my file anywhere.

27    But you didn't hit her, and you didn't use an object.

24

1    Or did you?

2        INMATE MOORE:  I believe I may have hit her

3    with my hand, but I didn't use any objects or anything

4    like that.  There was no -- no hammers or anything.

5        PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

6    you're in a fight and she somehow, you know, falls or

7    gets hit against the wall or whatever, and it makes

8    that significant amount of damage to her brain that

9    she subsequently dies here.  Why do you think you got

10   first degree murder?

11       INMATE MOORE:  Because of the events that

12   leading up to what happened that morning.

13       PRESIDING COMMISSIONER ST. JULIEN:  And what

14   was that?

15       INMATE MOORE:  The things that the witnesses

16   heard coming from that room.

17       PRESIDING COMMISSIONER ST. JULIEN:  Were they

18   threats?

19       INMATE MOORE:  I believe so.

20       PRESIDING COMMISSIONER ST. JULIEN:  What did

21   they say --

22       INMATE MOORE:  I'm not sure.

23       PRESIDING COMMISSIONER ST. JULIEN:  Well, what

24   did they say they heard?

25       INMATE MOORE:  They said they heard screaming

26   coming from the direction of the room that we were in.

27       PRESIDING COMMISSIONER ST. JULIEN:  Before

25

1   this, before your fatal encounter?

2           INMATE MOORE:  Yes.

3           PRESIDING COMMISSIONER ST. JULIEN:  Hours

4   before or --

5           INMATE MOORE:  According to the court

6   transcripts, it was all that morning.

7           PRESIDING COMMISSIONER ST. JULIEN:  And you

8   don't remember any of that.

9           INMATE MOORE:  I remember some of it, but it's

10  really sketchy.

11          PRESIDING COMMISSIONER ST. JULIEN:  Okay.

12  Yeah, this crime, I mean, it seems very sketchy.

13          INMATE MOORE:  Uh-huh.

14          PRESIDING COMMISSIONER ST. JULIEN:  And I guess

15  maybe I just don't have all of the record, but it was

16  very strange.  So did you plan to kill her?

17          INMATE MOORE:  No.

18          PRESIDING COMMISSIONER ST. JULIEN:  Did you

19  want to kill her?

20          INMATE MOORE:  No.

21          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

22  had you argued often?

23          INMATE MOORE:  Actually, no.  We may have

24  had -- it was actually nothing ever heated, nothing

25  ever -- that -- nothing that ever even progressed into

26  a physical altercation or even a heated argument

27  between us.

26

1       PRESIDING COMMISSIONER ST. JULIEN:  Did you

2  love her?

3       INMATE MOORE:  Yes.

4       PRESIDING COMMISSIONER ST. JULIEN:  So were you

5  jealous?  I mean, if she was engaging in acts of

6  prostitution which I don't know if we know that or

7  not, but it's in here, so is -- were you jealous?

8       INMATE MOORE:  Well, we had a relatively open

9  relationship.

10       PRESIDING COMMISSIONER ST. JULIEN:  Yeah, but

11  that never works.  If you mean you love the person, at

12  least, it never works.  Somebody is always jealous or

13  angry.

14       INMATE MOORE:  Yeah.

15       PRESIDING COMMISSIONER ST. JULIEN:  There's no

16  such thing.  There's only an open relationship that

17  works if the two people don't care about each other.

18  So if you cared about her, were you jealous?

19       INMATE MOORE:  No.

20       PRESIDING COMMISSIONER ST. JULIEN:  So weren't

21  jealous if she had sex with other men?

22       INMATE MOORE:  No.

23       PRESIDING COMMISSIONER ST. JULIEN:  Okay.

24  Well, do you think that seems a little strange?

25       INMATE MOORE:  No.  If she didn't -- actually,

26  she didn't mind if I was with other people.  And that

27  was part of the -- that was part of the relationship.

27

1          PRESIDING COMMISSIONER ST. JULIEN:  Okay.

2          DEPUTY COMMISSIONER JOHNSON:  Why did you and

3   your wife separate?

4          INMATE MOORE:  We got married at -- we were

5   just -- we were in -- we were just out of -- I was

6   just out of high school.  And she was in high school.

7   And we had two children together, and we thought we

8   were in love when we got married.

9          DEPUTY COMMISSIONER JOHNSON:  Well, that's why

10  you got married.  I want to know why you got

11  separated.

12         INMATE MOORE:  Oh.  Because we grew apart.

13         DEPUTY COMMISSIONER JOHNSON:  Was there anybody

14  else involved in the growing apart?

15         INMATE MOORE:  No.

16         DEPUTY COMMISSIONER JOHNSON:  Okay.

17         PRESIDING COMMISSIONER ST. JULIEN:  Okay.

18  Okay.  So were you -- during this time that you were

19  with Claire, were you in contact with your children?

20         INMATE MOORE:  Actually, no.

21         PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

22  why do you think you lost contact with them?

23         INMATE MOORE:  'Cause I was a lousy father.

24         PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

25  you didn't want to have contact.

26         INMATE MOORE:  I did want to have contact, but

27  it wasn't a priority.  Actually, the -- the lifestyle

28

1    I was in --

2         PRESIDING COMMISSIONER ST. JULIEN:   Uh-huh.

3         INMATE MOORE:   -- and the drugs was more of a

4    priority than anything.

5         PRESIDING COMMISSIONER ST. JULIEN:   Okay.

6    Okay.  So what's different today?  How are you

7    different?

8         INMATE MOORE:   Well, I've -- I've taken some

9    steps to try to find out exactly what happened to me

10   that night, what happened to Ronald Moore that night

11   to cause all of these problems.  And I've tried --

12   I've taken courses, I've taken support groups, and I

13   have some AA, and I have an affiliation with the

14   chapel, with the chaplain.  And I have other programs

15   that are trying to help me get in touch with what it

16   was that happened then, so that you can recognize the

17   symptoms of what went on and not do that again, and

18   not be that person that I was that night.

19        PRESIDING COMMISSIONER ST. JULIEN:   Okay.

20   That's very important.  That's very crucial.  That's a

21   very crucial thing to be working on.  So what have you

22   found out so far?

23        INMATE MOORE:   That I can't do drugs, that I

24   can't drink, and that I don't need that in order to --

25   to have a life.

26        PRESIDING COMMISSIONER ST. JULIEN:   Uh-huh.

27        INMATE MOORE:   I had -- I don't know if I had

29

1   diluted myself into thinking that it was okay for me

2   to use drugs and to do drugs and to do -- being the

3   kind of lifestyle that I was, but it isn't, and it --

4   it doesn't work for me whether it's a functioning

5   alcoholic or a functioning drug addict or not.  It's

6   just not for me.  And I don't want to be that person.

7   I don't want to do anything that -- that led up to

8   that event.  And I want to be a hundred percent sure

9   that if I'm ever in any kind of situation where that's

10  presenting itself -- any kind of violence, I don't

11  want to have anything to do with any kind of violence

12  ever again.

13          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  You

14  said that you were trying to find out what happened

15  that night and that type of thing.  Have -- have you

16  come to that point yet where you --

17          INMATE MOORE:  Pretty much, pretty much.  I

18  have support groups here in the institution.  I have

19  people that I -- that I talk to, people that have been

20  through some similar situations.  And through

21  consultation and talking with them, talking with my

22  chaplain and people like that, it -- it's a lot

23  better.

24          PRESIDING COMMISSIONER ST. JULIEN:  So what

25  have you discovered?

26          INMATE MOORE:  I've discovered that if I need

27  to -- I've discovered that I have to kind of stay out

30

1   of those situations.  I have to stay away from

2   situations that have any kind of potential for drug

3   use, for violence, anything that has to do with any of

4   that.

5           PRESIDING COMMISSIONER ST. JULIEN:   Okay.  So

6   and what all -- what have you determined about that

7   night -- that happened that night?  Did you say that

8   you were trying to delve into the factors that caused

9   the crime?

10          INMATE MOORE:  Uh-huh.

11          PRESIDING COMMISSIONER ST. JULIEN:   Have you

12  found out any of those?

13          INMATE MOORE:  Well, I found out that I was

14  completely outside of myself, that that person that

15  committed that act, that person that's on that piece

16  of paper -- on those pieces of paper in front of you,

17  I don't want to be that person anymore.  And that the

18  things that led up to -- to that night and to that

19  morning, I don't want to have anything to do with

20  those kinds of things and that kind of a lifestyle.

