# EXHIBIT D

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

FILED

FEB -7 1990

THE PEOPLE,

      Plaintiff and Respondent,    A043199

      v.    (San Mateo Super
          Ct. No. C-17391)

RONALD JOE MOORE,

      Defendant and Appellant.

_____/

    A jury found defendant Ronald Joe Moore guilty of
first degree murder (Pen. Code, § 187; all section references
herein are to that code unless otherwise noted), finding true
special allegations which made him ineligible for probation
(§ 1203.075).  Sentenced to prison for 25 year to life (§ 190,
subd. (a)), he appeals claiming various errors at trial.  We
find no reversible error and so will affirm the judgment.

BACKGROUND

    The victim was Claire Miller, with whom defendant was
living at the Royal Lodge in San Mateo.  Defendant strangled and
beat her there in the early morning hours of November 10, 1986.
The case was tried on a theory of first degree, torture murder
(§ 189), with the jury also instructed on alternative lesser
offenses of second degree murder and voluntary and involuntary
manslaughter.

We focus principally on evidence as to the cause and timing of the victim's injuries since defendant challenges the sufficiency of the evidence of torture.

Defendant assaulted the victim sometime between the hours of midnight and probably 6 a.m. on Monday, November 10. Medical aid was not rendered until about 2 p.m., and she was pronounced brain dead at about 4 p.m., after emergency efforts briefly produced a heartbeat but failed to revive her.

Residents of neighboring rooms apparently heard the assaults. Francesca Cacho, in an adjacent room, was awakened by piercing screams sometime between midnight and 2 a.m. She heard door slamming, glass breaking and a woman pleading, "God, somebody please help me." Roommate Hershie Collins also heard the commotion, for a couple of minutes, adding that she heard thumping sounds like a body falling down stairs or hitting a wall.

Dennis Lastra, who occupied a room on the floor below, heard an argument between 2:05 and 2:10 a.m., after returning home from work. He heard a woman scream out twice, about three minutes apart, "Don't hit me," her voice sounding more fearful the second time. Co-occupant Tonya Allen testified at trial that she did not hear anything but, according to an officer who interviewed her on the afternoon following the assault, reported having been awakened near 4 a.m. by a woman screaming, "Don't hit me anymore."

At 1:50 p.m., an officer responding to a call of a domestic disturbance at the motel found the victim lying across

2

the bed in the room (#229), face up, eyes wide open and fixed, blood around her nose, and with no discernible pulse or breath. Defendant appeared upset or hysterical at first but helped the officer administer C.P.R. until paramedics arrived. The victim had on only jeans, with a blouse draped across her chest. The room was in disarray. A nearly empty whiskey bottle sat on the nightstand, and the victim's purse lay upended on the floor, its contents strewn about.

Defendant told police on the scene that he had left the room at 5 or 6 a.m., to go for a walk while the victim prostituted herself, and then returned between 11 a.m. and noon to find her unconscious on the bed and the door ajar. He repeated that story at the police station, adding that she periodically used the room for prostitution, that they used crack together, and that he occasionally rented the room to narcotics users. Defendant appeared uninjured but complained of a sore tailbone, refusing medical treatment.

Police suspicion focused quickly on defendant, partly because police noticed that he had unusually long fingernails which could have caused two crescent-shaped wounds on the victim's upper throat. After reviewing defendant's statement with him, officers falsely announced to him that the victim had regained consciousness and given a statement. (She had already been pronounced dead.) Defendant looked surprised though not at all relieved to hear this and immediately asked to know what she had said.

When asked to give his side of the story, defendant

changed his story, admitting arguing and struggling with her. He said they shared half a gram of rock cocaine on the afternoon before (Sunday) and argued about their drug use. He wanted them to quit and her to stop the prostitution. The argument turned to shoving, and he thought she struck her head on something as they struggled on the floor. He ripped off a pink blouse she was wearing. She fell to the floor at one point, hitting a wall heater grate. He grabbed her by the neck and pounded her head against the floor to stop her from fighting and screaming. He became angrier when she kicked him in the testicles as he sat on top of her on the floor and then called him names.

Having made those admissions, defendant agreed to give a taped statement. When informed that the victim was in fact dead, he snapped his head up and became upset but then gave the statement anyway, although in a less responsive and detailed manner.

