# EXHIBIT   G, PART 1

MC-275

Name  **RONALD MOORE**

Address  SAN QUENTIN STATE PRISON

SAN QUENTIN, CA 94974

CDC or ID Number  D-92538

CMS
**F I L E D**
SAN MATEO COUNTY
SEP 1 3 2006
Clerk of the Superior Court
By _____
DEPUTY CLERK

## CALIFORNIA SUPERIOR COURT

### IN AND FOR THE COUNTY OF SAN MATEO

(Court)

**RONALD MOORE,**

Petitioner

vs.

**ROBERT AYERS, Warden,**

Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. _____SC017391A_____

(To be supplied by the Clerk of the Court)

### INSTRUCTIONS – READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.
- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 (Rev. January 1, 1999)

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rules 56.5, 201(h)

6.  GROUNDS FOR RELIEF

Ground 1:  State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

See "**INSERT A**", "**INSERT B**," and "**INSERT C**" – **GROUND 1, 2, and 3**

Attached pages 1 through 17

a.  Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

b.  Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

GROUND 1

THE BOARD OF PAROLE HEARING'S FINDINGS THAT PETITIONER POSES A CURRENT UNREASONABLE RISK OF DANGER TO SOCIETY OR THREAT TO PUBLIC SAFETY IF RELEASED FROM PRISON IS NOT SUPPORTED BY "SOME EVIDENCE" AND THEREFORE IS ARBITRARY AND CAPRICIOUS IN VIOLATION OF STATE AND FEDERAL (14th Amendment) DUE PROCESS.

On November 28, 2005, Ronald Moore, "Petitioner," appeared before the Board of Parole Hearings ("Board") for his subsequent hearing. The Board found petitioner poses an reasonable risk of danger to society or a threat to public safety if released from prison. The record (Exhibit A, Board Hearing Transcripts ("BT")) shows that the Board based its decision on unchanging factors of the crime and precommitment behavior, which are: 1) already used in formulating the guidelines for setting terms; 2) had not been found true by a jury or court; 3) already been used at the sentencing hearing by the trial judge; and 4) used to deny Petitioner parole at his initial parole consideration hearing. (See Exhibit B, "Initial" Parole Consideration Hearing, Decision portion of transcripts.) The record also indicates that the Board failed to give proper consideration of petitioner's post-commitment offense factors that indicate remorse, rehabilitation, and suitability for parole. The Board stated reasons to deny parole, in pertinent part are:

1. [T]he offense was carried out in an especially cruel and callous manner. ... The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering in that apparently the victim had several bruises and, again, was strangled and hit or suffered a blow to the head which caused her to become unconscious and succumb to those injuries. ... And the motive for the crime is inexplicable or very trivial in relation to the offense, ... (BT 70.)

2. And while [ your ] -- in regards to previous record, there's no juvenile record. And, however, there was a failed attempt at adult probation, and there was also a county jail term and this was for petty theft and grand theft. (BT 71.)

3. And the inmate also has a history of unstable social history that includes the extents and narcotics -- illegal narcotics use. (BT 71.)

1.

4. And in terms of [your] incarceration, the inmate although [you] are now starting to program a little more wholeheartedly and better, but since [you've] been here 19 years, [you're] programmed in a limited manner while incarcerated and specifically not sufficiently participated in the official -- beneficial self-help and therapy programs. (BT 71-72.)

5. And the Psychological Report dated May 7, 2000 and 2 authored by Dr. Rueschenberg is not totally supportive of release and he gives a low to moderately low rate of future violence, and we like to see that a low. (BT 72.)

6. And the hearing panel notes that in response to Penal code Section 3042 notices, opposition has been expressed by the district attorney of San Mateo County. (BT 72.)

7. The inmate needs therapy in order to face, discuss, understand, and cope with stress in a nondestructive manner. Until progress is made, the inmate continues to be unpredictable and a threat to others. (BT 72-73.)

After finding Petitioner unsuitable for parole Presiding Commissioner,

St. Julien, commended Petitioner for the following:

[W]e would like to commend you for being disciplinary free throughout your entire incarceration and that is, indeed, an exceptional accomplishment.

[A]s well as your work in the Prison Industries Authorities where you're doing - where you're a certified computer operator, and as well as taking numerous college classes and, again, you're -- you have breaking barriers and that goes to '90, 91, and '92. And you have done the Project Impact Module 3 and that's been in -- that's 2004, 2005. You're AA work, and we notice you have chronos from 2003 to 2005, and we would encourage you to, indeed, step that up and become as focused as you can. And we also see a list of probably 15 or so educational -- higher educational classes that you have been taking, so we would definitely commend you for that and, again, on your certification in computer operator and as a computer operator and data entry operator.

(Exhibit A, BT at 73.) The record shows that the Board ignored the avalanche of appositive evidence that supports a finding of suitability and instead continued to rely on the unchangeable factor or the commitment offense. "[W]e find that the inmate has been convicted of murder, and it is not reasonable to expect that parole be granted at a hearing during the next two years." (BT 73-74.)

2.

The Board's reason[s] to deny parole must be supported by "some evidence" pertinent to the "relevant standards" promulgated by the Board to comply with constitutional due process. (In re Rosenkrantz, supra, 29 Cal.4th at pp. 657-658 & 675-677; see also In re Dannenberg, supra, 34 Cal.4th at pp. 1071, 1084, 1095, fn. 16.) This requires a Board panel's decision to deny parole to "have some rational basis in fact." (Scott II, 133 Cal.App.4th at p. 590, fn. 6.) As the administrative record of the Board's review and consideration of the pleadings make clear, there simply is no such rational basis supporting the Board's decision to deny Petitioner parole.

This is another case which demonstrates the Board's usage of a boiler-plate denial of using the gravity of the offense as the basis to deny parole regardless of a prisoner's efforts and showing of rehabilitation. Putting aside the pre-commitment factors, which were non-violent, and commitment offense, "all other factors indicate [Petitioner] is suitable for release on parole." (Scott II, supra, 133 Cal.App.4th at 594.)

The Rosenkrantz Court, citing Minnis, reaffirmed the principle that:

> [E]ven before factors relevant to parole decisions had been set forth expressively by the statute and by regulation, we concluded that "[a]ny official or board vested with discretion is under an obligation to consider all relevant factors [citation], and the [official or Board] cannot, consistently with its obligation, ignore post-conviction factors unless directed to do so by the Legislature."

In re Rosenkrantz (2002) 29 Cal.4th 616, 656 (quoting Minnis, 7 Cal.3d at 645.)

1. THE FACTS OF THE COMMITMENT OFFENSE DO NOT PROVIDE A REASONABLE BASIS TO DENY PAROLE.

As brutal as Petitioner's homicidal conduct may have been, it did not go beyond what caused that conduct to constitute a first degree murder with a possibility of parole, he did nothing beyond what accomplished the killing to "cruelly or callously exacerbate[] the victim's suffering." Parole

authorities may use the factors in Petitioner's case, a blow to the head, to aggravate his term, but that manner of death does not disqualify a prisoner from parole. As the California Court of Appeals (1st Appellate District) noted, the Board's observation that "[t]he offense itself is of sufficient severity for the denial, could be repeated annually until [Petitioner] dies or is rendered helpless by the infirmities of sickness or age." (Scott II, supra, 133 Cal.App.4th at p. 595.) The manner in which Petitioner's and victim's physical confrontation is not atypical for a murder case, and hardly acts to "distinguish this crime from ... murders as exceptionally callous." (In re Smith, supra, 114 Cal.App.4th at p. 367.) As the California Supreme Court has noted on more than a score of occasions, "murder is seldom pretty." (See, e.g., People v. Hinton (2006) 37 Cal.4th 839, 896.) The Board's denial of parole to such murders is contrary to the statute.

In In re Scott II, supra, the California Court of Appeals cautioned the Governor about reversing a grant of parole based solely on the commitment offense or other pre-commitment factors:

> Reliance on such an immutable factor "without regard to or consideration of subsequent circumstances" may be unfair [citation] and "runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." [Citation.] The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time. [Citation.] Thus, denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny.