21          PRESIDING COMMISSIONER ST. JULIEN:   Okay.  But

22  what caused you though?  What caused you to get into

23  that lifestyle and then to get into an argument with

24  someone that you cared about to the point of -- of

25  using such great force that subsequently ended her

26  life?

27          INMATE MOORE:  I was out of my mind with drugs

31

1   and alcohol.  We had been up for a long time.  We'd

2   been up for days, and been using for days.  And I lost

3   it.  I just lost it.  I became -- I was out of my

4   mind.

5           DEPUTY COMMISSIONER JOHNSON:  What were you

6   arguing about?

7           INMATE MOORE:  We were arguing about drugs and

8   other people.

9           DEPUTY COMMISSIONER JOHNSON:  If -- if you were

10  arguing about other people, you earlier stated that --

11  that you had the open relationship and there was no

12  jealousy.

13          INMATE MOORE:  Uh-huh.

14          DEPUTY COMMISSIONER JOHNSON:  Why the argument?

15          INMATE MOORE:  Because we had -- we -- from

16  my -- from what -- the way I remember things, we had

17  an understanding that it's okay to be with other

18  people as long as when we do the drugs, we do 'em at

19  home.  Now, we could bring the people at home -- we

20  could bring the people home, but the drugs have to be

21  there, too.  The drugs was a priority.  I was a

22  priority over everything else.

23          DEPUTY COMMISSIONER JOHNSON:  So but you -- but

24  you stated that you were arguing about drugs and other

25  lovers.

26          INMATE MOORE:  Other people.

27          DEPUTY COMMISSIONER JOHNSON:  People.

32

1           INMATE MOORE:  Uh-huh.

2           DEPUTY COMMISSIONER JOHNSON:  Meaning other

3   people, meaning --

4           INMATE MOORE:  Other people that we were going

5   to go -- like, go out and do drugs with -- with

6   someone else.  It's okay -- it's okay --

7           ATTORNEY HANDLEMAN:  I don't think they

8   understand -- let me clarify it.  It sounds like what

9   Mr. Moore is saying --

10          INMATE MOORE:  I didn't understand the

11  question.

12          ATTORNEY HANDLEMAN:  -- is -- is that they were

13  arguing about taking some of their drug supply and

14  using it with other people and, therefore, not sharing

15  the drugs with each other.

16          PRESIDING COMMISSIONER ST. JULIEN:  Oh.

17          ATTORNEY HANDLEMAN:  That's what I'm

18  understanding.

19          DEPUTY COMMISSIONER JOHNSON:  Okay.  In other

20  words -- all right -- I got that.  It was about the

21  drugs and other people, not sex with other people.

22          INMATE MOORE:  Yeah.  Yeah.  Yeah.

23          PRESIDING COMMISSIONER ST. JULIEN:  Okay.

24  Yeah, I -- I didn't get that either.

25          INMATE MOORE:  I didn't say that, did I?

26          ATTORNEY HANDLEMAN:  No.  That's what you were

27  trying to say though, right?

33

1        DEPUTY COMMISSIONER JOHNSON:  And then my

2    concern about that, Mr. Moore, is because in -- in the

3    Psych Report of June of 2002, the psychologist states

4    he related that they were, quote, having a pretty good

5    time off and on, end quote, until the last day when

6    they argued about, quote, drugs and lovers, end quote.

7    Okay?  So did he misunderstand -- did the psych

8    misunderstand you also?

9        INMATE MOORE:  Could be.

10       PRESIDING COMMISSIONER ST. JULIEN:  Okay.

11   Okay.  So for your juvenile record, you don't have a

12   juvenile record.  Adult history, criminal history, you

13   have arrest for burglary in 1967, but there's no

14   disposition.  And then also an arrest in '67.  It

15   looks like a drug violation, Health and Safety Code

16   11530, and that was dismissed as well.  And then in

17   1968, arrest for burglary, and then you were convicted

18   of a grand theft and received three years probation

19   and two months county jail, and then that -- in 1971,

20   that was set aside.  So do you remember -- do you

21   remember what you stole?

22       INMATE MOORE:  In the burglary, I believe it

23   was a car jack.

24       PRESIDING COMMISSIONER ST. JULIEN:  Oh,

25   somebody in --

26       INMATE MOORE:  Not a carjack.

27       PRESIDING COMMISSIONER ST. JULIEN:  Oh, oh.  I

34

1   thought you meant a carjacking.

2          INMATE MOORE:  No, no.

3          PRESIDING COMMISSIONER ST. JULIEN:   Oh.

4          INMATE MOORE:  I believe it was a

5   (indiscernible).

6          PRESIDING COMMISSIONER ST. JULIEN:   Oh, okay.

7   And then '69, possession of marijuana; and then '71,

8   petty theft.  And that conviction was set aside.  But

9   you got 90 days county jail and three years -- it just

10   says three years suspended, and I'm not sure what that

11   means.  Okay.  So you don't have a history, at least,

12   an arrest history of violence.  And just some thefts

13   there.  And, like you say, you -- your father was a --

14   it looks like he had an alcohol -- it looks like he

15   was an alcoholic, but he worked.  You had a religious

16   family.  You had -- it was -- do you have a brother or

17   sister?

18          INMATE MOORE:  Brother.

19          PRESIDING COMMISSIONER ST. JULIEN:   Okay.   And

20   how's he doing?

21          INMATE MOORE:  He's doing okay.

22          PRESIDING COMMISSIONER ST. JULIEN:   Okay.   Any

23   problems with the law?

24          INMATE MOORE:  No.

25          PRESIDING COMMISSIONER ST. JULIEN:   Okay.   So

26   what -- why did -- what happened to you?

27          INMATE MOORE:  What happened to me?

35

1           PRESIDING COMMISSIONER ST. JULIEN:   I mean,

2     'cause everything -- you know, it looks like you had

3     the -- a typical --

4           INMATE MOORE:   Yeah.

5           PRESIDING COMMISSIONER ST. JULIEN:   -- good

6     family, you know, a typical upbringing that a lot of

7     these guys in here wish they would have had.  So what

8     happened?

9           INMATE MOORE:   What happened to me?

10          PRESIDING COMMISSIONER ST. JULIEN:   Uh-huh.   I

11    mean, I don't mean that derogatory.   I just want to

12    know, you know, again, what was going on in your life

13    that led you into this downward spiral.

14          INMATE MOORE:   Well, I -- I think it was just

15    bad choices that I was making.

16          PRESIDING COMMISSIONER ST. JULIEN:   And why

17    were you making bad choices?

18          INMATE MOORE:   I don't know.  It's --

19          PRESIDING COMMISSIONER ST. JULIEN:   I mean,

20    were you tired of working?

21          INMATE MOORE:   No, I wasn't tired of working,

22    because I could work with or without the drugs.  It's

23    just that they were really bad choices.  I -- I don't

24    know if I considered myself to be a rebel or a rebel

25    without a cause or what.

26          PRESIDING COMMISSIONER ST. JULIEN:   Uh-huh.

27          INMATE MOORE:   But it was just a series of

36

1   really bad choices from the -- from the use of the

2   marijuana to -- to burglary which are -- which are

3   coward crimes anyway.

4           PRESIDING COMMISSIONER ST. JULIEN:   Uh-huh.

5           INMATE MOORE:   I -- I was a coward.   And, I

6   don't know, maybe I was trying to escape by doing this

7   or maybe I was trying to -- to -- to get some

8   recognition or something for myself.

9           PRESIDING COMMISSIONER ST. JULIEN:   Some notice

10  or --

11          INMATE MOORE:   I don't know.

12          PRESIDING COMMISSIONER ST. JULIEN:   By

13  getting -- you know, a lot of times people -- any

14  attention is good attention.

15          INMATE MOORE:   (Indiscernible) I was going

16  about it.

17          PRESIDING COMMISSIONER ST. JULIEN:   Did you not

18  have enough attention when you were growing up from

19  your parents?

20          INMATE MOORE:   Probably, probably.   Both my

21  parents worked.   My brother worked.

22          PRESIDING COMMISSIONER ST. JULIEN:   Was he much

23  older?

24          INMATE MOORE:   He's ten years older than I am.

25          PRESIDING COMMISSIONER ST. JULIEN:   Oh.   Okay.

26  So were you pretty much alone?

27          INMATE MOORE:   Yeah, probably.

37

1          PRESIDING COMMISSIONER ST. JULIEN:  Okay.

2    Okay.  And so you're still married to your wife?

3          INMATE MOORE:  No.  We were --

4          PRESIDING COMMISSIONER ST. JULIEN:  Okay.

5    Because this just says Moore was separated from his

6    wife at the time.