An autopsy showed that the victim died of pressure on the brain caused by swelling and subdural hemorrhage, trauma consistent with her head having been pounded against the floor. She had also been painfully strangled, long enough to cause asphyxiation. Petechiae, a sign of prolonged oxygen deprivation, was present under the eyelids and on the surface of the heart. Her thyroid cartilage (voice box) was squeezed until it fractured and hemorrhaged. Muscles in her neck were hemorrhaged, and there were crescent-shaped wounds on her neck consistent with manual strangulation in which fingernails were dug into the tissue. There were many blows to her head, ears and face. A

4

total of 28 separate areas of bruising, 2 areas of laceration and 10 abrasions (scrapes) appeared on the body. Defensive bruises and cuts on hands and feet appeared, and a knee showed a pattern injury consistent with her being forced down into a kneeling position. Rug burns on her back pointed to a struggle during the strangulation, with defendant straddling her. Examining the bruises and the progress of inflammation indicated trauma inflicted anywhere in a range of 6 to 12 hours before death. Another examination of the injuries suggested that they were between 12 and 24 hours old.

Defendant testified, elaborating on his statements to police and claiming that his actions were aggravated by alcohol and cocaine use. After alternately smoking cocaine, resting and watching television that night, he left the room at dawn to buy more crack cocaine and returned within 10 minutes. Miller accused him of using more than his share of crack, giving it away to other women and being with "nigger bitches" while she was away at work. The argument turned physical when she called him a "stupid nigger" and slapped him. He went for her purse, fearing that she had a knife in it, and she struck him with the telephone receiver. In the course of the fight, he struck and pushed her, dragged her on the floor and straddled her. When she kneed him in the groin, he grabbed her by the shoulders or neck, "trying to shake some sense into her."

The struggle, he testified, lasted only 5 to 10 minutes in all and ended when the victim fell back against the wall, motionless and staring, but still breathing. Unable to

5

get a response from talking to her, he lifted her onto the bed, wiped off her face and rolled her on her side, but still got no response. He passed out next to her and, alarmed when he awoke to find her breathing shallowly, called "911."

The defense offered expert testimony suggesting that defendant might have suffered from a cocaine-induced transient psychosis, which produces delusions and explosive violence, or at least acted under the influence of cocaine. Defendant testified that he and the victim smoked crack off and on over the three days prior to her death and, within the hour before the struggle, shared three quarters of a gram of crack, which he purchased at dawn.

The cocaine-influence defense was seriously undercut, however, by expert testimony showing that, based on stipulated levels of cocaine metabolites found in his and her blood and urine, their cocaine use was far less and/or far more remote in time than claimed. A prosecution expert found it unlikely that defendant suffered from cocaine psychosis, and defendant himself admitted to police having used crack only once or twice a week. The same expert said that three quarters of a gram of cocaine, even if shared, was a near lethal dose inconsistent with the physical evidence.

The victim was 5 foot, 1½ inches tall, weighed 104 pounds and was severely beaten. Defendant, who testified that he weighed 125 pounds, bore no apparent signs of being under the influence of drugs or of having suffered physical harm in the struggle. It was stipulated that fingernail scrapings taken

6

from him showed the presence of blood.

APPEAL

I

Defendant moved at the close of his case for acquittal (§ 1118.1) based on assertedly insufficient evidence of torture, but the motion was denied. He urges error in that ruling and in the later denial of his motion for a new trial (§ 1181, subd. 6) brought partly on the same ground.

The timing of the rulings allows us to review them in a single discussion. A trial court tests for substantial evidence in ruling on an acquittal motion (<u>People</u> v. <u>Bloyd</u> (1987) 43 Cal.3d 333, 350; <u>People</u> v. <u>Lines</u> (1975) 13 Cal.3d 500, 505) while to some degree reassessing the evidence in passing on a new trial motion (<u>People</u> v. <u>Robarge</u> (1953) 41 Cal.2d 628, 633-634). However, our review of either motion on appeal hinges on whether substantial evidence supported the denials when made. The evidence at the time of the two rulings here differed only in that, after the acquittal motion, some brief and largely cumulative rebuttal evidence about defendant's drug use came in.

"Murder by torture requires that the acts which caused the death involve a high degree of probability of death, and the defendant intend to cause pain for the purpose of revenge, extortion, persuasion, or any other sadistic purpose. . . . The killer is not satisfied with killing alone, but wishes to cause pain and suffering. . . . The nature of the victim's wounds is not determinative of the issue of intent to torture; rather, there must be other evidence of intent to cause suffering. . . .