(Id. at pp. 594-595.) Where such scrutiny reveals that the [Board] "did not fulfill" the requirement "to consider all other relevant factors," the decision cannot stand. (Id. at p. 595.) Such is the case here.

4.

First degree murder is not a crime automatically deemed unsuitable for parole. Under California Penal Code § 190.2, for a first degree murderer to be deemed unparoleable ("Death penalty or life imprisonment without parole") a jury or court, must find at least one of the twenty-two "special circumstances" described in Cal. Penal Code § 190.2 to be true. One of these special circumstance, § 190.2 (14), is that "[t]he murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity. As used in this section, the phrase 'especially heinous, atrocious, or cruel, manifesting exceptional depravity' means a conscienceless or pitiless crime that is unneccessarily torturous to the victim." The Board may not relitigate the Petitioner's commitment offense and use a factor that was not either submitted to a jury or rejected by the jury (not found true beyond a reasonable doubt.) (See e.g. United States Constitution, Fifth Amendment (double jeopardy); and Apprendi v. New Jersey, 120 S.Ct. 2348, 147 L.Ed.2d 435.) The Board's own Matrix recognize that Petitioner's commitment offense falls under one that does not preclude a finding of suitability. (Cal. Code of Regs. tit. 15 ("CCR-15") § 2403 (b).)

Pursuant to Cal. Penal Code § 3041(b), the Board has established criteria for setting parole release dates (CCR-15 § 2402.)

CCR-15, § 2403, states, in pertinent part that:

(a) General. The panel shall set a base term for each life prisoner who is found suitable. The base term shall be established solely on the gravity of the base crime, taking into account all of the circumstances of that crime. ...
    The base term shall be established by utilizing the appropriate matrix of base terms provided in this section. The panel shall determine the category most closely related to the circumstances of the crime. The panel shall impose the middle base term reflected in the matrix unless the panel finds circumstances in aggravation or mitigation. ...

If the Board finds circumstances in aggravation of the base term the "panel may impose the upper base term or another term longer than the

middle base term upon a finding of aggravating circumstances." (CCR-15 §

2404.) Circumstances in aggravation of the base term includes, in pertinent

part:

> (1) The crime involved some factors described in the
> appropriate matrix in a category higher on either axis that
> the categories chosen as most closely related to the crime;
> (2) The victim was particularly vulnerable;
> (3) The prisoner had a special relationship of confidence
> and trust with victim, such as that of employer-employee;
> . . .
> (17) The prisoner has a history of criminal behavior for which
> the term is not being enhanced under Section 2407;
> (18) The prisoner has engaged in other reliably documented
> criminal conduct which was an integral part of the crime for
> which the prisoner is currently committed to prison;
> (19) The prisoner was on probation or parole or was in custody
> of had escaped from custody at the time the crime was
> committed;
> (20) Any circumstances in aggravation including those listed
> in the Sentencing Rules for the superior Court.

CCR-15 § 2405 describes "Circumstances in Mitigation for the Base

Term," which include, in pertinent part:

> (1) The crime involved some factors described in the
> appropriate matrix in a category lower on either axis than
> the categories chosen as most closely related to the crime;
> . . .
> (4) The prisoner tried to help the victim or sought aid after
> the commission of the crime or tried to dissuade a crime
> partner from committing other offense;
> . . .
> (6) The crime was committed during or due to an unusual
> situation, unlikely to reoccur;
> (7) The crime was committed during a brief period of extreme
> mental or emotional trauma;
> (8) The prisoner has a minimal or no history of criminal
> behavior;
> (9) Any Sentencing Rules for Superior Courts.

The record shows that the Board based its decision to deny parole on the

same factors that went into creating the guidelines and matrix in the first

place. This violates due process and makes the regulations to be used for

determining suitability and setting prison terms unconstitutionally vague

and meaningless. The Board used factors that may be used to impose the

upper base term as reasons to deny parole; and totally ignored the mitigating circumstance that may be used to lower the base term.

In Little v. Hadden, 504 F.Supp. 558, 561, a federal court addressed the same type of abuse that is present here:

> [I]t is unreasonable and impermissible for the Commission to base a decision to continue beyond the guidelines on the same factors that went into formulating the guidelines in the first place. No one disputes that this was a serious crime, but the factors of seriousness indicated by the this record are included in the guidelines themselves. ... It is clear to the Court from the record in this case that the Commission has attempted to continue Little in custody beyond the guidelines because of its ad hoc decision regarding the seriousness of the offense, but the factors relied upon are either unsupported by the record or were already considered in formulating the guidelines. ... In short, the Commission's decision is arbitrary and capricious because it is not based on anything in the record before it. Moreover, it reflects an abuse of discretion because it attempts to continue Little's confinement beyond the guidelines without the statutory required good cause.

(See also, Lupo v. Norton, 371 F.Supp. 156 (1974).)

The Board failed to conduct an individualized assessment of all required factors. Clearly, the facts at hand do not meet the requirements set forth by the regulations and the courts to justify the Board's finding of unsuitability for parole. As the record shows, Petitioner's crime merely satisfies the bare minimum requirements for finding of a first degree murder. He did not torture Claire Miller, or lie in wait for her, he did not prolong her suffering, or kill her in order to rob her or incite a race war. His crime, while terrible, does not rise to the level of callousness present in Dannenberg, where after a long period of marital disharmony, the defendant bludgeoned his wife repeatedly with a pipe wrench and then drowned her or allowed her to drown in the bathtub; or Rosenkrantz, where defendant purchased an Uzi and, one week after provocation, shot the victim numerous times at close range and then remained a fugitive for

7.

24 days; or <u>Van Houten</u>, where defendant assisted with multiple stabbings
of the victim with a knife and bayonet, after the victim witnessed her husband
receiving the same fate, all an effort to incite a race war. See <u>Van Houten</u>,
116 Cal.App.4th at 365.

Not only does Petitioner's crime fail on its own to constitute "some
evidence" that he is a continuing threat to public safety, but the Board
erred by failing to consider all of the factors required by the regulations.

2.  PETITIONER'S PREVIOUS RECORD OF ADULT PROBATION AND JAIL
    TERM FOR PETTY THEFT AND GRAND THEFT, AND PREVIOUS UNSTABLE
    HISTORY THAT INCLUDES THE EXTENTS AND NARCOTICS DOES NOT
    PROVIDE "SOME EVIDENCE" THAT PETITIONER IS A CURRENT
    UNREASONABLE RISK TO PUBLIC SAFETY.

The Board also pointed to Petitioner's precommitment offense behavior
as "some evidence" that he would pose an unreasonable threat to public safety
if released from prison. "And while [Petitioner] -- in regards to the previous
record, there's no juvenile record. And however, there was a failed attempt
at adult probation, and there was also a county jail term and this was for
petty theft and grand theft. And the inmate also has - illegal narcotics
use." (BT 71.) These charges do not rise to the level anticipated in the
Regulations which define "Previous Record of Violence" as "previous occasions
[prisoner] inflicted or attempted to inflict serious injury on a victim."
CCR-15 § 2402(b)(2); see also <u>Van Houten</u>, 116 Cal.App.4th at 353. Petty theft
or Grand theft, are not assaults and Petitioner's adult probation was not
an attempt to inflict injury, of any severity, on anyone. No reasonable
interpretation (<u>Rosenkrantz</u>, 29 Cal.4th at 680) of these facts can transform
them into becoming "some evidence" of "Previous Record of Violence." (CCR-15
§ 2402(b).)

Courts have also made clear that the evidence cited by the Executive
must be **relevant** and **probative** to the factors that such evidence is being

used to support. For instance, in Smith, the Governor had pointed to evidence indicating that "the crime was not an isolated incident, but rather the culmination of 'a continuing pattern' of personal drug use, social instability, and violence against Garner." Smith, 114 Cal.App.4th at 367. The court held that though there was some evidence of drug use, such evidence was not relevant to a determination of the key inquiry -- whether the inmate would pose a current, unreasonable threat to public safety.

> [T]he observation is more historical backdrop than a reflection of the circumstances surrounding commission of the offense: its matter, scope, and motivation. Indeed, there is no evidence that Smith shot Garner while he was under the influence, and no evidence that he abused her immediately before the shooting or even during the days and weeks before it. Thus, the Governor's observation does not tend to distinguish Smith's offense as especially grave.