7          INMATE MOORE:  No.  We've been -- we're

8    divorced now.

9          PRESIDING COMMISSIONER ST. JULIEN:  It says

10   Moore is married, but is currently going through

11   divorce proceedings.

12         INMATE MOORE:  That was --

13         PRESIDING COMMISSIONER ST. JULIEN:  So I guess

14   it's --

15         INMATE MOORE:  -- from the last hearing.

16         PRESIDING COMMISSIONER ST. JULIEN:  Oh, it's

17   dated this hearing again.  Okay.  So it took you a

18   long time to get divorced.

19         INMATE MOORE:  Uh-huh.

20         PRESIDING COMMISSIONER ST. JULIEN:  Why do you

21   think that is?

22         INMATE MOORE:  That's because, probably, she

23   probably wanted to get a divorce.  I was just moving

24   around.  I was just on the go.  I was just moving.

25   And in the life that I was in, I was just gone all the

26   time.  I was just moving all the time.

27         PRESIDING COMMISSIONER ST. JULIEN:  Okay.

38

1          INMATE MOORE:  We stayed in the same city,

2    but I was, like, I lived in self different places in

3    Sacramento.

4          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

5    then in terms of your parole plans, your mom still

6    lives in Sacramento, so you would want to live with

7    her or your nephew, Willy, also in Sacramento.  And so

8    maybe your father is deceased?

9          INMATE MOORE:  Yes.

10         PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

11   the report says that you also contacted the Walden

12   House which is a tran -- Transitional Living Program

13   in San Francisco.  And in terms of employment, you're

14   certified entry -- data entry?

15         INMATE MOORE:  Uh-huh.

16         PRESIDING COMMISSIONER ST. JULIEN:  Data entry

17   operator.  And you had planned on working in data

18   entry computer.  Okay.  And you're also interested in

19   counseling, so it looks like drug counseling, biblical

20   counseling, general life counseling.  And -- so it

21   looks like you've had an interest in religion.  And

22   when did that interest take place?

23         INMATE MOORE:  A few years back.  I got

24   involved in some programs over at the chapel.  And I

25   take that as a way of maintaining my focus, keeping me

26   focused, keeping me driven to positive things and to

27   things I need to make sure my life doesn't go back to

39

1    the way it was.

2            PRESIDING COMMISSIONER ST. JULIEN:   Okay.

3    That's a good thing.  And then -- so in terms of a job

4    offer, you don't have a -- or maybe it's -- do you

5    have a job offer written?

6            INMATE MOORE:  No.

7            PRESIDING COMMISSIONER ST. JULIEN:   No, that's

8    all right, I mean --

9            INMATE MOORE:  No.

10           PRESIDING COMMISSIONER ST. JULIEN:   -- I know

11   it's very difficult to -- to get.  It said -- the

12   report also states that you don't think you'll have

13   any problem getting a job and that you're -- what is

14   it?  Six months away from becoming an apprentice?

15           INMATE MOORE:  Oh, CSC --

16           PRESIDING COMMISSIONER ST. JULIEN:   And what is

17   it?  What side that stand for?

18           INMATE MOORE:  It's a CSC Certification.  It's

19   a wood -- wood working machine that operates by

20   computers but it does -- it cuts wood.

21           PRESIDING COMMISSIONER ST. JULIEN:   Mm.

22           INMATE MOORE:  And so and then --

23           PRESIDING COMMISSIONER ST. JULIEN:   And that's

24   your -- is that a vocation?

25           INMATE MOORE:  Yes.

26           PRESIDING COMMISSIONER ST. JULIEN:   Okay.

27           INMATE MOORE:  Well, it's not a vocation, per

40

1  se, it's a certification.  And --

2      PRESIDING COMMISSIONER ST. JULIEN:  Oh, okay.

3      INMATE MOORE:  And it's not what the

4  institution would consider a vocation.  It's part

5  of -- it's part of my training in PIA.

6      PRESIDING COMMISSIONER ST. JULIEN:  PIA, okay.

7  But it's still something that's employed.  Is it?

8      INMATE MOORE:  Oh, yes.

9      PRESIDING COMMISSIONER ST. JULIEN:

10 (Indiscernible) it looks good.  And, now, I noted one

11 thing, and Commissioner Johnson will go through this

12 I'm sure more thoroughly, but I just wanted to ask you

13 one thing that was in the Psych Report that states

14 that you needed more recovery programming.  And as we

15 talked about that before that was several years ago.

16 And it looks like you've been doing more programming.

17 Did you take the suggestion from the last Board

18 Report?

19     INMATE MOORE:  Yes.

20     PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

21 up to then, why hadn't you participated as much as you

22 probably could have in terms of recovery programming?

23     INMATE MOORE:  I took some -- when I was in

24 Solano, I took some NA classes --

25     INMATE MOORE:  Uh-huh.

26     INMATE MOORE:  -- in there.  But, truthfully, I

27 was taking them for the wrong reason at the time.  I

41

1    wasn't taking them for myself.  I wasn't taking them

2    to try to improve myself.  I was taking them, because

3    it was a requirement and was taking them for the wrong

4    reason.  That's why I stopped.  And so I just quit,

5    because it wasn't helping me.

6              PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

7              INMATE MOORE:  And there was no application.

8              PRESIDING COMMISSIONER ST. JULIEN:  And so

9    what's changed?

10              INMATE MOORE:  Now, I want to apply the

11    principles in AA and NA and any other principles that

12    are positive to my life, like I said before, to make

13    sure that I don't go back down that other road.

14              PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

15    that was in -- so that was -- when did that change

16    come?  Was it around 2000 and two, or when did you

17    decide that you needed to take advantage of the

18    programs for your (indiscernible)?

19              INMATE MOORE:  Well, the last board -- the last

20    board hearing did kind of submit the fact that I

21    needed that.

22              PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

23              INMATE MOORE:  But it did start a little while

24    before that when I got involved in religion a little

25    bit.

26              PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

27              INMATE MOORE:  That helped and it kind of

42

1    pointed me to the fact that -- that I do need some

2    help.

3              PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

4              INMATE MOORE:  You know, and I won't -- I won't

5    be able to do it on my own, and --

6              PRESIDING COMMISSIONER ST. JULIEN:  Did you

7    think that you could do it on your own before?

8              INMATE MOORE:  I think so.  I think so.

9              PRESIDING COMMISSIONER ST. JULIEN:  Okay.

10    'Cause I don't -- okay.  Okay.  And you were in a jury

11    trial?

12              INMATE MOORE:  Yeah.

13              PRESIDING COMMISSIONER ST. JULIEN:  Did you get

14    offered a plea?

15              INMATE MOORE:  Yeah.

16              PRESIDING COMMISSIONER ST. JULIEN:  Isn't

17    that --

18              INMATE MOORE:  That -- we...

19              PRESIDING COMMISSIONER ST. JULIEN:  I'm

20    still -- okay.  Okay.  So -- I'm going did go through

21    these first.  So in terms of your letters here --

22              INMATE MOORE:  Uh-huh.

23              PRESIDING COMMISSIONER ST. JULIEN:  -- we have

24    a letter from your older brother, and his name is

25    Willy G. Moore, and lives in Sacramento.  And he says,

26    I can affirm the change in my brother's character.

27    He's no longer the same person that committed the

43

1    crime nearly 20 years ago, and is a changed man.  And

2    he also extends -- he says, I would be -- I will bring

3    him home -- bring him to my home where I can provide a

4    stable environment, housing, assisting in retaining

5    counseling required, provide employment in landscaping

6    or janitorial until he can secure his own employment.

7    I'm willing to assist him in any way possible.  Okay.

8    And then I -- this must be his son?

9         INMATE MOORE:  Is there a name?

10        PRESIDING COMMISSIONER ST. JULIEN:  Willy

11   Moore.

12        INMATE MOORE:  Uh-huh.

13        PRESIDING COMMISSIONER ST. JULIEN:  You know a

14   Willy -- Willy Moore?

15        INMATE MOORE:  Willy R.

16        PRESIDING COMMISSIONER ST. JULIEN:  Oh, R.

17   Yeah.

18        INMATE MOORE:  Uh-huh.

19        PRESIDING COMMISSIONER ST. JULIEN:  I see, a

20   proper name.  Okay.  That's like he's signing junior.

21   Okay.  And he's your nephew.  And he says, I've known

22   my uncle my whole life, and I've seen him change

23   gradually from the person he was to the positive

24   person he is now.  He is a counselor and advisor in my

25   youth, which allowed me to avoid many pitfalls in

26   life.  Should you allow him a second chance, I will

27   provide housing, assistance in securing employment,

44

1  and stability as he reorients himself into society.