7

However, the condition of the body is a circumstance to be con-
sidered along with other circumstances in determining the suffi-
ciency of the evidence . . . . Our Supreme Court has reversed
convictions based on a torture-murder theory in spite of the
gruesome condition of the victim's body when the evidence showed
the killing resulted from an explosion of violence rather than
from a cold-blooded intent to inflict pain. . . ." (People v.
Campbell (1987) 193 Cal.App.3d 1653, 1669, citations omitted.)

Defendant focuses on the needed intent to cause pain
and suffering, arguing that the evidence shows only one or more
"explosions of violence" triggered by cocaine abuse and taunts.
However, reviewing the entire record in the light most favorable
to the judgment, as we must (People v. Johnson (1980) 26 Cal.3d
557, 576-578; People v. Barnes (1986) 42 Cal.3d 284, 303-304),
we conclude that a rational finder of fact could conclude beyond
a reasonable doubt that the requisite "premeditated intent to
inflict extreme and prolonged pain" (People v. Morales (1989)
48 Cal.3d 527, 559; People v. Steger (1976) 16 Cal.3d 539, 546,
emphasis deleted) motivated the attack or attacks.

The nature and variety of injuries clearly support
murder by torture. (Cf. People v. Davenport (1985) 41 Cal.3d
247, 269.) The victim was choked to the point of asphyxiation,
had her thyroid cartilage crushed, was bruised, scraped or cut
all over her body, and had her head repeatedly bashed against
the floor, the latter trauma causing death hours later from two
large subdural hemorrhages. Strangulation, though inherently
malicious and cruel, does not necessarily indicate torture

8

(People v. Bender (1945) 27 Cal.2d 164, 170, 177-178), but it is
a strong indicator when coupled with other inferences of intent
(People v. Caldwell (1955) 43 Cal.2d 864, 865, 869-870 [prior
threats]) or where the strangulation is unusually forcible
(People v. Morales, supra, 48 Cal.3d 527, 541, 560 [belt used
until it broke]).  Here the voice box was crushed, fingernails
were dug into the neck, and the choking continued for "several
minutes" -- long enough to asphyxiate.

        There are also other inferences of intent.  We must
assume in support of the judgment that jurors rejected the claim
that all of the victim's injuries took place after dawn, in the
space of 5 or 10 minutes.  Witnesses heard frantic pleas to stop
the beating up to six hours earlier, and defendant's claim of
having purchased and consumed cocaine at dawn is belied by all
the stipulated laboratory evidence of his and her drug use.
Jurors must also have rejected the idea that he acted under the
influence of cocaine or a transient psychosis.  Lack of signifi-
cant intoxication in either defendant or the victim implies a
calculated intent to inflict pain and suffering, rather than one
or more unplanned explosions of violence.  (Cf. People v. Tubby
(1949) 34 Cal.2d 72, 78 [animal fury unleashed when inhibitions
removed by alcohol]; People v. Anderson (1965) 63 Cal.2d 351,
358-360 [defendant had a .34 blood-alcohol level hours after the
killing]; People v. Bender, supra, 27 Cal.2d 164, 170, 172-173,
177-178 [jealous rage while drunk].)

        Jurors could have found, then, that defendant began his
assault much earlier in the morning, with a clear head, and made

                                 9

up the story about a post-dawn altercation (and passing out) to
hide the ugly fact that he left her to suffer from grave injury,
including a crushed throat, for as long as 10 hours. Merely
abandoning a victim to suffer after such an assault may not say
much about torturous intent (People v. Kerr (1951) 37 Cal.2d 11,
15), but standing by while the victim suffers does (People v.
Campbell, supra, 193 Cal.App.3d 1653, 1670). Defendant's own
admissions about events leading to the assault provide ample
reason to infer retaliation or punishment. Jurors were entitled
to reject his preposterous claim that this kind of beating was
needed to stop a weaponless, 104-pound woman from fighting,
especially when defendant bore no visible signs of injury.