(Id. at 368.)

**3, 4, & 5, 7.** THERE IS NO EVIDENCE THAT PETITIONER HAS NOT SUFFICIENTLY PARTICIPATED IN BENEFICIAL SELF-HELP AND THERAPY PROGRAMS. NOR IS THERE ANY EVIDENCE THAT STAFF PSYCHOLOGIST DO NOT SUPPORT A FINDING OF SUITABILITY OR THAT PETITIONER NEEDS THERAPY IN ORDER TO FACE, DISCUSS, UNDERSTAND, AND COPE WITH STRESS IN A NONDESTRUCTIVE MANNER.

In their decision to deny parole, Commissioner Tracy St. Julien stated about Petitioner's programming and conduct in while in prison that contradicts the finding of unsuitability. The Commissioner said:

> Nevertheless, we would like to commend you for being disciplinary free throughout your entire incarceration and that is, indeed, an exceptional accomplishment. And you are to be commended for that as well as your work in the Prison Industry Authority where you're doing - where you're a certified computer operator, and as well as taking numerous college classes and, again, you're -- you have breaking barriers and that goes back to '90, '91, and '92. And you have done the Project Impact Module 3 and that's been in -- that's 2004, 2005. You're AA work, and we notice you have chronos from 2003 to 2005, and we would encourage you to, indeed, step that up and become as focused as you can. And we also see a list of probably 15 or so educational -- higher educational classes that you have been taking, so we would definitely commend you for that and, again, on your certification in computer operator and as a computer operator and data entry operator. ...

9.

(Exhibit A, BT 73.)

Furthermore, the California Department of Corrections and Rehabilitation (CDCR) own expert psychologist found that Petitioner is not an unreasonable threat to public safety. Dr. Eric Rueschenberg, Ph.D., found that Petitioner "poly-substance abuse in full remission;" and that Petitioner's risk for violence in the community as "low to moderate." (BT 47.) Petitioner's "adjustment in prison has been favorable. He has exhibited a prosocial orientation, resuming his college education, and receiving exceptional ratings from his supervisors for his work performance. He has not received any CDC 115s. He has also been an active participant in religious activities. He seems to be demonstrating a level of maturity and motivation that was lacking at the time of his offense." (BT. 48.)

In a recent parole case, the court held that the Board's observation that the inmate had not gained an ability to speak English and that he had failed to upgrade his vocational training was not relevant to support a conclusion that "'he would pose an unreasonable risk of danger to society or threat to public safety if released from prison.' Nothing in the record indicates that defendant's criminality or ability to support himself was affected by any limitation of his vocational or language skills." In re Deluna (2005) 126 Cal.App.4th 585, 598; Cf. Van Houten, 116 Cal.App.4th at 353 (inmate's previous arrest record did not constitute "some evidence" of a threat to public safety because the alleged acts did not involved serious injury or attempted serious injury to a victim).

Petitioner has been disciplinary free his entire time prison. He has demonstrated that he can cope with stress in a non-destructive manner. In In re Smith, Cal.App.4th at 371, the Court held that evidence that a prisoner used intoxicating substances 20 years prior is not some evidence that he

is currently dangerous:

> [W]e conclude that Smith's past desire for and use of drugs
> not by itself reasonably established current unsuitability
> because there is no additional evidence to complete a chain
> of reasoning between his past drug use and a finding that
> because of it he currently poses an unreasonable risk of danger
> if released. In other words, in the absence of some evidence
> to support a reasonable belief that Smith might start using
> drugs again, the fact that he used drugs extensively more than
> 20 years ago does not by itself represent some evidence that
> he is currently dangerous.

(Id., at 371.) Same holds true here.

There is no reasonable basis to believe that Petitioner might start using drugs and alcohol if released. The Board is asserting authority that it does not posses. "According to a Task Force of the American Psychiatric Association, '[n]either psychiatrist nor anyone else have demonstrated an ability to predict the future violence or dangerousness. [Citation.] As our Supreme Court has also noted, ' the same studies which proved the inaccuracy of psychiatric prediction [of dangerousness] have demonstrated beyond dispute the no less disturbing manner in which such prophecies consistently err: they predict acts of violence which will not in fact take place ('false positive'), thus branding as 'dangerous' many persons who are in reality totally harmless. [Citation]" (People v. Burnick (1975) 14 Cal.3d 306, 327.)

   6.  THE FACT THAT THE DISTRICT ATTORNEY'S OFFICE OPPOSES PAROLE
       DOES NOT CONSTITUTE "SOME EVIDENCE" THAT PETITIONER IS A CURRENT
       RISK TO PUBLIC SAFETY.

The Board cited the District Attorney's opposition to a finding of suitability as "some evidence" to deny parole. (BT 72.) However, public outcry cannot be used to determine whether an inmate is suitable for parole. (In re Powell (1988) 248 Cal.Rptr. 431; In re Fain (1983) 139 Cal.App.3d 295.) An evidentiary hearing will reveal that the District Attorney's Office in opposes parole in nearly all, or all, parole consideration hearings. The Board routinely uses the District Attorney's opposition as some evidence

INSERT A

to deny parole, while ignoring public support to grant parole. Such is the case here.

For the foregoing reasons, the court should find that the Board's decision to deny parole is arbitrary and capricious because it is not supported by any evidence that Petitioner poses a current unreasonable risk to public safety. Petitioner prays that the court order the Board to set his term within the Matrix guidelines for first degree murder, apply his earned good-conduct credits toward that term, any credit that goes beyond the calculated term be credited to his parole, and any relief that court finds in the interest of justice.

## GROUND 2

THE BOARD OF PAROLE HEARINGS' FAILURE TO CONSIDER ALL RELEVANT FACTORS AND IGNORING POST-CONVICTION FACTORS IN PETITIONER'S PAROLE SUITABILITY DETERMINATION VIOLATED PETITIONER'S RIGHTS TO A FAIR AND MEANINGFUL HEARING IN VIOLATIONS OF STATE AND FEDERAL DUE PROCESS.

The California Supreme Court has consistently held the Board "is under an obligation to consider all relevant factors" and may not ignore post-conviction factors in its parole suitability determinations. In re Rosenkrantz, 29 Cal.4th at 655 (citing In re Minnis, 7 Cal.3d. 639, 645 (1972). Despite this mandate, the Board has inexplicable and unjustifiably ignored abundant, undisputed evidence contained in petitioner's post-conviction record showing petitioner is suitable for release on parole. In re Scott, 119 Cal.App.4th 871, 899 (2004).

First, although the Board stated that "[I] feel personally like you are remorseful, but you haven't articulated that if you know what I mean[]" (Exhibit A, BT 75), the Board failed to mention consideration of evidence that petitioner has demonstrated signs of remorse as a factor indicating parole suitability. 15 CCR § 2402(d)(3) ("[T]he prisoner has given indications that he understands the nature and magnitude of the offense."). Petitioner's "Counselor's Report" provided the Board with an assessment of petitioner's remorse and the Board failed to consider it: "Moore appears very remorseful and expressed his deep regret for his actions. He acknowledge his responsibility for the crime. He does not attempt to make any excuses for his actions." According the next previous Counselor's Report in June 2002,: "Moore appears remorseful. He was tearful throughout the interview, and he was sweating profusely when talking about the details of the crime." (Exhibit A, BT 66.) Furthermore, at the 2005 hearing the Board failed to consider the mitigating circumstances : "Mr. Moore tried to conduct CPR on his victim when he noticed that she wasn't breathing. He called for assistance and waited

13.

for the police to arrive." (Exhibit A, BT 67.)

The Board also failed to mention consideration of petitioner's advancing age which is yet another factor set forth in the regulations tending to demonstrate parole suitability: "The prisoner's present age reduces the probability of recidivism." 15 CCR 2402(d)(7). Petitioner was 37 years old at the time he was involved with the life crime. When petitioner appeared before the 2005 hearing panel, petitioner was 56 years old. Twenty-years have transpired since the commission of the crime during which time petitioner has aged, matured and experienced numerous accomplishments. Dr. Eric Rueschenberg indicated in his report that petitioner "appears to have low to moderate [] risk for violence in the community. At the time of the index offense, his criminal record was minor, and he had no violent offenses." (Exhibit A, BT 47.)