2  Okay.  And then Evelyn Moore and -- your mother?

3          INMATE MOORE:  Uh-huh.

4          PRESIDING COMMISSIONER ST. JULIEN:  And she

5  says, my son has taken some wrong turns in life, but I

6  believe he has put forth the effort to get his life

7  back together.  I remain in constant contact with him,

8  and he has shown dramatic improvement.  I continue to

9  offer my support, housing, and any other assistance my

10 son would require should you release him.  He can help

11 care for me, and I will take full responsibility for

12 him.  I am certain that he will be positive,

13 productive, an asset to our family, and, given the

14 opportunity, to the community.  Okay.  And then for

15 your 3042 notices -- and those are notices that go to

16 the courts and law enforcement -- letting them know of

17 the hearing.  We have a letter from the San Mateo

18 Police Department.  And it's signed by Susan Manheimer

19 who's the chief of police, M-A-N-H-E-I-M-E-R.  And she

20 says this letter is to express my agency's strong

21 opposition to parole -- a parole granted at this time.

22 Okay.  And on -- okay.  So before we move on, is there

23 anything you'd like to add about the commitment crime

24 and your future plans?

25         INMATE MOORE:  No.

26         PRESIDING COMMISSIONER ST. JULIEN:  Okay.

27 Okay.  Then Commissioner Johnson?

45

1        DEPUTY COMMISSIONER JOHNSON:  Mr. Moore, during

2    this portion of the hearing, we'll cover what you've

3    done since your last board appearance, and I prepared

4    for this by reviewing your Central File.  If there's

5    any -- once I've finished, if there's anything that

6    I've left out, you or your attorney will have the

7    opportunity to add that on.  The last hearing was June

8    of '02 here at San Quentin.  It was your initial

9    hearing.  The decision was a three-year denial.  The

10   recommendation was to upgrade vocationally and become

11   involved in self-help.  Classification score is 19,

12   Level two.  Custody Medium A.  Assignment is PIA.

13        INMATE MOORE:  Uh-huh.

14        DEPUTY COMMISSIONER JOHNSON:  And academics

15   since the last Board Report: August of '02,

16   communications; September of '03, algebra; June of

17   '04, pastoral care.  That was a college course.

18        INMATE MOORE:  These are all college courses.

19        DEPUTY COMMISSIONER JOHNSON:  Yeah.  May of

20   '05, Old Testament survey.  Self-help.  How long have

21   you been involved in AA this time?

22        INMATE MOORE:  A little over two years.

23        DEPUTY COMMISSIONER JOHNSON:  Counselor

24   Reports, AA.  Impact Module Three, October of '04,

25   January of '05, February of '05, and March of '05.

26   AA, each quarter since your last board appearance.

27   And laudatory chronos are in -- going back to the last

46

1    board appearance.  Attended classes in college

2    program.  Oh, God, I think I covered that and -- most

3    of the laudatory chronos are AA participation and

4    education; is that correct?

5         INMATE MOORE:  Uh-huh.

6         DEPUTY COMMISSIONER JOHNSON:  I noticed your

7    work grades.  I was looking at those.  The most recent

8    one dated June of this year and probably the most

9    recent one isn't in here because of the file system,

10   but June of this year.  Work grades, one above average

11   and four exceptional.  And the length of the

12   supervision was 60 months.  How long have you been in

13   that job?  60 months, that's five --

14        INMATE MOORE:  Five years.

15        DEPUTY COMMISSIONER JOHNSON:  Five years.

16        INMATE MOORE:  Yeah.

17        DEPUTY COMMISSIONER JOHNSON:  Okay.  A

18   Psychological Evaluation dated June of '02 offered by

19   Eric Rueschenberg, R-E -- R-U-E-S-C-H-E-N-B-E-R-G,

20   Ph.D. and doctor -- mental health and medical history,

21   Mr. Moore does not have a mental health history either

22   in prison or the community.  Current mental status,

23   Mr. Moore arrived for the interview promptly, was

24   appropriately groomed and dressed, shaved head,

25   closely trimmed mustache; demeanor was mild-mannered

26   and easygoing.  He was alert and well-oriented in the

27   three spears.  His speech was normal and his responses

47

1  were well-articulated.  His mood was eurythmic.  And

2  effect was broad and appropriate.  He did not endorse

3  any primary systems of depression or hypromania --

4  hypomania.  His thinking was well-integrated and

5  purposeful.  There are no indications of paranoid

6  ideation.  Memory and concentration were intact.

7  Judgment was questionable, and insight was only

8  partial.  He denied any thoughts or ideations of harm

9  to self or others.  Diagnostic impression, Access One,

10  poly-substance abuse in full remission; Access Two,

11  diagnosis deferred; Three, none; Four, incarceration;

12  Access Five, GAF of 85.  Risk for violence.  I'm going

13  to defer to the conclusion on that.  He -- he explains

14  -- Mr. -- or doctor explains the current research that

15  supports empirical-based risk assessment, and his

16  assessment is, overall, Mr. Moore appears to have low

17  to moderate rest -- risk for violence in the

18  community.  At the time of the index offense, his

19  criminal record was minor, and he had no violent

20  offenses.  However, he was heavily emerged in cocaine

21  use and the drug subculture.  According to the POR, he

22  was financially supported by the victim.  And while

23  she was at work, he rented out their room to drug

24  users.  It appeared that his life was headed in a

25  downward spiral.  In the present interview, he seemed

26  to have difficulty identifying the factors that

27  contributed to the crime.  His institutional

48

1    adjustment in prison has been favorable.  He has

2    exhibited a prosocial orientation, resuming his

3    college education, and receiving exceptional ratings

4    from his supervisors for his work performance.  He has

5    not received any CDC 115s.  He has also been an active

6    participant in religious activities.  He seems to be

7    demonstrating a level of maturity and motivation that

8    was lacking at the time of his offense.  His primary

9    concern is his lack of participation in recovery

10   programming, especially considering the circumstance

11   of his crime.  He also needs to formulate a more

12   complete parole plan that includes strategies for

13   relapse prevention.  I note in reference to that last

14   statement that this report was written in June of '02,

15   and since then, you had taken and done the positive

16   programming.  Is there anything I've left out?

17        ATTORNEY HANDLEMAN:  You -- the -- you missed a

18   couple of the college courses.  Because under the

19   lauditary (sic) -- laudatory chronos, there's actually

20   one, two, three, four, five, seven college courses

21   since spring of 2002.  I think you missed the one on

22   church leadership and administration in the summer of

23   2004.

24        DEPUTY COMMISSIONER JOHNSON:  Okay.  I think we

25   missed this one, too.

26        ATTORNEY HANDLEMAN:  Oh, yes.  Administrative

27   Services Certificate.  And there's a Ministry

49

1    Certificate, apparently.  Within -- what -- when do

2    you think that was from?

3           INMATE MOORE:  No.  It was this fall.

4           ATTORNEY HANDLEMAN:  Okay.

5           DEPUTY COMMISSIONER JOHNSON:  It was that

6    pass -- okay.  Anything else?  I return to the chair.

7           PRESIDING COMMISSIONER ST. JULIEN:  Okay.  Did

8    you strangle Claire?

9           INMATE MOORE:  Yes.

10          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

11   why didn't you tell me that?

12          INMATE MOORE:  Excuse me?

13          PRESIDING COMMISSIONER ST. JULIEN:  So why

14   didn't you mention that?  When I was talking to you

15   about what happened during -- you know, how she died,

16   how she was killed, you didn't mention that you

17   strangled her.

18          INMATE MOORE:  Oh, I'm sorry.

19          PRESIDING COMMISSIONER ST. JULIEN:  Well, don't

20   be sorry.  I mean, I'm just wond -- wondering why you

21   didn't mention it.

22          INMATE MOORE:  I assumed you knew.

23          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

24   it must have been a pretty bad fight.  Did she hit you

25   back at all or --

26          INMATE MOORE:  Yeah.  It was -- it was mutual

27   exchanges.

50

1      PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

2  just explain the insight component for another a

3  minute.  Do you know what -- beside the drug

4  influence, which I know is very significant, but

5  you're not being violent before or after?  Do you know

6  what possessed you at that point in time to become

7  that violent that you would strangle Claire and then

8  knock her into a wall or to wherever?  I mean, I know

9  you said that night was foggy, but you said -- also

10  you said that you're trying out -- to find, you know,

11  to find out what really happened, you know, to delve

12  deep inside and figure out what happened.