Finally, there is evidence from which to infer a
prolonged assault, which further supports the intent to inflict
severe pain and suffering. (People v. Steger, supra, 16 Cal.3d
539, 548.) Violence and screams were heard from 2 a.m., or
earlier, until as late as 4 a.m. Defendant stresses that the
forensic pathologist who performed the autopsy could not say for
sure, from a microscopic examination of tissues, whether the
victim's bruises were inflicted over several hours or over some
shorter time period. However, as the trial judge noted in deny-
ing the motion for acquittal, autopsy photos showed distinctly
different coloration (aging) of the bruises, something within
jurors' common experience to assess. The neurosurgeon who
declared the victim brain dead (at 4 p.m.) testified, based on
seeing the coloration of the bruises in person and in the
photos, that the bruises were from 12 to 24 hours old and that

10

swelling in <u>some</u> of the injuries had already begun to subside,
something which takes 12 or so hours to occur.

II

Defendant contends that the court erred by giving the
following, modified version of CALJIC No. 8.11, over objection,
as the definition of implied malice (numbers and emphasis ours):

"Malice is implied [1] when the killing results from an
intentional act involving a high degree of probability that it
will result in death, which act is done for a base, antisocial
purpose and with a wanton disregard for human life <u>or</u> [2] when
the killing results from an intentional act, the natural conse-
quences of which are dangerous to life, which act was deliber-
ately performed by a person who knows that his conduct endangers
the life of another, and who acts with conscious disregard for
life, <u>while actually appreciating the risk involved</u>."

This part of CALJIC No. 8.11 was drafted in response
to language in <u>People</u> v. <u>Watson</u> (1981) 30 Cal.3d 290 (<u>Watson</u>),
where the high court noted that implied malice always requires
a subjective appreciation of the risks involved (pp. 296-297)
and referred to the two prongs ([1] and [2] above) as two ways
of conveying the same state of mind (p. 300). Defendant argues
that the first prong of the instruction erroneously allowed the
jury to find implied malice using an <u>objective</u> rather than sub-
jective determination of risks involved. He offered a clarify-
ing instruction below, but the court refused it, opting instead
to modify the CALJIC instruction by adding the last phrase
quoted above, while "actually appreciating the risk involved."

11

The problem with the added phrase, he urges, is that it might be understood as modifying only the second prong of the instruction, while it is the first prong of which he complains.

The Supreme Court has resolved this basic issue in People v. Dellinger (1989) 49 Cal.3d 1212 (Dellinger), a case handed down after oral argument herein.  Agreeing with a recent opinion by Division One of this court in People v. Benson (1989) 210 Cal.App.3d 1223 (review den. Aug. 10, 1989) and disapproving contrary authority, Dellinger held that "the 'wanton disregard for human life' definition of implied malice does adequately convey to the jury that defendant need be shown to have subjectively appreciated the life-threatening risk created by his conduct." (Dellinger, supra, at p. 1217.)  Calling the "wanton disregard" prong "a superfluous charge" which need not be given in future cases, the court nevertheless found no error in the instruction as found in the 1983 revisions of either CALJIC Nos. 8.11 or 8.31.  (Id., at p. 1221.)  It follows that no error occurred here.

Dellinger does warn of "the potential for exploitation of the two-pronged instruction when combined with affirmative arguments to the jury that defendant could be found guilty . . . even without subjective awareness of the risk" but found no such arguments in that case.  (49 Cal.3d at p. 1221 fn. 1 .)

Defendant isolates parts of the prosecutor's arguments in an effort to show such a misstatement.  However, at no time did the prosecutor affirmatively say that subjective awareness of the risk was not required.  In fact, as defendant candidly

12

notes, the prosecutor stated twice that such an awareness <u>was</u>
needed, and defense counsel did the same.

Finally, further support for rejecting the claim of
error here is that the trial court modified the parallel CALJIC
instruction on implied malice (No. 8.31) so as to merge the two
prongs into a single test which explicitly required actual
awareness.  No error has been shown.

### III

Defendant next claims numerous instances of misconduct
in the prosecutor's examination of witnesses and argument to the
jury.  We find no prejudicial error and no merit to an alternate
claim that counsel's failure to object and seek admonitions was
ineffective assistance.

### <u>Misconduct</u>

Defendant devotes over 20 pages of briefing to claimed
misconduct, yet the record shows that trial counsel objected in
only one, relatively innocuous, instance.  In cross-examining a
defense psychiatrist about whether defendant may have suffered
from cocaine psychosis, the prosecutor tried to emphasize that
input from defendant himself was the only source of information
the expert had, asking:  "And the only other person who was
there, as best any of us know, is Claire Miller, and she's not
talking, right?"  The court sustained a defense objection (argu-
mentative and gruesome).  There was no answer for the jury to
be told to disregard, and jurors were instructed generally not
to draw inferences from questions to which objections were sus-
tained.  This clearly cured any prejudice.