The Board ignored the evidence cited above and provided by petitioner and Dr. Eric Rueschenberg as to the above two factors tending to demonstrate parole suitability. This resulted in the Board violating petitioner's due process rights by ignoring relevant, reliable information (CCR 15 § 2402(b)) and failing to apply two parole suitability factors which are relevant to petitioner's case. In re Rosenkrantz, 29 Cal.4th at 655.

Based on the record, petitioner has clearly participated in beneficial self-help programs; however, the Board fails to articulate a reason why it believes petitioner's participation is insufficient. In fact, the Board contradicts itself when it stated: "I commend you for your programming, it's absolutely excellent." (Exhibit A, BT 76.) The Board's failure to consider this "excellent" programming violates due process. Furthermore, lay persons such as the Board of Parole Hearings Commissioners have no training in the field of psychology and predictions of human behavior. They are unequipped

14.

to assess whether an individual "could benefit from" or need self-help programs. As such, their conclusion should be viewed as no more than mere speculation. <u>Irons v. Warden of California State Prison-Solano</u>, 358 F.Supp.2d 936, 947 (2005).

The Board's determination that petitioner "has not sufficiently participated in beneficial self-help programs" is a determination unrelated to the issue of petitioner's dangerousness to the public and unrelated to any of the authorized factors tending to show suitability or unsuitability. In fact, the regulations do not set forth "self-help participation" as a factor tending to indicate either suitability or unsuitability. Thus, even if the Board thinks that more self-help programming would be beneficial to petitioner, it was wrong for the Board to deny parole to petitioner based on such an unauthorized factor.

For the foregoing reasons, the Court should grant the petition and order the Board to release petitioner on parole.

## GROUND 3

THE BOARD OF PAROLE HEARINGS VIOLATED PETITIONER'S LIBERTY
INTEREST TO BE RELEASED ON PAROLE. UNDER CALIFORNIA'S PAROLE
SCHEME PETITIONER HAS A CONSTITUTIONALLY PROTECTED LIBERTY
INTEREST IN RELEASE ON PAROLE. THE BOARD IS REQUIRED TO NORMALLY
SET A PAROLE RELEASE DATE PURSUANT TO PENAL CODE § 3041 AND
CAL. CODE REGS, TIT. 15 § 2401 UNLESS THE BOARD FINDS PETITIONER
POSES A CURRENT DANGER TO SOCIETY.

Under the "clearly established" framework set forth by the United
State Supreme Court in Greenholtz v. Inmate of Nebraska Penal and Board of
Pardons v. Allen, when a state's statutory scheme uses mandatory language
that "creates a presumption that parole release will be granted," unless
certain statutorily defined determinations are met, that gives rise to a
constitutionally protected liberty interest in release on parole. Greenholtz
v. Inmate of Nebraska Penal, 442 U.S. 1, 12 (1979); Board of Pardons v. Allen,
482 U.S. 369, 377-378 (1987).

In McQuillion v. Duncan, the Ninth Circuit Court of Appeals held
California's parole scheme, as codified in Penal Code § 3041, largely
parallels the schemes used in Greenholtz and Allen and therefore gives rise
to a cognizable liberty interest in release on parole. McQuillion v. Duncan,
306 F.3d 895, 901 (9th Cir. 2002). See also Biggs v. Terhune, 334 F.3d 910,
914 (2003) ("Section 3041 of the California Penal Code creates in every inmate
a cognizable liberty interest in parole which is protected by the procedural
safeguards of the Due Process Clause.") While McQuillion involved a Board-
granted parole release date that the Governor subsequently rescinded, the
McQuillion Court concluded California's parole scheme created a general
expectation in parole to all life-term inmates, not only to those who have
or previously had a parole release date. McQuillion v. Duncan, 306 F.3d at
903. This point was further clarified by the Ninth Circuit Court of Appeals
in Biggs v. Terhune, supra. There the Court concluded the liberty interest
in parole was created upon the incarceration of the inmate and not upon the

16.

grant of a parole release date. Biggs, 334 F.3d at 915. However, a prisoner such as McQuillion who had previously been granted a parole release date has a heightened liberty interest in release on parole. McQuillion, 306 F.3d at 903. In the instant case petitioner's crime does not of the gravity that prevents parole. The Board has failed to "normally grant parole" at his initial hearing and continues to rely on a the commitment offense, which by its own Matrix and guidelines provides a term somewhere in the area of 27-29 years, which with post conviction credit as provided in CCR 15 § 2290, may be reduced by one-third. (CCR 15 § 2403(b).) Petitioner therefore had a specific expectation of release on parole. (Id.)

In reviewing the applicable statutory law and Board regulations, the California Supreme Court has determined life prisoners such as petitioner have an expectation of release upon parole. In In re Rosenkrantz, the Supreme Court concluded "parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation." In re Rosenkrantz, 29 Cal.4th 616, 654 (2002). The Rosenkrantz Court further concluded this "expectation" is a liberty interest protected by due process of law. (Id. at 659-661.)

For the foregoing reasons, the Court should grant the petition and declare the rights of petitioner having a protected liberty interest in parole. The Court should order the Board to follow its own guidelines and California law.

8. Did you appeal from the conviction, sentence, or commitment? ☐ Yes. ☒ No. If yes, give the following information:

  a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

    _____

  b. Result: _____ c. Date of decision: _____

  d. Case number or citation of opinion, if known: _____

  e. Issues raised: (1) _____

       (2) _____

       (3) _____

  f. Were you represented by counsel on appeal? ☐ Yes. ☐ No. If yes, state the attorney's name and address, if known:

9. Did you seek review in the California Supreme Court? ☐ Yes. ☐ No. If yes, give the following information:

  a. Result: _____ b. Date of decision: _____

  c. Case number or citation of opinion, if known: _____

  d. Issues raised: (1) _____

       (2) _____

       (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

11. Administrative Review:

  a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal. App.3d 500 [125 Cal. Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

    No administrative appeals available

  b. Did you seek the highest level of administrative review available? ☐ Yes. ☐ No.
    *Attach documents that show you have exhausted your administrative remedies.*

E X H I B I T   A

SUBSEQUENT PAROLE CONSIDERATION HEARING BOARD OF PAROLE HEARINGS TRANSCRIPT
NOVEMBER 28, 2005

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of:               )          CDC Number D-92538
                          )
RONALD MOORE              )
                          )          INMATE
_____)          COPY

CALIFORNIA STATE PRISON

SAN QUENTIN, CALIFORNIA

NOVEMBER 28, 2005

4:30 P.M.


PANEL PRESENT:

Ms. Tracey St. Julien, Presiding Commissioner
Mr. Joseph Johnson, Deputy Commissioner


OTHERS PRESENT:

Mr. Ronald Moore, Inmate
Mr. Scott Handleman, Attorney for Inmate
Mr. Sean Gallagher, Deputy District Attorney
Correctional Officers Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

          _____  No      See Review of Hearing
          _____  Yes     Transcript Memorandum


**Carol Chase, Peters Shorthand Reporting**

ii

## INDEX

|  | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 11 |
| Pre-Commitment Factors | 16 |
| Post-Commitment Factors | 33 |
| Parole Plans | 38 |
| Closing Statements | 63 |
| Recess | 68 |
| Decision | 69 |
| Adjournment | 76 |
| Transcriber Certification | 77 |

--oOo--

1

1       P R O C E E D I N G S

2           DEPUTY COMMISSIONER JOHNSON:  We are on the

3       record.

4           PRESIDING COMMISSIONER ST. JULIEN:  Okay.  The

5       time is 4:30 p.m., and this is a subsequent parole

6       hearing for Ronald Moore.  CDC No. D-92538.  Today is

7       November 28, 2005.  We are at San Quentin State

8       Prison. The inmate was received on August 5, 1988,

9       with a life term starting the same day.  Count One,

10      murder first, Penal Code Violation 187.  And the

11      inmate received a term of 25 years to life with a

12      minimum eligible parole date of July 12, 2000 and

13      three.  And this is from the county of San Mateo, Case

14      No. C17391; is that correct, sir?

15          INMATE MOORE:  Yes.

16          PRESIDING COMMISSIONER ST. JULIEN:  Okay.

17      We're tape recording the hearing, so we're going to go

18      around the room and introduce ourselves.  We'll say

19      our first and last names, spell our last name and then

20      if you could also state your CDC number.  And my name

21      is Tracey St. Julien, S-T, capital J-U-L-I-E-N.