13      INMATE MOORE:  From my recollection, I believe

14  that -- that we were on the bed and we were arguing.

15  I believe she struck me with something.  And I have no

16  proof of that.  I have no medical anything to -- to

17  corroborate that or anything.

18      PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

19      INMATE MOORE:  All I know is that I felt a

20  painful sensation in my head.

21      PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

22      INMATE MOORE:  I don't know if I blacked out.

23  I know if I -- I don't know.

24      PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

25  I -- it looks like they had the same trouble in the

26  last hearing, because one of commissioners then is

27  saying, without copies of the Autopsy Report, which I

51

1  had asked to be provided for this hearing.  Not that

2  they're there.  We have a bit -- so that we need a

3  better understanding of the injuries to the victim.

4  Okay.  In there she says that there was some bruising.

5  Did you hit her -- had you hit her before?

6         INMATE MOORE:  No.

7         PRESIDING COMMISSIONER ST. JULIEN:  Okay.

8  Okay.  And I also, when I went over to get this

9  transcript, there's an envelope with a letter, and I

10  guess it's from your attorney.

11         ATTORNEY HANDLEMAN:  I thought you had that.  I

12  thought you had already had that.

13         PRESIDING COMMISSIONER ST. JULIEN:  Oh.  No, I

14  didn't.  I mean, I just read it now, but --

15         ATTORNEY HANDLEMAN:  Okay.

16         PRESIDING COMMISSIONER ST. JULIEN:  It's --

17  now, do you work with the prison -- California Prison

18  (indiscernible)?

19         INMATE MOORE:  Yeah.  It's a nonprofit --

20         PRESIDING COMMISSIONER ST. JULIEN:  Okay.  I

21  never heard of it before.  So -- okay.  So you wrote

22  the letter --

23         INMATE MOORE:  Right.

24         PRESIDING COMMISSIONER ST. JULIEN:  -- on

25  behalf of (indiscernible) and you're also

26  representing --

27         INMATE MOORE:  Right.

52

1          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

2     this is giving an overview of the crime of your

3     position that Mr. Moore should be found suitable.

4     Okay.

5          ATTORNEY HANDLEMAN:  Yes.

6          PRESIDING COMMISSIONER ST. JULIEN:  Okay.

7     Okay.  Do you have any other questions?

8          DEPUTY COMMISSIONER JOHNSON:  How long have you

9     been involved in -- seriously in AA?

10         INMATE MOORE:  A little over two years.

11         DEPUTY COMMISSIONER JOHNSON:  You know the

12    steps?

13         INMATE MOORE:  Pardon me?

14         DEPUTY COMMISSIONER JOHNSON:  Do you know the

15    steps?

16         INMATE MOORE:  I don't know them by memory, but

17    I know that they're all biblically based and that I

18    have -- I have a general understanding of what they

19    mean.

20         DEPUTY COMMISSIONER JOHNSON:  Do you think it's

21    important to memorize them?  Isn't that one of the --

22    one of the steps of the 12 steps?

23         INMATE MOORE:  Yeah.  I think it's important,

24    and I'm -- I'm beginning to.

25         DEPUTY COMMISSIONER JOHNSON:  Do you remember

26    any of them?

27         INMATE MOORE:  I can remember three.

53

1          DEPUTY COMMISSIONER JOHNSON:  Number 3?

2          INMATE MOORE:  Uh-huh.

3          DEPUTY COMMISSIONER JOHNSON:  What is it?

4          INMATE MOORE:  Make a conscious decision to

5    turn my will and my life over to the care of God.

6          INMATE MOORE:  You said that -- Miss --

7    Miss St. Julienne asked you about why you didn't

8    mention that you had strangled her, and your response

9    was, you thought we knew; is that correct?

10          INMATE MOORE:  Uh-huh.

11          DEPUTY COMMISSIONER JOHNSON:  If my memory

12    serves me correct, the questioning -- as she was

13    questioning -- questioning you about that was a

14    general questioning of you to find out what happened

15    to the victim in this case.

16          INMATE MOORE:  Uh-huh.

17          DEPUTY COMMISSIONER JOHNSON:  Wouldn't you

18    think it would be important that we know in this fight

19    that you strangled her?

20          INMATE MOORE:  Yeah.

21          DEPUTY COMMISSIONER JOHNSON:  Or attempted to?

22          INMATE MOORE:  Yes.

23          DEPUTY COMMISSIONER JOHNSON:  All right.  I

24    don't have anything further.

25          INMATE MOORE:  I'm -- like I said, I'm sorry

26    about that.  I thought that you had probably read

27    over.

54

1      DEPUTY COMMISSIONER JOHNSON:  Let me make a

2  suggestion to you.  Don't make any assumptions.

3      INMATE MOORE:  Okay.

4      PRESIDING COMMISSIONER ST. JULIEN:  Okay?

5      DEPUTY COMMISSIONER JOHNSON:  Okay.

6      INMATE MOORE:  Okay.

7      DEPUTY COMMISSIONER JOHNSON:  All right.

8      PRESIDING COMMISSIONER ST. JULIEN:  Because

9  some of the stuff we get ahead of the time, and some

10  of the stuff we don't.  And I'm looking for the appeal

11  in here.

12      DEPUTY COMMISSIONER JOHNSON:  Yeah.  Did you

13  appeal your case, because I can't -- I can't find it.

14      PRESIDING COMMISSIONER ST. JULIEN:  Yeah.  And

15  usually, that's the first thing I look for, and I

16  don't see it in here, but I know in the transcript it

17  talks about an appeal.

18      INMATE MOORE:  I --

19      PRESIDING COMMISSIONER ST. JULIEN:  So your

20  file is in -- incomplete.

21      INMATE MOORE:  I have it here.

22      PRESIDING COMMISSIONER ST. JULIEN:  Because you

23  appealed, right?

24      INMATE MOORE:  I went through the -- the normal

25  appeal process.

26      PRESIDING COMMISSIONER ST. JULIEN:  Yeah,

27  that's right, yeah.

55

1          INMATE MOORE:  Yeah.  That one was done.

2          PRESIDING COMMISSIONER ST. JULIEN:  Because I

3    don't have it in here.  I don't know why it's not in

4    here.  But I don't think any of us had one.  But just

5    reading in this transcript --

6          DEPUTY DISTRICT ATTORNEY GALLAGHER:  Yeah, it's

7    here.

8          PRESIDING COMMISSIONER ST. JULIEN:  -- it said

9    that you --

10          DEPUTY DISTRICT ATTORNEY GALLAGHER:  May I just

11    clarify, after the last hearing, I see a note from the

12    district attorney who attended having both the

13    appellant decision and a copy of the Autopsy Report

14    forwarded to the CDC File.

15          PRESIDING COMMISSIONER ST. JULIEN:  Yeah.  So

16    maybe they just didn't put it in the other reports.

17    It looks like it's in the C File but not anywhere

18    else, which doesn't do us any good when we're, you

19    know, reviewing at home.  So -- okay.  Well, this is

20    Heather Dun.  This is the last case, Commissioner

21    Johnson.

22          DEPUTY COMMISSIONER JOHNSON:  Shame on me.

23          PRESIDING COMMISSIONER ST. JULIEN:  That's

24    okay.

25          DEPUTY COMMISSIONER JOHNSON:  It's in his file

26    here.

27          PRESIDING COMMISSIONER ST. JULIEN:  Actually,

56

1  this wasn't -- now that you mention it, this wasn't in

2  the last case either, because I wasn't here so.  Okay.

3  Well -- we'll have to ask everybody before we start if

4  they've had an appeal this week if they appealed the

5  decision previously.  Anyway, because usually the

6  appeal would give a more vivid description of what the

7  Autopsy Report said or, you know, whatever.  But --

8  yeah, I don't think we have it.

9          **DEPUTY COMMISSIONER JOHNSON:**  Yep.

10         **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

11  Because there -- which is strange, because in the last

12  hearing, they quoted from the appeal.  So, I don't

13  know.  Okay.  Oh -- oh, he says the district

14  attorney's reading the appellant decision which I

15  haven't seen.  Yes, I guess we -- maybe the DA had one

16  and nobody else had one, too.  So -- okay.  It just

17  makes us a little -- it's a little confusing for us,

18  because we don't have, you know, we don't have all the

19  information that we should have.

20         **DEPUTY DISTRICT ATTORNEY GALLAGHER:**  Right.