13

In none of the remaining instances did counsel object or seek a curative or limiting instruction. Under settled law, defendant has waived his right to complain on appeal unless a prompt objection and admonition could not have cured the harm. (People v. Bittaker (1989) 48 Cal.3d 1046, 1098, mod. 49 Cal.3d 501b; People v. Edelbacher (1989) 47 Cal.3d 983, 1030; People v. Green (1980) 27 Cal.3d 1, 34.) A brief review of the claimed misconduct shows that any prejudice could have been cured.

Defendant complains that the prosecutor misstated the law in various respects during argument. In part II (ante), we noted that there were no affirmative misstatements on implied malice. Without passing on other parts of this argument, it is enough to note that prompt objections obviously would have cured any harm. The prosecutor also cautioned jurors to rely on the instructions as given by the trial judge. Moreover, defendant makes no attempt to show that the prosecutor acted in bad faith, an essential element for showing that misstating the law is misconduct. (People v. Bonin (1988) 46 Cal.3d 659, 702.)

Any impropriety in the prosecutor editorializing and lacing his questioning with opinion could easily have been cured by proper objection and admonitions. Defendant cannot complain, as he tries to do, that the number of such comments prevented cure. Appropriate objections presumably would have cut short any misconduct.

Also carable were instances where it is claimed that the prosecutor mischaracterized testimony or the defense theory of the case. Many of those instances appear, in any event, to

14

be permissible hyperbole based on inferences in the record.

The only debatable instance is where the prosecutor, responding to defense criticism for not producing a taped statement of one witness who heard screams, said: "I hate to tell you, ladies and gentlemen, there is also all kinds of evidence in the room you haven't seen. We don't have to bring in [a] Bekins moving van to bring in all the evidence we have. You wouldn't want that. You would be here for several months." That response, while most likely intended to play on the court's instruction that neither side was required to produce all available evidence (CALJIC No. 2.11), could have invited speculation that the People had additional proof and, thus, as referring to facts not in evidence. (People v. Bolton (1979) 23 Cal.3d 208, 212.) However, no particular piece of evidence was mentioned, and an objection and admonition or clarification certainly would have been an effective cure. (Cf. People v. Ratliff (1986) 41 Cal.3d 675, 690; People v. Beach (1983) 147 Cal.App.3d 612, 629.)

Ineffective assistance

We reject the notion that counsel's failure to object constituted ineffective assistance. Defendant must show that "(1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's deficient representation subjected the defense to prejudice, i.e., there is a reasonable probability that but for counsel's failings the result would have been more favorable. [Citations.]" (People v. Bell (1989)

15

49 Cal.3d 502, 546.)

    Defendant fails to meet the first component of his
burden -- deficient performance.  Where the record, as here,
sheds no light on why counsel acted or failed to act in the
manner challenged (i.e., counsel was not asked to explain), we
must reject the claim "although we may doubt that a satisfactory
explanation could be provided . . . ."  (Ibid., citing People
v. Pope (1979) 23 Cal.3d 412, 426.)  This is so even if the
record shows misconduct.  (Id., at p. 547.)  In Bell, failure
to object to instances of misconduct far more egregious than
those urged here was held to fall within the realm of reasonable
competence.  (Id., at pp. 531-542.)  We reach the same result.

                              IV

    Defendant moved toward the start of his case to admit
testimony from an older brother and a nephew who, according to
an offer of proof, would relate how he was peaceful by nature
before starting to use drugs in the summer of 1986; that he had
been nonviolent throughout the breakdown of a marriage involving
infidelity similar to the infidelity of which he accused Claire
Miller; that he underwent gradual mental and physical changes as
his drug use progressed; that he became increasingly withdrawn
and reclusive; that he valued his relationship with Miller; and
that the violence resulting in Miller's death surprised the
family as being unlike him.  Counsel stated that a psychiatrist
would rely on that same information to render an opinion about
defendant's mental state on the day of the killing.  The purpose
was to show a gradual, drug-based change which would tend to

                              16

show that the homicide was the result of cocaine use and other stresses, thus negating malice.

The court ruled the brother and nephew's testimony inadmissible, apparently finding it to be character evidence barred under the Evidence Code.