22          DEPUTY COMMISSIONER JOHNSON:  Joseph Johnson,

23      J-O-H-N-S-O-N, deputy commissioner.

24          DEPUTY DISTRICT ATTORNEY GALLAGHER:  Sean

25      Gallagher, deputy district attorney from the county of

26      San Mateo.  S-E-A-N, G-A-L-L-A-G-H-E-R.

27          ATTORNEY HANDLEMAN:  Scott Handleman,

2

1    H-A-N-D-L-E-M-A-N, representing Mr. Moore.

2            INMATE MOORE:  Ronald Joe Moore, M-O-O-R-E.

3    D-92538.

4            PRESIDING COMMISSIONER ST. JULIEN:  Okay.  We

5    also have two correctional officers in the room who

6    are here for security purposes.  And Mr. Moore, are

7    you familiar with the ADA statements, I mean, your ADA

8    rights?

9            INMATE MOORE:  Uh-huh, yes.

10           PRESIDING COMMISSIONER ST. JULIEN:  Okay.  I

11   note that on September 28th you signed -- September

12   the 28th of 2005, you signed a BPT Form 1073

13   indicating that you did not have any disabilities.

14   And is that still correct?

15           INMATE MOORE:  Yes.

16           PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

17   did you have any trouble walking into the room today?

18           INMATE MOORE:  No.

19           PRESIDING COMMISSIONER ST. JULIEN:  Are you --

20   you're mobile?  You're fine?

21           INMATE MOORE:  Yes.

22           PRESIDING COMMISSIONER ST. JULIEN:  Okay.  You

23   can go up and down stairs without a problem?

24           INMATE MOORE:  Yes.

25           PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

26   how about your vision?  Can you see clearly?

27           INMATE MOORE:  Yes.

-3-

1          PRESIDING COMMISSIONER ST. JULIEN:   Without

2     glasses?  I notice you don't have any eyeglasses on

3     or --

4          INMATE MOORE:   I have glasses, but just for

5     reading.

6          PRESIDING COMMISSIONER ST. JULIEN:   Okay.  So

7     you don't think you'll need them here today?

8          INMATE MOORE:   No.

9          PRESIDING COMMISSIONER ST. JULIEN:   Okay.  And

10    any hearing impairments?

11         INMATE MOORE:   No.

12         PRESIDING COMMISSIONER ST. JULIEN:   Okay.  And

13    I note that you have a high school diploma?

14         INMATE MOORE:   Yes.

15         PRESIDING COMMISSIONER ST. JULIEN:   So have

16    you -- have you had any learning disability --

17    learning disabilities?

18         INMATE MOORE:   No.

19         PRESIDING COMMISSIONER ST. JULIEN:   Okay.  And

20    what about -- do you know what the Triple CMS and EOP

21    Programs are?

22         INMATE MOORE:   No, not in depth.

23         PRESIDING COMMISSIONER ST. JULIEN:   Okay.  Do

24    you know that they're the Mental Health Services

25    Programs that the department offers?

26         INMATE MOORE:   Uh-huh.

27         PRESIDING COMMISSIONER ST. JULIEN:   So if you

4

1   have depression or some kind of a psychological

2   issues, those programs would give you some assistance

3   with that.

4           INMATE MOORE:   Okay.

5           PRESIDING COMMISSIONER ST. JULIEN:   And have

6   you ever been a part of either of those programs?

7           INMATE MOORE:   No.

8           PRESIDING COMMISSIONER ST. JULIEN:   Okay.   Have

9   you ever taken any psychotropic medications?

10          INMATE MOORE:   No.

11          PRESIDING COMMISSIONER ST. JULIEN:   And are you

12  on any -- did you want to say something?

13          ATTORNEY HANDLEMAN:   Yes.   On the matter of

14  mental health.

15          PRESIDING COMMISSIONER ST. JULIEN:   Uh-huh.

16          ATTORNEY HANDLEMAN:   We -- we were just

17  concerned that he -- that Mr. Moore doesn't have an up

18  dated Psychological Report since May 2000 and two.

19  And we were actually going to request a postponement

20  of the hearing if that's possible.

21          PRESIDING COMMISSIONER ST. JULIEN:   Well,

22  actually 2000 and two isn't old.

23          ATTORNEY HANDLEMAN:   Okay.

24          PRESIDING COMMISSIONER ST. JULIEN:   Interpret

25  the part.

26          ATTORNEY HANDLEMAN:   I just wanted to check on

27  that --

5

1          PRESIDING COMMISSIONER ST. JULIEN:   Yeah, I

2   know that things are constantly changing in regards --

3          ATTORNEY HANDLEMAN:   Okay.

4          PRESIDING COMMISSIONER ST. JULIEN:   -- to

5   Psychological Evaluations and -- but it's pretty much,

6   you know, the policy now that if he were -- if he did

7   have psychological issues, you know, if he were in

8   Triple CMS or EOP, something like that, you know,

9   where that mental state would be changing.

10          ATTORNEY HANDLEMAN:   Uh-huh.

11          PRESIDING COMMISSIONER ST. JULIEN:   Then, yeah,

12   you would want to have something more updated to

13   consider.  But if there are no psychological issues,

14   then, you know, now there's even talk of letting them

15   go, having just one done --

16          ATTORNEY HANDLEMAN:   I see.

17          PRESIDING COMMISSIONER ST. JULIEN:

18   -- throughout the term, the entire term of

19   incarceration.  So --

20          ATTORNEY HANDLEMAN:   All right.

21          PRESIDING COMMISSIONER ST. JULIEN:   I've done

22   some with 1999, so 2000 and two is not considered --

23          ATTORNEY HANDLEMAN:   Okay.

24          PRESIDING COMMISSIONER ST. JULIEN:   -- old.

25          ATTORNEY HANDLEMAN:   All right then.

26          PRESIDING COMMISSIONER ST. JULIEN:   And his was

27   (indiscernible).

6

1        DEPUTY COMMISSIONER JOHNSON:  It wasn't

2  negative.

3        PRESIDING COMMISSIONER ST. JULIEN:  Yeah.  I

4  wasn't negative and we can discuss -- there I did have

5  a comment on it, but we can discuss that as the time

6  goes by -- as the hearing goes by.  Okay.  Now, you --

7  are you on any medicines now for any health

8  conditions?

9        INMATE MOORE:  No.

10       PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

11  is there any reason why you can't participate today?

12       INMATE MOORE:  No.

13       PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And,

14  Mr. Handleman, are you satisfied that your client's

15  ADA rights have been met?

16       ATTORNEY HANDLEMAN:  Yes.

17       PRESIDING COMMISSIONER ST. JULIEN:  Okay.  I'm

18  going to go ahead then and give you an outline of the

19  hearing -- are you cold or nervous or --

20       INMATE MOORE:  I'm a little nervous.

21       PRESIDING COMMISSIONER ST. JULIEN:  Oh, okay.

22  Well, take a deep breath.

23       INMATE MOORE:  Okay.

24       PRESIDING COMMISSIONER ST. JULIEN:  Okay.  The

25  hearing is being conducted pursuant to Penal Code

26  Sections 3041 and 3042 and the rules and regulations

27  of the board of prison terms governing life

7

1   consideration hearings for -- governing parole

2   consideration hearings for life inmates.  The purpose

3   of the hearing today is to consider your suitability

4   for parole.  We'll reach a decision today and inform

5   you whether or not we find you suitable for parole.

6   If you are found suitable, your length of your

7   confinement will be explained to you.  The hearing

8   will be conducted in two parts.  First, I'll discuss

9   with you the crime you were committed for, your prior

10  criminal and social history, your parole plans, and

11  letters of support and opposition.  And then

12  Commissioner Johnson will discuss with you your

13  behavior and programming since your commitment and

14  your Counselor's Report and Psychological Evaluation.