21  And I think that was the reason, obviously, for

22  forwarding those two things, and his note indicates

23  that it was sent to the parole board but --

24         **PRESIDING COMMISSIONER ST. JULIEN:**  Probably

25  should be sent to --

26         **DEPUTY COMMISSIONER JOHNSON:**  It should be sent

27  to the institution --

57

1          **PRESIDING COMMISSIONER ST. JULIEN:**  Yeah.

2          **DEPUTY COMMISSIONER JOHNSON:**  -- for placement

3     into the Central File.

4          **PRESIDING COMMISSIONER ST. JULIEN:**  Yeah.

5          **ATTORNEY HANDLEMAN:**  That could be it.

6          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

7     Okay.  Okay.  And Commissioner Johnson just mentioned

8     to us but I'll say it again, it's not that, you know,

9     anybody here's interested in stepping you up or, you

10    know, or accusing you of not being forthcoming, you

11    know, or whatever, but it's very important to be, I

12    think, really clear about the crime and what happened

13    even if it's something that you have to recount from a

14    transcript even if it's something you can't remember,

15    because, like I said, I having trouble grasping how

16    knocking somebody against the wall could lead to their

17    death.  You know, and now I find out there's bruises

18    and strangulation and all kinds of things which, you

19    know, makes much more sense.  So often, I think, it

20    makes or -- you know, it's hard for you.  It might

21    even be very hard for you to come to grips with what

22    happened.  But until you can come to grips, good, bad

23    or ugly, you know, you can't move on from it.  So as

24    awful as this crime was and, you know, the injuries

25    suffered by the victim, they have to be brought out in

26    the open, and they have to be discussed, because,

27    otherwise, you know, you're not going to be able to

58

```
 1    face them and confront them and then move on.  Okay?
 2            INMATE MOORE:  Okay.
 3            PRESIDING COMMISSIONER ST. JULIEN:  Okay.
 4    Okay.  Mr. Gallagher, do you have questions for
 5    Mr. Moore?
 6            DEPUTY DISTRICT ATTORNEY GALLAGHER:  I do.  I
 7    just have a few if I might.
 8            PRESIDING COMMISSIONER ST. JULIEN:  Okay.
 9            DEPUTY DISTRICT ATTORNEY GALLAGHER:  Would the
10    board ask the inmate if he recalls the act of
11    strangulation, if he did it with his hands or with an
12    instrument?
13            PRESIDING COMMISSIONER ST. JULIEN:  Do you
14    recall that?
15            INMATE MOORE:  Hands.
16            PRESIDING COMMISSIONER ST. JULIEN:  Did you
17    hear that?
18            DEPUTY DISTRICT ATTORNEY GALLAGHER:  Good.  He
19    said hands.
20            PRESIDING COMMISSIONER ST. JULIEN:  Hands.
21    Yeah.
22            DEPUTY DISTRICT ATTORNEY GALLAGHER:  And if
23    the -- will the board ask the inmate if he recalls
24    the -- the acts actually causing death by his
25    strangulation and the infliction of the head injuries?
26    Does he also recall the specific acts of beating that
27    led up to the acts causing death?
```

59

1          PRESIDING COMMISSIONER ST. JULIEN:  Did you

2     hear is that?

3          INMATE MOORE:  What did he say?

4          PRESIDING COMMISSIONER ST. JULIEN:  I'm sorry.

5     Can you repeat the question?

6          DEPUTY DISTRICT ATTORNEY GALLAGHER:  Sure.

7     If -- if the board would ask the inmate if he recalls

8     the acts causing death, the strangling -- the

9     strangulation and the beating that caused the head

10    injury?  Does he also recall the beating of the victim

11    that led up to the acts that caused death, the

12    strangulation?  Does he --

13         PRESIDING COMMISSIONER ST. JULIEN:  Maybe

14    make it -- make it -- can you make that two -- two

15    questions.  It's kind of a compound question there.

16         DEPUTY DISTRICT ATTORNEY GALLAGHER:  If you

17    would ask the inmate if he recalls beating the victim.

18         INMATE MOORE:  Somewhat, yes.

19         DEPUTY DISTRICT ATTORNEY GALLAGHER:  If the

20    board would ask the inmate how he recalls beating her.

21         INMATE MOORE:  I mentioned before that the

22    events that led up to this are -- are sketchy.  I know

23    that there was a fight.  I know that it was brutal.

24    And I know that I had a part in that.  And all of the

25    events I'm not that clear on, but I know that I'm

26    responsible for what happened in that room.

27         PRESIDING COMMISSIONER ST. JULIEN:  Would the

60

1  board ask the inmate why he described the fight as

2  brutal?  What made it brutal?

3          INMATE MOORE:  Why I describe the fight as

4  brutal?

5          DEPUTY DISTRICT ATTORNEY GALLAGHER:  Yes.

6          PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

7          INMATE MOORE:  Because she's dead.

8          DEPUTY DISTRICT ATTORNEY GALLAGHER:  Would the

9  board ask the inmate if he would describe this fight

10  as brief or a long fight?  A short one or a long one?

11          INMATE MOORE:  As far -- as far as the duration

12  of the fight, I'm not that clear on how long it went

13  on.  By what was done in the transcripts and what was

14  brought out in court, I'm assuming that it was quite

15  extensive.

16          DEPUTY DISTRICT ATTORNEY GALLAGHER:  And would

17  the board ask the inmate if by extensive does me mean

18  that it was long over a period of time and of such

19  level that other people would have heard it?

20          INMATE MOORE:  Yes.

21          DEPUTY DISTRICT ATTORNEY GALLAGHER:  Would the

22  board ask the inmate if his inability or -- or being

23  unable to remember certain aspects of what happened is

24  due, in his belief, to the drugs that he had used?

25          INMATE MOORE:  Yes.

26          DEPUTY DISTRICT ATTORNEY GALLAGHER:  Would the

27  board ask the inmate if he has an explanation for why

61

1    when his blood was tested after arrest that it showed

2    a fairly low level of drugs in his system, and the

3    police officers didn't note that he appeared to be

4    under the influence of drugs?

5         **INMATE MOORE:** I can't --

6         **ATTORNEY HANDLEMAN:** I would clarify that or

7    object to clarify or point out that it was, according

8    to Probation Officer's Report, it was a good number of

9    hours after the actually assault had taken place when

10   the defendant was tested for drug use.

11        **DEPUTY DISTRICT ATTORNEY GALLAGHER:** Let's

12   clarify that. Would the board ask the inmate if he

13   has an explanation for why the police officers didn't

14   note he appeared to be under the influence of a

15   controlled substance when he was arrested at the

16   motel?

17        **INMATE MOORE:** Would I -- could you ask that

18   again?

19        **DEPUTY DISTRICT ATTORNEY GALLAGHER:** Sure. Do

20   you have an explanation for why the police officers

21   would say that you did not appear to be under the

22   influence?

23        **INMATE MOORE:** I don't know. I can't answer

24   for them. All I can -- all I know is that I know we

25   had done cocaine and we were on -- we had done alcohol

26   before the events that led -- during the events that

27   led up to this. And we were both under the influence

62

1  of both alcohol and cocaine.

2      **DEPUTY DISTRICT ATTORNEY GALLAGHER:**  Would the

3  board ask the inmate why he called the paramedics if

4  he had just finished strangling her?

5      **INMATE MOORE:**  I didn't want her to die, and I

6  knew that she was beyond my help.

7      **DEPUTY DISTRICT ATTORNEY GALLAGHER:**  Is --

8  would the board ask the inmate if he is aware of the

9  fact that the first degree murder conviction is based

10  on a torture theory?

11      **INMATE MOORE:**  Yes.

12      **DEPUTY DISTRICT ATTORNEY GALLAGHER:**  And would

13  the board ask the inmate if -- if drugs had been such

14  a significant part of how he came to be in custody,

15  why he didn't start narcotics anonymous until two

16  years ago.

17      **INMATE MOORE:**  I explained that before.

18      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

19      **INMATE MOORE:**  Because --

20      **PRESIDING COMMISSIONER ST. JULIEN:**  Answer.  Go

21  ahead.

22      **INMATE MOORE:**  Okay.  Because I wasn't

23  already -- I was doing it for the wrong reason, and I

24  thought that I could help myself, and I didn't think

25  that I needed those types of programs to help myself.

26      **DEPUTY DISTRICT ATTORNEY GALLAGHER:**  Okay.

27  That's all I have then.  Thank you.

63

1        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.  And

2   Mr. Handleman?  Questions?

3        **ATTORNEY HANDLEMAN:**  When -- when -- when you

4   were -- also directed through the board?

5        **PRESIDING COMMISSIONER ST. JULIEN:**  No.