Defendant claims prejudicial error, arguing that the Truth-in-Evidence provision of Proposition 8 (Cal. Const., art. I, § 28, subd. (d)) has abrogated any such code restrictions (cf. People v. Harris (1989) 47 Cal.3d 1047, 1080-1082; People v. Lankford (1989) 210 Cal.App.3d 227, 235-240, review denied Aug. 9, 1989); that the testimony was offered not to prove conduct (the killing was admitted) but to show a mental condition affecting whether he actually formed a required mental state (Pen. Code, §§ 28-29); and that any code restrictions on such evidence deprived him of his due process right to present a defense. The People respond on the merits and urge harmless error in any event.

We shorten the discussion by assuming error for sake of argument because any error was clearly harmless. Although the brother and nephew did not testify, the psychiatrist did. He explained in detail how he based his opinions in part on interviews with the brother and nephew, as well as a statement by defendant's mother.

The expert revealed virtually everything which, according to the offer of proof, the nephew and brother would have said themselves -- plus the mother's corroborative views. No prejudice appears.

17

**V**

The jury was instructed in the language of CALJIC No. 8.75, to the effect that it could not return verdicts on lesser forms of homicide until it first unanimously agreed to acquit on any greater offenses. Defendant claims prejudicial error. We disagree.

First, the very Supreme Court authority on which he relies indicates that no error occurred. An "acquittal-first" instruction is proper to the extent that it controls the order in which jurors return verdicts on greater and lesser offenses; it is improper only if it prevents jurors from <u>discussing</u> or <u>considering</u> lesser offenses before returning verdicts on the greater ones. (<u>People</u> v. <u>Kurtzman</u> (1988) 46 Cal.3d 322, 330.) The Supreme Court in <u>Kurtzman</u> noted <u>ambiguous</u> language in CALJIC No. 8.75 that <u>could</u> confuse jurors on how deliberations should proceed, but the court stopped short of finding error in the instruction alone. (<u>Id</u>., at p. 336.) What <u>Kurtzman</u> condemned as error (and found harmless) was a trial court's amplifying "interpretation" which misinformed jurors that they could not <u>consider</u> lesser offenses beforehand. (<u>Id</u>., at pp. 335-336.)

Here, only the unamplified instruction was given, and the Supreme Court has clarified that this alone does not amount to error. CALJIC No. 8.75 itself does not "purport to instruct the jury to determine whether the defendant is guilty of the greater offense before 'considering' any lesser offense." (<u>People</u> v. <u>Adcox</u> (1988) 47 Cal.3d 207, 242, mod. 47 Cal.3d 1106a, citing <u>Kurtzman</u>.) Accordingly, where the instruction is

18

not improperly embellished and where "nothing in the record of
deliberations [suggests] that the jury had great difficulty, or
was divided, . . . no error is shown." (Ibid.; see also People
v. Hernandez (1988) 47 Cal.3d 315, 352 [no apparent disagreement
or deadlock, no long deliberations and no requests for readbacks
or further instruction].) Such analysis might at first suggest
a test of prejudice rather than error, yet the Supreme Court is
clear, even using quotation marks in one case to call defense
counsel's request of the instruction "invited 'error' . . . ."
(People v. Hernandez, supra, 47 Cal.3d at p. 353.)

Here there was no embellishment and no indication of
disagreement or deadlock to suggest that jurors were misled by
ambiguity in the instruction. Jurors completed their task in
just 5½ hours, after 6 days of testimony in an 11-day trial.
They asked for a readback of a toxicologist's testimony about
blood alcohol and cocaine metabolite levels in defendant and
the victim, but this does not signify disagreement. Also, as
the Attorney General notes, the prosecutor invited jurors in
closing arguments to approach the case by considering second
degree murder first and then working their way up to torture
murder, which tends to show that jurors did not feel bound to
consider only first degree murder before returning a verdict.

No error appears. By a similar analysis, the lack of
any record indications that jurors were misled by ambiguity in
the instruction means that prejudice does not appear, assuming
for sake of argument that error did occur.

19

## VI

Defendant contends that if no error caused him legal prejudice standing alone, a combination of them did.  However, taking together the single cognizable act of misconduct found in part III and the evidentiary ruling assumed to be error for sake of argument in part IV, there still was no miscarriage of justice.  (Cal. Const., art. VI, § 13.)

### DISPOSITION

The judgment is affirmed.


_____
Smith, J.

We concur:

_____
Kline, P. J.

_____
Peterson, J.