15  You have the opportunity to review your Central File

16  and previous hearing transcripts and, if you need to

17  correct or clarify anything, then please feel free to

18  do so.  When that's done, the district attorney and

19  your attorney will be able to ask you questions.  And

20  this is a nonconfrontational hearing, so the district

21  attorney, actually, will ask his questions through the

22  panel, and then you in turn answer to us.  And then

23  your attorney, the district attorney, and you will be

24  able to make the final statement regarding your parole

25  suitability.  Then we'll recess for deliberations,

26  we'll clear the room.  After we have reached decision,

27  we'll reconvene the hearing and announce that

8

1    decision.   The California Code of Regulations states

2    that, regardless of time served, a life inmate shall

3    be found unsuitable for and denied parole, if in the

4    judgment of the panel the inmate would still pose an

5    unreasonable risk or danger to society if released

6    from prison.   And you also have certain rights.   Those

7    rights include the right to a timely notice of this

8    hearing, the right to present additional documents,

9    and the right to review your Central File.   Excuse me.

10   And, Mr. Handleman, have your client's rights been

11   met?

12          ATTORNEY HANDLEMAN:   Yes.

13          PRESIDING COMMISSIONER ST. JULIEN:   Sorry.   You

14   also have the right to be heard by an impartial panel.

15   And now that you have seen the panel here today, do

16   you have any objections?

17          INMATE MOORE:   No.

18          PRESIDING COMMISSIONER ST. JULIEN:

19   Mr. Handleman?

20          ATTORNEY HANDLEMAN:   It's fine.

21          PRESIDING COMMISSIONER ST. JULIEN:   Okay.

22   You'll receive a copy of our written tentative

23   decision today.   That decision is subject to review by

24   the decision review unit and the entire board unit as

25   a whole.   And it will become effective within a

26   hundred and 20 days.   And it's also subject to review

27   by the governor.   And you'll receive a copy of that

9

1   decision and these hearing transcripts.  Excuse me.

2   And the board no longer has an appeals process, so if

3   you have any objections or complaints about anything

4   that happens here today, you need to file those

5   directly with the court.  And information on how to

6   file a complaint is found in the prison law library,

7   and you'd go through the policy entitled

8   Administrative Appeals, Correspondence, and Grievances

9   Concerning BPH Decisions.  You're not required to

10  admit your offense or discuss your offense if you do

11  not wish to do so.  However, we do accept as true the

12  findings of the Court, and we invite you to discuss

13  the facts and circumstances of the crime if you wish,

14  and we will review and consider any prior statements

15  regarding the crime in determining your suitability

16  for parole.  Commissioner Johnson, is there any

17  confidential information?

18          DEPUTY COMMISSIONER JOHNSON:  No, there isn't.

19          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

20  have I passed that hearing checklist to you?

21          DEPUTY COMMISSIONER JOHNSON:  It's right here.

22          ATTORNEY HANDLEMAN:  Oh.  (Indiscernible).

23          PRESIDING COMMISSIONER ST. JULIEN:    If you

24  could take a look at that and tell me know if you have

25  all those same documents, and then pass that to

26  Mr. Gallagher.

27          DEPUTY DISTRICT ATTORNEY GALLAGHER:  Thank you.

10

1          PRESIDING COMMISSIONER ST. JULIEN:   And do you

2    have any additional documents?

3          ATTORNEY HANDLEMAN:   Yes.   Actually, Mr. Moore

4    has letters of support from his family which he

5    received too late to get them into the file.

6          PRESIDING COMMISSIONER ST. JULIEN:   Okay.

7          ATTORNEY HANDLEMAN:   There's one from his

8    mother, Evelyn Moore; one from his brother, Willy

9    Moore; and from his nephew, Willy Moore.   The letters.

10          PRESIDING COMMISSIONER ST. JULIEN:   Okay.

11    Thank you.   Thank you.   And I note that I received the

12    hearing checklist back.   And, gentlemen, is that in

13    order?

14          DEPUTY DISTRICT ATTORNEY GALLAGHER:   Yes.

15          ATTORNEY HANDLEMAN:   Yes.   I think it is.

16          PRESIDING COMMISSIONER ST. JULIEN:   Okay.   And

17    do you have any preliminary objections?

18          ATTORNEY HANDLEMAN:   No preliminary objections.

19          PRESIDING COMMISSIONER ST. JULIEN:   And will

20    Mr. Moore be speaking with us today?

21          ATTORNEY HANDLEMAN:   Yes.

22          PRESIDING COMMISSIONER ST. JULIEN:   I need to

23    give you an oath, sir.   Do you solemnly swear or

24    affirm that the testimony you give at this hearing

25    will be the truth, the whole truth, and nothing but

26    the truth?

27          INMATE MOORE:   I do.

11

1      PRESIDING COMMISSIONER ST. JULIEN:  Okay.  I'm

2   going to go ahead and read the Statement of Facts as

3   they appear in the November 2000 and five Board

4   Report.  And that report was prepared by Correctional

5   Counselor One, last name Shaw, S-H-A-W.  And approved

6   by correctional counselor three, Belshaw,

7   B-E-L-S-H-A-W.  And it states that on November 10th of

8   1986, San Mateo Police Department Report states that

9   at approximately 2:00 p.m. an investigating officer

10  responded to a report of a disturbance at a motel on

11  North Bay Shore Boulevard.  Manager of the motel

12  reported that he received a telephone call from a

13  hysterical male asking the police and an ambulance to

14  be sent to Room 229.  The officer found Ronald Moore

15  in Room 229 with the Victim Claire Miller who was

16  unconscious and appeared to have been beaten.  At

17  first, Mr. Moore told the police that he had returned

18  home to the motel room and found the victim nude,

19  unconscious, and apparently beaten.  He said the

20  victim occasionally engaged in acts of prostitution

21  and, when she did so, Mr. Moore left the room.  He

22  said he left on this date for that reason.  The

23  victim, who had been transported to the hospital soon

24  after the arrival of -- the arrival of the police,

25  died of a brain injury suffered during the assault.

26  Eventually, Mr. Moore changed his story and told the

27  officer that he and the victim used crack cocaine by

12

1    smoking it.  They became engaged in an argument.  The

2    defendant said that the victim lied to him about her

3    use of cocaine and seeing other men and having sexual

4    relations with them in order to obtain crack cocaine.

5    Moore said that the argument became a physical

6    altercation between Miller and himself.  As a result,

7    the victim became unconscious, and Moore eventually

8    had to give her CPR.  Later, he determined that he

9    could do nothing more to help her.  Okay.  So how did

10   Cher -- Cheryl receive -- I'm sorry -- Claire -- how

11   did Claire receive the head injury that eventually

12   killed her?  Wait -- did you hit her?  Did she fall?

13   What?

14        INMATE MOORE:  I pushed her.

15        PRESIDING COMMISSIONER ST. JULIEN:  Down?

16   Or --

17        INMATE MOORE:  Away from me.

18        PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

19   then what happened?

20        INMATE MOORE:  We were just engaged in

21   fighting.

22        PRESIDING COMMISSIONER ST. JULIEN:  But how did

23   she get that significant of a force to the head that

24   caused her to die?

25        INMATE MOORE:  We were on -- when we started,

26   we were on the bed, and we started fighting on the

27   bed, and I pushed her away, and she hit the wall.

13

1          PRESIDING COMMISSIONER ST. JULIEN:  Then it

2     must have been a really -- I mean, was it a really

3     forceful push?

4          INMATE MOORE:  Yeah.

5          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

6     had she been using crack cocaine?  So you both were --

7     had been using crack cocaine that day?

8          INMATE MOORE:  Yes.

9          PRESIDING COMMISSIONER ST. JULIEN:  So were you

10    intoxicated with it?

11         INMATE MOORE:  Yes.

12         PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

13    was she?

14         INMATE MOORE:  Yes.

15         PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

16    what was the argument about?

17         INMATE MOORE:  We began arguing about,

18    actually, seeing other people and being with other

19    people.  And it just kind of --

20         PRESIDING COMMISSIONER ST. JULIEN:  Escalate --

21         INMATE MOORE:  -- escalated from there.

22         PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

23    had you gotten into physical altercations before?