6        **ATTORNEY HANDLEMAN:**  No.  Mr. Moore, when you

7   were -- on the night of the commitment offense or the

8   day of commitment offense, how many days or how

9   long -- for how long of a time did you say you had

10  been using drugs and crack cocaine and alcohol?

11       **INMATE MOORE:**  We'd been up for at least five

12  days doing drugs and alcohol.

13       **ATTORNEY HANDLEMAN:**  And had you gone to sleep

14  during those five days?

15       **INMATE MOORE:**  No.

16       **ATTORNEY HANDLEMAN:**  That's -- that's all.  No

17  further questions.

18       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

19  Okay.  And Mr. Gallagher, do you have a closing

20  statement, please?

21       **DEPUTY DISTRICT ATTORNEY GALLAGHER:**  I do.  I

22  think it's instructive, the -- the way in which some

23  of the evidence was discovered at the hearing.  I had,

24  obviously, the information as to the cause of death as

25  to how some of the other physical aspects of the

26  victim were documented and found it interesting that

27  the defendant hadn't noted anything prior to the

64

1   court, and had every intention of doing that and

2   asking why he hadn't brought forward some of the

3   specifics, because I frankly think that he is at the

4   same place that he was in 2000 and two in terms of the

5   acceptance of responsibility and understanding how he

6   came to be, where he -- where he is now and where he

7   was then.  The board, I think, had indicated the last

8   time that he needed to be more forthcoming about his

9   crime to demonstrate insight, that there was an

10  inability or unwillingness to learn how to deal with

11  stress and how to cope with it and these things made

12  him an unpredictable threat to society and, I think

13  frankly, we're still in that same place where this

14  vicious crime that went for by witness's testimony,

15  over a period of hours before the phone call was made

16  to 911 is without known motive.  There's no indication

17  what would have caused this type of violent rage, and

18  there's no information to help us, I think at this

19  point, in determining what would have caused such a

20  violent act by the defendant.  Now we're 19 years down

21  the road, it doesn't provide any type of security for

22  the public when the defendant -- I'm sorry, when the

23  inmate exhibits such little insight into himself and

24  into the certain senses of his crime.  And I'll

25  submit.

26          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

27  Thank you.  And, Mr. Gallagher -- I'm sorry.

65

1    Mr. Handleman?

2        **ATTORNEY HANDLEMAN:**  Yeah.  I think that Mr. --

3    Mr. -- first let me address the district attorney's

4    observations that there was no known motive, no

5    acceptance of responsibility.  Mr. Moore is -- has

6    been -- has looked into his offense and has seen the

7    primary role of drugs.  And a lot of what we heard

8    discussed today is crack cocaine and the fact that he

9    had a deep level of addiction to crack as did his

10   girlfriend, the Victim Claire Miller.  The -- the --

11   so there has been certainly an acceptance of

12   responsibility for becoming a drug addict and the

13   result and consequences of his drug addiction.  The

14   motive -- if argue where there's motive that's because

15   he was, as he himself stated, he was in an irrational,

16   deranged state of mind owing to the drug use.  And

17   when one is addicted to drugs, there's not a clear,

18   rational motive for one's behavior.  I -- I think that

19   looking positively about at -- at what Mr. Moore's

20   behavior here, it's his -- the tremendous amount of

21   programming that he's done since 2002, the Alcoholics

22   A the impact, the 7 college classes, most of them

23   related to, in one way or another, to bible study, all

24   points to his remorsefulness and his interest in

25   improving himself and his commitment to self

26   awareness.  I would also say as far as remorse and

27   regret go, that in addressing the matter of taking

66

1   responsibility, I would quote his most recent
2   Counselor's Report.  Moore appears very remorseful and
3   expressed his deep regret for his actions.  He
4   acknowledges his responsibility for the crime.  He
5   does not attempt to make any excuses for his actions.
6   And according to his next previous Counselor's Report
7   in June 2002, Moore appears remorseful.  He was
8   tearful throughout the interview, and he was sweating
9   profusely when talking about the details of the crime.
10  Again, he does not attempt to make any excuses for his
11  actions.  I think in addressing the question of
12  Mr. Moore's suitability, also, it's necessary to look
13  at him as a total individual, not -- not solely at the
14  commitment offense.  I mean, and when you look at his
15  life history, you see that he lacks any significant
16  history of violent crime.  That's a -- which is a
17  factor of supporting the finding of suitability.  And
18  his lack of violence is -- is attested to that, and
19  there's a letter from his wife in his C File that he's
20  never been a violent man.  That's from his
21  preincarceration wife, Marilyn Moore.  So it would
22  also be necessary that no one would deny it, least of
23  all Mr. Moore would deny it, the commitment offense --
24  that the commitment offense was, you know, was a
25  tragic episode in which somebody lost their life.  A
26  woman lost her life.  And no one in this room, I
27  think, more than Mr. Moore would want to undue that.

67

1    But one circumstance still should be noted in

2    mitigation which is that Mr. Moore tried to conduct

3    CPR on his victim when he noticed that she wasn't

4    breathing.  He called for assistance and waited for

5    the a police to arrive.  So it wasn't a premeditated

6    murder.  It was an episode which Mr. Moore has been

7    open about -- completely open about that there was

8    some -- there was some beating that went on, there was

9    various wounds which were inflicted, and the totality

10   of these wounds resulted in Miss Miller's death.  I

11   don't think that Mr. Moore has tried to be -- I think

12   he has been evasive in any way regarding the episode

13   which is that he's been clear with the fact that over

14   the course of an evening in -- in which he was in a

15   drug (indiscernible) state.  He was repeatedly violent

16   to her, and she died from one blunt force injury or

17   another.  So -- so all these factors in addition to

18   those which I've enumerated in this letter, support --

19   support finding his suitability.

20        PRESIDING COMMISSIONER ST. JULIEN:  Okay.

21   Thank you, sir.  And Mr. Moore, do you have anything

22   to add regarding your parole suitability?

23        INMATE MOORE:  Just that I -- I know that what

24   I did, I mean, it -- I have to live with that every

25   day.  And I'm not trying to mitigate anything that

26   I've done, and I'm not trying to sidestep anything

27   that I've done.  I did a terrible thing.  And I am

68

1   doing everything I can to come to terms with that.

2   I'm doing everything I can to make sure that that

3   doesn't happen again.  In any situation -- in any

4   situation and any circumstance, I'm trying to make

5   sure that -- that -- that whoever that guy was -- that

6   guy there -- doesn't come back.  That's it.

7        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay, sir.

8   Okay.  Thank you very much.  We will recess now for

9   deliberations.

10                    **R E C E S S**

11                      --oOo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

69

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3          **DEPUTY COMMISSIONER JOHNSON:**  We're back on the

4     record.

5          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.  So

6     we put them in the file.

7          **DEPUTY COMMISSIONER JOHNSON:**  They might get

8     lost.

9          **PRESIDING COMMISSIONER ST. JULIEN:**  Yeah.

10         **DEPUTY COMMISSIONER JOHNSON:**  We're not

11    authorized to put stuff in the file.

12         **PRESIDING COMMISSIONER ST. JULIEN:**  So you

13    want -- yeah, so you want -- you want to make sure you

14    give them to your counsel.

15         **INMATE MOORE:**  Okay.

16         **DEPUTY COMMISSIONER JOHNSON:**  To be -- to be

17    placed in your Central File.

18         **INMATE MOORE:**  Okay.

19         **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.  All

20    parties have returned to the room for the hearing for

21    Mr. Ronald Moore, and, Mr. Moore, we are going to deny

22    you parole at this time.  The panel's reviewed all the

23    information received from the public and relied on the

24    followed circumstances in -- including that the inmate

25    is not yet suitable for parole and would pose an

26    unreasonable risk of danger to society or a threat to

27    **RONALD MOORE    D-92538    DECISION PAGE 1    11/28/05**

1   public safety if released from prison.  Specifically,

2   as it regards the commitment offense, the offense was

3   carried out in an especially cruel and callous manner.