24         INMATE MOORE:  No.

25         PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

26    there was no instrument used?

27         INMATE MOORE:  No.

14

1          PRESIDING COMMISSIONER ST. JULIEN:  A hammer

2    or a --

3          INMATE MOORE:  No.

4          PRESIDING COMMISSIONER ST. JULIEN:  So it was

5    just the force of you knocking her into the wall?

6          INMATE MOORE:  Uh-huh.  It's a very small room.

7    It was just a motel room.

8          PRESIDING COMMISSIONER ST. JULIEN:  Yeah, yeah.

9          INMATE MOORE:  It was very small.  And there

10   was a television at the end of the bed and a dresser

11   at the end of the bed.

12         PRESIDING COMMISSIONER ST. JULIEN:  Yeah.  No.

13   Because it just seems like it would have to take a

14   very significant amount of force to cause that much

15   brain damage.  Okay.  And how long had you known

16   Claire?

17         INMATE MOORE:  Almost a year.

18         PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

19   were you working?

20         INMATE MOORE:  No, not at the time.

21         PRESIDING COMMISSIONER ST. JULIEN:  Okay.  Then

22   how were you getting the money to buy the crack

23   cocaine?

24         INMATE MOORE:  Basically, just hustling.

25         PRESIDING COMMISSIONER ST. JULIEN:  So what

26   does that mean?

27         INMATE MOORE:  I was doing -- sometimes I'd do

15

1    yardwork in the neighborhood or sometimes I'd sell

2    drugs.

3         PRESIDING COMMISSIONER ST. JULIEN:  Okay.

4    Well, I think to your credit, you did try to revive

5    her, and you did call for help and very often in my

6    case at least, I see a lot of crimes where they just

7    leave the people for dead.  So did you think that she

8    was dead, or did you think that she had a chance to

9    survive?

10        INMATE MOORE:  Yes, I did.  I did.

11        DEPUTY COMMISSIONER JOHNSON:  You did what?

12        INMATE MOORE:  I did think that she had a

13   chance to survive.

14        PRESIDING COMMISSIONER ST. JULIEN:  And then

15   once you realized that she was dead, what did you

16   think?

17        INMATE MOORE:  As far as I knew, she hadn't

18   expired while she was in the motel room.

19        PRESIDING COMMISSIONER ST. JULIEN:  Mm.

20        INMATE MOORE:  And while I was there after I

21   came to the recognition of what I had done and what

22   had -- what had happened, I -- I tried to, you know, I

23   tried to help her.

24        PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

25        INMATE MOORE:  You know, as much as I could.

26   And as far as I know or as far as I'm aware she was --

27   she was still alive when she left the room.

16

1        PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

2   the -- did the paramedics came, and they took her to

3   the hospital?

4        INMATE MOORE:  Yeah.  They took her out of

5   there.  Out of the room.

6        PRESIDING COMMISSIONER ST. JULIEN:  And what

7   happened to you?  Did the police come?

8        INMATE MOORE:  Yeah.  The -- there was a --

9   there were -- the police came first into the room --

10        PRESIDING COMMISSIONER ST. JULIEN:  Mm.

11        INMATE MOORE:  -- as far as I remember, and

12   then the paramedics came into the room after the

13   police had gotten there.

14        PRESIDING COMMISSIONER ST. JULIEN:  Okay.

15   Okay.  So how did the drug use start?

16        INMATE MOORE:  Excuse me?

17        PRESIDING COMMISSIONER ST. JULIEN:  How did

18   your drug use start?

19        INMATE MOORE:  How did it start?

20        PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

21        INMATE MOORE:  On that particular day or --

22        PRESIDING COMMISSIONER ST. JULIEN:  No.  Just

23   how did you start using -- I mean, how did you start

24   using so many drugs that you -- you know, you didn't

25   have a job.  And you were just -- cause it's not --

26   were you addicted?

27        INMATE MOORE:  Yes.

17

1        PRESIDING COMMISSIONER ST. JULIEN:  Yeah.  So

2   how did you -- how did the drug use start?

3        INMATE MOORE:  Well, I -- it actually came -- I

4   was working at first.

5        PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

6        INMATE MOORE:  And I was actually, I guess a

7   functioning alc -- drug user.

8        PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

9        INMATE MOORE:  'Cause I worked, you know, most

10   of the time.

11        PRESIDING COMMISSIONER ST. JULIEN:  Yeah,

12   'cause didn't you --

13        INMATE MOORE:  I couldn't hold down --

14        PRESIDING COMMISSIONER ST. JULIEN:  Yeah.  You

15   had a -- you graduated from high school.

16        INMATE MOORE:  Uh-huh.

17        PRESIDING COMMISSIONER ST. JULIEN:  You started

18   American River College.  It is a college I went to

19   myself.  And it sounded like you were -- you had an

20   intact family.  You were going along with life.  You

21   were married?

22        INMATE MOORE:  Yep.

23        PRESIDING COMMISSIONER ST. JULIEN:  You had two

24   kids.

25        INMATE MOORE:  Yes.

26        PRESIDING COMMISSIONER ST. JULIEN:  And then

27   what happened?

18

1          INMATE MOORE:  I don't know.  I just went off

2    the deep end.  I just went off the deep end.  When I

3    got down here to the Bay Area, I didn't come for

4    drugs.  Okay.  But I got involved in them after I got

5    down here.  I came down here in about the first part

6    of 1980.

7          PRESIDING COMMISSIONER ST. JULIEN:  With your

8    family?

9          INMATE MOORE:  No.  Just that I was alone.

10         PRESIDING COMMISSIONER ST. JULIEN:  And why was

11   that?

12         INMATE MOORE:  I came down here to work.

13         PRESIDING COMMISSIONER ST. JULIEN:  I mean,

14   were you separated or --

15         INMATE MOORE:  From what?

16         PRESIDING COMMISSIONER ST. JULIEN:  From your

17   wife.

18         INMATE MOORE:  Yes.

19         PRESIDING COMMISSIONER ST. JULIEN:  Okay.

20         INMATE MOORE:  I'd been separated from her for

21   quite a while.

22         PRESIDING COMMISSIONER ST. JULIEN:  Oh, okay.

23         INMATE MOORE:  We were separated after six

24   years of marriage.

25         PRESIDING COMMISSIONER ST. JULIEN:  Okay.

26         INMATE MOORE:  So we were estranged --

27         PRESIDING COMMISSIONER ST. JULIEN:  Okay.

19

1          INMATE MOORE:   -- for all that period of time.

2     And I came alone down here, and I was working down

3     here.  I was working through a temp agency.  And I met

4     some people that did drugs, and I kind of did drugs.

5     I made some bad choices.  You know, it's not -- it's

6     not like they led me into a life of drugs.  It's --

7     it's a choice I made, you know.

8          PRESIDING COMMISSIONER ST. JULIEN:  And why did

9     you make that choice?

10          INMATE MOORE:  Stupidity.  That was very

11    foolish.

12          PRESIDING COMMISSIONER ST. JULIEN:  Well, what

13    else?  How old were you about then?

14          INMATE MOORE:  About 34 or 35.

15          PRESIDING COMMISSIONER ST. JULIEN:  Yeah.  So

16    you weren't a kid.

17          INMATE MOORE:  No.

18          PRESIDING COMMISSIONER ST. JULIEN:  So what --

19    I mean, were you depressed?  Were you finding it hard

20    to get along financially?  What -- 'cause, you know,

21    by that time in life, people usually start settling

22    down, so I'm just interested in what made you start

23    using these things that would --

24          INMATE MOORE:  Mess up my life.

25          PRESIDING COMMISSIONER ST. JULIEN:  Eventually.

26          INMATE MOORE:  Well, I don't know.  I wasn't

27    depressed about anything.  I didn't have a bad

20

1   childhood.  I didn't have a bad life or anything like

2   that.  I just began using drugs because they were

3   there, I guess.

4          PRESIDING COMMISSIONER ST. JULIEN:  So you

5   liked the way they made you feel?