4   And that the victim who was the inmate's girlfriend,

5   Claire Miller, age 34 at the time, was beaten to death

6   and strangled and this took place following a -- a

7   seemingly prolonged physical altercation between the

8   two parties.  The offense was carried out in a manner

9   which demonstrates an exceptionally callous disregard

10  for human suffering in that apparently the victim had

11  several bruises and, again, was strangled and hit or

12  suffered a blow to the head which caused her to become

13  unconscious and succumb to those injuries.  And the

14  motive for the crime is inexplicable or very trivial

15  in relation to the offense, and then apparently was

16  over -- the death occurred during a fight over drug

17  use.  And these conclusions are drawn from the

18  statement of facts as they appear in the summary of

19  the crime in the November 2000 and five Board Report

20  wherein it states that the police officers were called

21  to a motel in -- on Bay Shore Boulevard in San Mateo,

22  and they found Ronald Moore who's the -- the inmate

23  with the Victim Claire Miller who was unconscious and

24  appeared to have been beaten.  At first, Mr. Moore

25  told the police that he returned home to the motel and

26  found the victim nude, unconscious and apparently

27  **RONALD MOORE     D-92538     DECISION PAGE 2     11/28/05**

71

1    beaten.  He said that the victim occasionally engaged

2    in acts of prostitution and, when she did so,

3    Mr. Moore left the room.  He said that he left on this

4    date for that reason.  The victim, who had been

5    transported to the hospital soon after the arrival of

6    the police, died of a brain injury suffered during the

7    assault.  Eventually, Mr. Moore changed his story and

8    told the officer that he and the victim used crack

9    cocaine by smoking it and became engaged in an

10   argument.  The inmate then said that the victim lied

11   to him about her use of cocaine and seeing other men

12   and having sexual relations with them in order to

13   obtain crack cocaine.  Moore stated that the argument

14   became a physical altercation between Miller and

15   himself.  As a result, the victim became unconscious

16   and Moore eventually had to give her CPR.  Later, he

17   determined that he could do nothing more to help her.

18   And while your -- in regards to the previous record,

19   there's no juvenile record.  And, however, there was a

20   failed attempt at adult probation, and there was also

21   a county jail term and this was for petty theft and

22   grand theft.  And the inmate also has a history of

23   unstable social history that includes the extents and

24   narcotics -- illegal narcotics use.  And in terms of

25   your incarceration, the inmate although you are now

26   starting to program a little more wholeheartedly and

27   **RONALD MOORE    D-92538    DECISION PAGE 3    11/28/05**

72

1   better, but since you've been here 19 years, you're

2   programmed in a limited manner while incarcerated and

3   specifically not sufficiently participated in the

4   official -- beneficial self-help and therapy programs.

5   And the Psychology Report dated May 7, 2000 and 2

6   authored by  Dr. Rueschenberg is not totally

7   supportive of release and that he gives you a low to

8   moderately low rate of future violence, and we would

9   like to see that at a low.  And in terms of your

10  parole plans, you do have viable residential plans.

11  Not in the county of last single residence, but that's

12  no longer an issue.  The board likes to parole people

13  where they would do best, so Sacramento County where

14  your family is probably the best choice for you.  And

15  you do have a marketable skill, and you do have some

16  options for employment, but we would like to see -- if

17  you could firm those up as much as possible to get

18  some -- you know, try -- I know a job offer is hard to

19  get, but perhaps you can, you know, send out letters

20  and just kind of see what response you get in your

21  chosen field.  And the hearing panel notes that in

22  response to Penal Code Section 3042 notices,

23  opposition has been expressed by the district attorney

24  of San Mateo County.  And the panel makes the

25  following findings.  The inmate needs therapy in order

26  to face, discuss, understand, and cope with stress in

27  **RONALD MOORE     D-92538     DECISION PAGE 4     11/28/05**

73

1    a nondestructive manner.  Until progress is made, the

2    inmate continues to be unpredictable and a threat to

3    others.  And the inmate need to (indiscernible) recent

4    needs to demonstrate the ability to demonstrate these

5    needs over an extended period of time.  Nevertheless,

6    we would like to commend you for being disciplinary

7    free throughout your entire incarceration and that is,

8    indeed, an exceptional accomplishment.  And you are to

9    be commended for that as well as your work in the

10   Prison Industries Authority where you're doing – where

11   you're a certified computer operator, and as well as

12   taking numerous college classes and ,again, you're --

13   you have breaking barriers and that goes back to '90,

14   '91, and '92.  And you have done the Project Impact

15   Module 3 and that's been in -- that's 2004, 2005.

16   You're AA work, and we notice you have chronos from

17   2003 to 2005, and we would encourage you to, indeed,

18   step that up and become as focused as you can.  And we

19   also see a list of probably 15 or so educational --

20   higher educational classes that you have been taking,

21   so we would definitely commend you for that and,

22   again, on your certification in computer operator and

23   as a computer operator and data entry operator.

24   However, these positive aspects of behavior do not

25   outweigh the factors of unsuitability.  And in a

26   separate decision we find that the inmate has been

27   **RONALD MOORE    D-92538    DECISION PAGE 5    11/28/05**

74

1    convicted of murder, and it is not reasonable to

2    expect that parole be granted at a hearing during the

3    next two years.  And specific reasons for that again,

4    the severity of the commitment crime, the crime was

5    committed in an especially cruel manner and that the

6    inmate and the Victim Claire Miller, 34 years old at

7    the time was beaten to death.  She was beaten,

8    strangled by the inmate.  And this was apparently over

9    the use of drugs.  The inmate was high on crack

10   cocaine, and an argument ensued between he and the

11   victim.  And apparently this victim, I mean, this

12   argument lasted quite some time.  It escalated to the

13   point of the victim being strangled, knocked to the

14   point of unconsciousness and then finally succumbing

15   to those injuries.  And we will note also for the

16   record that the inmate did not leave the victim for

17   dead, but did try to secure help.  So that would be a

18   mitigating factor.  And, however, the offense was

19   carried out in a dispassionate manner and a manner

20   which demonstrates an exceptionally callous disregard

21   for human suffering and, again, also the motive for

22   the crime is inexplicable and very trivial in relation

23   to the offense and that apparently was over the use of

24   drugs and other relationship issues.  And the inmate

25   has a history of illegal drug use, specifically crack

26   cocaine.  And the recent Psychological Report dated

27   **RONALD MOORE    D-92538    DECISION PAGE 6    11/28/05**

75

1   May of 2000 and two by Dr. Rueschenberg indicates a

2   need for a long period of observation, evaluation or

3   treatment.  Ad we're going to see the inmate complete

4   additional self-help and therapy programming which is

5   essential to his adjustment, and we feel that he needs

6   the additional time to gain such programming.

7   Therefore, I want your period of observation and

8   evaluation of the inmate as required before the board

9   should find that he is suitable for parole.  And we

10   would recommend that you remain disciplinary free,

11   and, if available, participate in self-help and

12   therapy programming and also cooperate with clinicians

13   in the completion of a new Psychological Evaluation

14   which we have ordered the department to do prior to

15   your next hearing.  Commissioner?

16        **DEPUTY COMMISSIONER JOHNSON:**  Additionally,

17   the -- if the DA would send to the Department of

18   Corrections the -- the appeal decision and the Autopsy

19   Report.  And personally, Mr. Moore, I think, you know,

20   I feel personally like you are remorseful, but you

21   haven't articulated that if you know what I mean.  So

22   in doing -- in participating in the Psychology

23   Evaluation, you need to take a look at -- you know,

24   because you haven't told, I mean, you're -- you're

25   responses to the a DA's questions -- to Commissioner's

26   questions were totally inadequate, and -- but I -- but

27   **RONALD MOORE**     **D-92538**     **DECISION PAGE 7**     **11/28/05**

76

1    I believe you are -- you are remorseful.  You just

2    don't know how to articulate that so work on doing

3    that.  And I -- as she said, I commend you for your

4    programming, it's absolutely excellent.  You know,

5    I -- I worked longer in corrections than you've been

6    here and -- and to see somebody go that long without

7    disciplinaries, that's -- that's remarkable.  So good

8    luck to you.

9         **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.  And

10   I concur in those comments, too.  Okay.  Good luck to

11   you, sir.  And now we will adjourn the hearing now.

12   And it is 6:20 p.m.

13                      --oOo--

14

15

16

17

18

19

20

21

22   PAROLE DENIED TWO YEARS            MAR 2 8 2006

23   THIS DECISION WILL BE FINAL ON:_____

24   YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

25   DATE, THE DECISION IS MODIFIED.

26   RONALD MOORE    D-92538    DECISION PAGE 8    11/28/05

77

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, CAROL CHASE, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 76, and which

recording was duly recorded at CALIFORNIA STATE

PRISON, SAN QUENTIN, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING of RONALD

MOORE, CDC NO. D-92538, on NOVEMBER 28, 2005, and that

the foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated DECEMBER 19, 2005, at Sacramento,

California.

CAROL CHASE
TRANSCRIBER
**PETERS SHORTHAND REPORTING**