6          INMATE MOORE:  Well, at the time, yeah.

7          PRESIDING COMMISSIONER ST. JULIEN:  Okay. Well,

8   I mean, that's a reason.

9          INMATE MOORE:  It's -- it's just the way it

10  was.

11         PRESIDING COMMISSIONER ST. JULIEN:  Yeah.

12  Okay.  So you started using -- and what kind of drugs

13  did you start with?

14         INMATE MOORE:  Crack.

15         PRESIDING COMMISSIONER ST. JULIEN:  Oh, okay.

16  And so then you were working -- were you still

17  working -- were you still working the temp jobs?

18         INMATE MOORE:  Uh-huh.

19         PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

20  then how did the -- I'm assuming that you escalated in

21  terms of your use.

22         INMATE MOORE:  Yes.  Definitely.

23         PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

24  was that just because of the addiction or --

25         INMATE MOORE:  Well, at first it was more than

26  just recreational.  Okay.  It wasn't really every day

27  at first.  And being in this crowd of people --

21

1          PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

2          INMATE MOORE:  -- that I was with or this

3     particular person that I was with, and I --

4          PRESIDING COMMISSIONER ST. JULIEN:  Claire?

5          INMATE MOORE:  No.  It was another guy.

6          PRESIDING COMMISSIONER ST. JULIEN:  Yeah.

7          INMATE MOORE:  And I'm not trying to justify

8     anything by this, but I was hanging around with this

9     guy.

10         PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

11         INMATE MOORE:  And we started using.  And we

12    just started using regularly all the time.  All --

13    sometimes all day.  Sometimes all day, every day.  And

14    it had escalated to that in a very short time.

15         PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

16         INMATE MOORE:  'Cause the drug doesn't really

17    last that long.

18         PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

19    then -- so were you still working or --

20         INMATE MOORE:  Yeah.

21         PRESIDING COMMISSIONER ST. JULIEN:  So at

22    what -- at what point did you meet Claire?

23         INMATE MOORE:  I was still working and I met

24    her at -- in that same motel room -- in the same motel

25    complex where I stayed.

26         PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

27         INMATE MOORE:  And she was with another guy at

22

1   the time, and I went to their house.  I went to their

2   room actually to do drugs --

3           PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

4           INMATE MOORE:  -- and whatever.

5           PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

6           INMATE MOORE:  And I met her and the guy that

7   she was with at that time.  That was about, probably,

8   a year or so before.

9           PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

10          INMATE MOORE:  Well, at least a few months --

11          PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

12          INMATE MOORE:  --  before she and I got

13  together.  And then one day I saw her after, you know,

14  several months after I had seen -- after I had been in

15  their room.  And I saw her and we just kind of hooked

16  up.

17          PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

18  And how would you describe your relationship, because

19  this is about a year, right?

20          INMATE MOORE:  That we were together.  About

21  nine months to a year or so.  It was a good

22  relationship.  It was an open relationship.

23          PRESIDING COMMISSIONER ST. JULIEN:  And what

24  would -- what advantage was that to you?

25          INMATE MOORE:  There was also drugs.

26          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

27  she always had drugs or she found a way --

23

1          INMATE MOORE:   One of us -- one of us usually

2     had something.

3          PRESIDING COMMISSIONER ST. JULIEN:   Okay.

4          INMATE MOORE:   Or we were about to get

5     something.

6          PRESIDING COMMISSIONER ST. JULIEN:   Okay.  So

7     you hadn't had a violent -- you hadn't had any kind of

8     physical fights or anything before this day?

9          INMATE MOORE:   No.

10         PRESIDING COMMISSIONER ST. JULIEN:   Okay.

11    Would you describe yourself as a violent person?

12         INMATE MOORE:   No.

13         PRESIDING COMMISSIONER ST. JULIEN:   Had you

14    been violent before?

15         INMATE MOORE:   No.

16         PRESIDING COMMISSIONER ST. JULIEN:   Did you

17    want to hurt her?

18         INMATE MOORE:   No, I don't believe so.

19         PRESIDING COMMISSIONER ST. JULIEN:   So what do

20    you mean you don't believe so?

21         INMATE MOORE:   Well, 'cause a lot of the events

22    of that night are still sketchy in my mind and I --

23    I'm sure I didn't want to hurt her.

24         PRESIDING COMMISSIONER ST. JULIEN:   Did you --

25    there were no -- and I'm -- and I keep asking you

26    this, because I couldn't find it in my file anywhere.

27    But you didn't hit her, and you didn't use an object.

24

1  Or did you?

2      INMATE MOORE:  I believe I may have hit her

3  with my hand, but I didn't use any objects or anything

4  like that.  There was no -- no hammers or anything.

5      PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

6  you're in a fight and she somehow, you know, falls or

7  gets hit against the wall or whatever, and it makes

8  that significant amount of damage to her brain that

9  she subsequently dies here.  Why do you think you got

10  first degree murder?

11      INMATE MOORE:  Because of the events that

12  leading up to what happened that morning.

13      PRESIDING COMMISSIONER ST. JULIEN:  And what

14  was that?

15      INMATE MOORE:  The things that the witnesses

16  heard coming from that room.

17      PRESIDING COMMISSIONER ST. JULIEN:  Were they

18  threats?

19      INMATE MOORE:  I believe so.

20      PRESIDING COMMISSIONER ST. JULIEN:  What did

21  they say --

22      INMATE MOORE:  I'm not sure.

23      PRESIDING COMMISSIONER ST. JULIEN:  Well, what

24  did they say they heard?

25      INMATE MOORE:  They said they heard screaming

26  coming from the direction of the room that we were in.

27      PRESIDING COMMISSIONER ST. JULIEN:  Before

25

1    this, before your fatal encounter?

2              INMATE MOORE:  Yes.

3              PRESIDING COMMISSIONER ST. JULIEN:  Hours

4    before or --

5              INMATE MOORE:  According to the court

6    transcripts, it was all that morning.

7              PRESIDING COMMISSIONER ST. JULIEN:  And you

8    don't remember any of that.

9              INMATE MOORE:  I remember some of it, but it's

10   really sketchy.

11             PRESIDING COMMISSIONER ST. JULIEN:  Okay.

12   Yeah, this crime, I mean, it seems very sketchy.

13             INMATE MOORE:  Uh-huh.

14             PRESIDING COMMISSIONER ST. JULIEN:  And I guess

15   maybe I just don't have all of the record, but it was

16   very strange.  So did you plan to kill her?

17             INMATE MOORE:  No.

18             PRESIDING COMMISSIONER ST. JULIEN:  Did you

19   want to kill her?

20             INMATE MOORE:  No.

21             PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

22   had you argued often?

23             INMATE MOORE:  Actually, no.  We may have

24   had -- it was actually nothing ever heated, nothing

25   ever -- that -- nothing that ever even progressed into

26   a physical altercation or even a heated argument

27   between us.

26

1          PRESIDING COMMISSIONER ST. JULIEN:  Did you
2    love her?

3          INMATE MOORE:  Yes.

4          PRESIDING COMMISSIONER ST. JULIEN:  So were you
5    jealous?  I mean, if she was engaging in acts of
6    prostitution which I don't know if we know that or
7    not, but it's in here, so is -- were you jealous?

8          INMATE MOORE:  Well, we had a relatively open
9    relationship.

10         PRESIDING COMMISSIONER ST. JULIEN:  Yeah, but
11   that never works.  If you mean you love the person, at
12   least, it never works.  Somebody is always jealous or
13   angry.

14         INMATE MOORE:  Yeah.

15         PRESIDING COMMISSIONER ST. JULIEN:  There's no
16   such thing.  There's only an open relationship that
17   works if the two people don't care about each other.
18   So if you cared about her, were you jealous?

19         INMATE MOORE:  No.

20         PRESIDING COMMISSIONER ST. JULIEN:  So weren't
21   jealous if she had sex with other men?

22         INMATE MOORE:  No.

23         PRESIDING COMMISSIONER ST. JULIEN:  Okay.
24   Well, do you think that seems a little strange?

25         INMATE MOORE:  No.  If she didn't -- actually,
26   she didn't mind if I was with other people.  And that
27   was part of the -- that was part of the relationship.