# EXHIBIT   G, PART 2

1        PRESIDING COMMISSIONER ST. JULIEN:  Okay.

2        DEPUTY COMMISSIONER JOHNSON:  Why did you and

3   your wife separate?

4        INMATE MOORE:  We got married at -- we were

5   just -- we were in -- we were just out of -- I was

6   just out of high school.  And she was in high school.

7   And we had two children together, and we thought we

8   were in love when we got married.

9        DEPUTY COMMISSIONER JOHNSON:  Well, that's why

10  you got married.  I want to know why you got

11  separated.

12       INMATE MOORE:  Oh.  Because we grew apart.

13       DEPUTY COMMISSIONER JOHNSON:  Was there anybody

14  else involved in the growing apart?

15       INMATE MOORE:  No.

16       DEPUTY COMMISSIONER JOHNSON:  Okay.

17       PRESIDING COMMISSIONER ST. JULIEN:  Okay.

18  Okay.  So were you -- during this time that you were

19  with Claire, were you in contact with your children?

20       INMATE MOORE:  Actually, no.

21       PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

22  why do you think you lost contact with them?

23       INMATE MOORE:  'Cause I was a lousy father.

24       PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

25  you didn't want to have contact.

26       INMATE MOORE:  I did want to have contact, but

27  it wasn't a priority.  Actually, the -- the lifestyle

28

1    I was in --

2            PRESIDING COMMISSIONER ST. JULIEN:    Uh-huh.

3            INMATE MOORE:    -- and the drugs was more of a

4    priority than anything.

5            PRESIDING COMMISSIONER ST. JULIEN:    Okay.

6    Okay.  So what's different today?  How are you

7    different?

8            INMATE MOORE:    Well, I've -- I've taken some

9    steps to try to find out exactly what happened to me

10   that night, what happened to Ronald Moore that night

11   to cause all of these problems.  And I've tried --

12   I've taken courses, I've taken support groups, and I

13   have some AA, and I have an affiliation with the

14   chapel, with the chaplain.  And I have other programs

15   that are trying to help me get in touch with what it

16   was that happened then, so that you can recognize the

17   symptoms of what went on and not do that again, and

18   not be that person that I was that night.

19           PRESIDING COMMISSIONER ST. JULIEN:    Okay.

20   That's very important.  That's very crucial.  That's a

21   very crucial thing to be working on.  So what have you

22   found out so far?

23           INMATE MOORE:    That I can't do drugs, that I

24   can't drink, and that I don't need that in order to --

25   to have a life.

26           PRESIDING COMMISSIONER ST. JULIEN:    Uh-huh.

27           INMATE MOORE:    I had -- I don't know if I had

29

```
 1   diluted myself into thinking that it was okay for me
 2   to use drugs and to do drugs and to do -- being the
 3   kind of lifestyle that I was, but it isn't, and it --
 4   it doesn't work for me whether it's a functioning
 5   alcoholic or a functioning drug addict or not.  It's
 6   just not for me.  And I don't want to be that person.
 7   I don't want to do anything that -- that led up to
 8   that event.  And I want to be a hundred percent sure
 9   that if I'm ever in any kind of situation where that's
10   presenting itself -- any kind of violence, I don't
11   want to have anything to do with any kind of violence
12   ever again.
13        PRESIDING COMMISSIONER ST. JULIEN:  Okay.  You
14   said that you were trying to find out what happened
15   that night and that type of thing.  Have -- have you
16   come to that point yet where you --
17        INMATE MOORE:  Pretty much, pretty much.  I
18   have support groups here in the institution.  I have
19   people that I -- that I talk to, people that have been
20   through some similar situations.  And through
21   consultation and talking with them, talking with my
22   chaplain and people like that, it -- it's a lot
23   better.
24        PRESIDING COMMISSIONER ST. JULIEN:  So what
25   have you discovered?
26        INMATE MOORE:  I've discovered that if I need
27   to -- I've discovered that I have to kind of stay out
```

30

1    of those situations.  I have to stay away from

2    situations that have any kind of potential for drug

3    use, for violence, anything that has to do with any of

4    that.

5            PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

6    and what all -- what have you determined about that

7    night -- that happened that night?  Did you say that

8    you were trying to delve into the factors that caused

9    the crime?

10            INMATE MOORE:  Uh-huh.

11            PRESIDING COMMISSIONER ST. JULIEN:  Have you

12    found out any of those?

13            INMATE MOORE:  Well, I found out that I was

14    completely outside of myself, that that person that

15    committed that act, that person that's on that piece

16    of paper -- on those pieces of paper in front of you,

17    I don't want to be that person anymore.  And that the

18    things that led up to -- to that night and to that

19    morning, I don't want to have anything to do with

20    those kinds of things and that kind of a lifestyle.

21            PRESIDING COMMISSIONER ST. JULIEN:  Okay.  But

22    what caused you though?  What caused you to get into

23    that lifestyle and then to get into an argument with

24    someone that you cared about to the point of -- of

25    using such great force that subsequently ended her

26    life?

27            INMATE MOORE:  I was out of my mind with drugs

31

1    and alcohol.  We had been up for a long time.  We'd

2    been up for days, and been using for days.  And I lost

3    it.  I just lost it.  I became -- I was out of my

4    mind.

5             DEPUTY COMMISSIONER JOHNSON:  What were you

6    arguing about?

7             INMATE MOORE:  We were arguing about drugs and

8    other people.

9             DEPUTY COMMISSIONER JOHNSON:  If -- if you were

10   arguing about other people, you earlier stated that --

11   that you had the open relationship and there was no

12   jealousy.

13            INMATE MOORE:  Uh-huh.

14            DEPUTY COMMISSIONER JOHNSON:  Why the argument?

15            INMATE MOORE:  Because we had -- we -- from

16   my -- from what -- the way I remember things, we had

17   an understanding that it's okay to be with other

18   people as long as when we do the drugs, we do 'em at

19   home.  Now, we could bring the people at home -- we

20   could bring the people home, but the drugs have to be

21   there, too.  The drugs was a priority.  I was a

22   priority over everything else.

23            DEPUTY COMMISSIONER JOHNSON:  So but you -- but

24   you stated that you were arguing about drugs and other

25   lovers.

26            INMATE MOORE:  Other people.

27            DEPUTY COMMISSIONER JOHNSON:  People.

32

1          INMATE MOORE:   Uh-huh.

2          DEPUTY COMMISSIONER JOHNSON:   Meaning other

3    people, meaning --

4          INMATE MOORE:   Other people that we were going

5    to go -- like, go out and do drugs with -- with

6    someone else.   It's okay -- it's okay --

7          ATTORNEY HANDLEMAN:   I don't think they

8    understand -- let me clarify it.   It sounds like what

9    Mr. Moore is saying --

10         INMATE MOORE:   I didn't understand the

11   question.

12         ATTORNEY HANDLEMAN:   -- is -- is that they were

13   arguing about taking some of their drug supply and

14   using it with other people and, therefore, not sharing

15   the drugs with each other.

16         PRESIDING COMMISSIONER ST. JULIEN:   Oh.

17         ATTORNEY HANDLEMAN:   That's what I'm

18   understanding.

19         DEPUTY COMMISSIONER JOHNSON:   Okay.   In other

20   words -- all right -- I got that.   It was about the

21   drugs and other people, not sex with other people.

22         INMATE MOORE:   Yeah.   Yeah.   Yeah.

23         PRESIDING COMMISSIONER ST. JULIEN:   Okay.

24   Yeah, I -- I didn't get that either.

25         INMATE MOORE:   I didn't say that, did I?

26         ATTORNEY HANDLEMAN:   No.   That's what you were

27   trying to say though, right?

33

1        DEPUTY COMMISSIONER JOHNSON:  And then my

2   concern about that, Mr. Moore, is because in -- in the

3   Psych Report of June of 2002, the psychologist states

4   he related that they were, quote, having a pretty good

5   time off and on, end quote, until the last day when

6   they argued about, quote, drugs and lovers, end quote.

7   Okay?  So did he misunderstand -- did the psych

8   misunderstand you also?

9        INMATE MOORE:  Could be.

10        PRESIDING COMMISSIONER ST. JULIEN:  Okay.

11   Okay.  So for your juvenile record, you don't have a

12   juvenile record.  Adult history, criminal history, you

13   have arrest for burglary in 1967, but there's no

14   disposition.  And then also an arrest in '67.  It

15   looks like a drug violation, Health and Safety Code

16   11530, and that was dismissed as well.  And then in

17   1968, arrest for burglary, and then you were convicted

18   of a grand theft and received three years probation

19   and two months county jail, and then that -- in 1971,

20   that was set aside.  So do you remember -- do you

21   remember what you stole?

22        INMATE MOORE:  In the burglary, I believe it

23   was a car jack.

24        PRESIDING COMMISSIONER ST. JULIEN:  Oh,

25   somebody in --

26        INMATE MOORE:  Not a carjack.

27        PRESIDING COMMISSIONER ST. JULIEN:  Oh, oh.  I

34

1    thought you meant a carjacking.

2           INMATE MOORE:  No, no.

3           PRESIDING COMMISSIONER ST. JULIEN:  Oh.

4           INMATE MOORE:  I believe it was a

5    (indiscernible).

6           PRESIDING COMMISSIONER ST. JULIEN:  Oh, okay.

7    And then '69, possession of marijuana; and then '71,

8    petty theft.  And that conviction was set aside.  But

9    you got 90 days county jail and three years -- it just

10   says three years suspended, and I'm not sure what that

11   means.  Okay.  So you don't have a history, at least,

12   an arrest history of violence.  And just some thefts

13   there.  And, like you say, you -- your father was a --

14   it looks like he had an alcohol -- it looks like he

15   was an alcoholic, but he worked.  You had a religious

16   family.  You had -- it was -- do you have a brother or

17   sister?

18          INMATE MOORE:  Brother.

19          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

20   how's he doing?

21          INMATE MOORE:  He's doing okay.

22          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  Any

23   problems with the law?

24          INMATE MOORE:  No.

25          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

26   what -- why did -- what happened to you?

27          INMATE MOORE:  What happened to me?

35

1          PRESIDING COMMISSIONER ST. JULIEN:  I mean,

2     'cause everything -- you know, it looks like you had

3     the -- a typical --

4          INMATE MOORE:  Yeah.

5          PRESIDING COMMISSIONER ST. JULIEN:  -- good

6     family, you know, a typical upbringing that a lot of

7     these guys in here wish they would have had.  So what

8     happened?

9          INMATE MOORE:  What happened to me?

10         PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.  I

11    mean, I don't mean that derogatory.  I just want to

12    know, you know, again, what was going on in your life

13    that led you into this downward spiral.

14         INMATE MOORE:  Well, I -- I think it was just

15    bad choices that I was making.

16         PRESIDING COMMISSIONER ST. JULIEN:  And why

17    were you making bad choices?

18         INMATE MOORE:  I don't know.  It's --

19         PRESIDING COMMISSIONER ST. JULIEN:  I mean,

20    were you tired of working?

21         INMATE MOORE:  No, I wasn't tired of working,

22    because I could work with or without the drugs.  It's

23    just that they were really bad choices.  I -- I don't

24    know if I considered myself to be a rebel or a rebel

25    without a cause or what.

26         PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

27         INMATE MOORE:  But it was just a series of

36

1   really bad choices from the -- from the use of the

2   marijuana to -- to burglary which are -- which are

3   coward crimes anyway.

4          PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

5          INMATE MOORE:  I -- I was a coward.  And, I

6   don't know, maybe I was trying to escape by doing this

7   or maybe I was trying to -- to -- to get some

8   recognition or something for myself.

9          PRESIDING COMMISSIONER ST. JULIEN:  Some notice

10  or --

11         INMATE MOORE:  I don't know.

12         PRESIDING COMMISSIONER ST. JULIEN:  By

13  getting -- you know, a lot of times people -- any

14  attention is good attention.

15         INMATE MOORE:  (Indiscernible) I was going

16  about it.

17         PRESIDING COMMISSIONER ST. JULIEN:  Did you not

18  have enough attention when you were growing up from

19  your parents?

20         INMATE MOORE:  Probably, probably.  Both my

21  parents worked.  My brother worked.

22         PRESIDING COMMISSIONER ST. JULIEN:  Was he much

23  older?

24         INMATE MOORE:  He's ten years older than I am.

25         PRESIDING COMMISSIONER ST. JULIEN:  Oh.  Okay.

26  So were you pretty much alone?

27         INMATE MOORE:  Yeah, probably.

37

1          PRESIDING COMMISSIONER ST. JULIEN:  Okay.

2   Okay.  And so you're still married to your wife?

3          INMATE MOORE:  No.  We were --

4          PRESIDING COMMISSIONER ST. JULIEN:  Okay.

5   Because this just says Moore was separated from his

6   wife at the time.

7          INMATE MOORE:  No.  We've been -- we're

8   divorced now.

9          PRESIDING COMMISSIONER ST. JULIEN:  It says

10  Moore is married, but is currently going through

11  divorce proceedings.

12         INMATE MOORE:  That was --

13         PRESIDING COMMISSIONER ST. JULIEN:  So I guess

14  it's --

15         INMATE MOORE:  -- from the last hearing.

16         PRESIDING COMMISSIONER ST. JULIEN:  Oh, it's

17  dated this hearing again.  Okay.  So it took you a

18  long time to get divorced.

19         INMATE MOORE:  Uh-huh.

20         PRESIDING COMMISSIONER ST. JULIEN:  Why do you

21  think that is?

22         INMATE MOORE:  That's because, probably, she

23  probably wanted to get a divorce.  I was just moving

24  around.  I was just on the go.  I was just moving.

25  And in the life that I was in, I was just gone all the

26  time.  I was just moving all the time.

27         PRESIDING COMMISSIONER ST. JULIEN:  Okay.

38

1          INMATE MOORE:  We stayed in the a same city,

2     but I was, like, I lived in self different places in

3     Sacramento.

4          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

5     then in terms of your parole plans, your mom still

6     lives in Sacramento, so you would want to live with

7     her or your nephew, Willy, also in Sacramento.  And so

8     maybe your father is deceased?

9          INMATE MOORE:  Yes.

10          PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

11     the report says that you also contacted the Walden

12     House which is a tran -- Transitional Living Program

13     in San Francisco.  And in terms of employment, you're

14     certified entry -- data entry?

15          INMATE MOORE:  Uh-huh.

16          PRESIDING COMMISSIONER ST. JULIEN:  Data entry

17     operator.  And you had planned on working in data

18     entry computer.  Okay.  And you're also interested in

19     counseling, so it looks like drug counseling, biblical

20     counseling, general life counseling.  And -- so it

21     looks like you've had an interest in religion.  And

22     when did that interest take place?

23          INMATE MOORE:  A few years back.  I got

24     involved in some programs over at the chapel.  And I

25     take that as a way of maintaining my focus, keeping me

26     focused, keeping me driven to positive things and to

27     things I need to make sure my life doesn't go back to

39

1    the way it was.

2            PRESIDING COMMISSIONER ST. JULIEN:   Okay.

3    That's a good thing.  And then -- so in terms of a job

4    offer, you don't have a -- or maybe it's -- do you

5    have a job offer written?

6            INMATE MOORE:  No.

7            PRESIDING COMMISSIONER ST. JULIEN:   No, that's

8    all right, I mean --

9            INMATE MOORE:  No.

10           PRESIDING COMMISSIONER ST. JULIEN:   -- I know

11   it's very difficult to -- to get.  It said -- the

12   report also states that you don't think you'll have

13   any problem getting a job and that you're -- what is

14   it?  Six months away from becoming an apprentice?

15           INMATE MOORE:  Oh, CSC --

16           PRESIDING COMMISSIONER ST. JULIEN:   And what is

17   it?  What side that stand for?

18           INMATE MOORE:  It's a CSC Certification.  It's

19   a wood -- wood working machine that operates by

20   computers but it does -- it cuts wood.

21           PRESIDING COMMISSIONER ST. JULIEN:   Mm.

22           INMATE MOORE:  And so and then --

23           PRESIDING COMMISSIONER ST. JULIEN:   And that's

24   your -- is that a vocation?

25           INMATE MOORE:  Yes.

26           PRESIDING COMMISSIONER ST. JULIEN:   Okay.

27           INMATE MOORE:  Well, it's not a vocation, per

40

1    se, it's a certification.  And --

2          PRESIDING COMMISSIONER ST. JULIEN:  Oh, okay.

3          INMATE MOORE:  And it's not what the

4    institution would consider a vocation.  It's part

5    of -- it's part of my training in PIA.

6          PRESIDING COMMISSIONER ST. JULIEN:  PIA, okay.

7    But it's still something that's employed.  Is it?

8          INMATE MOORE:  Oh, yes.

9          PRESIDING COMMISSIONER ST. JULIEN:

10   (Indiscernible) it looks good.  And, now, I noted one

11   thing, and Commissioner Johnson will go through this

12   I'm sure more thoroughly, but I just wanted to ask you

13   one thing that was in the Psych Report that states

14   that you needed more recovery programming.  And as we

15   talked about that before that was several years ago.

16   And it looks like you've been doing more programming.

17   Did you take the suggestion from the last Board

18   Report?

19         INMATE MOORE:  Yes.

20         PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

21   up to then, why hadn't you participated as much as you

22   probably could have in terms of recovery programming?

23         INMATE MOORE:  I took some -- when I was in

24   Solano, I took some NA classes --

25         INMATE MOORE:  Uh-huh.

26         INMATE MOORE:  -- in there.  But, truthfully, I

27   was taking them for the wrong reason at the time.  I

41

1    wasn't taking them for myself.  I wasn't taking them

2    to try to improve myself.  I was taking them, because

3    it was a requirement and was taking them for the wrong

4    reason.  That's why I stopped.  And so I just quit,

5    because it wasn't helping me.

6              PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

7              INMATE MOORE:  And there was no application.

8              PRESIDING COMMISSIONER ST. JULIEN:  And so

9    what's changed?

10             INMATE MOORE:  Now, I want to apply the

11   principles in AA and NA and any other principles that

12   are positive to my life, like I said before, to make

13   sure that I don't go back down that other road.

14             PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

15   that was in -- so that was -- when did that change

16   come?  Was it around 2000 and two, or when did you

17   decide that you needed to take advantage of the

18   programs for your (indiscernible)?

19             INMATE MOORE:  Well, the last board -- the last

20   board hearing did kind of submit the fact that I

21   needed that.

22             PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

23             INMATE MOORE:  But it did start a little while

24   before that when I got involved in religion a little

25   bit.

26             PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

27             INMATE MOORE:  That helped and it kind of

1    pointed me to the fact that -- that I do need some

2    help.

3              PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

4              INMATE MOORE:  You know, and I won't -- I won't

5    be able to do it on my own, and --

6              PRESIDING COMMISSIONER ST. JULIEN:  Did you

7    think that you could do it on your own before?

8              INMATE MOORE:  I think so.  I think so.

9              PRESIDING COMMISSIONER ST. JULIEN:  Okay.

10    'Cause I don't -- okay.  Okay.  And you were in a jury

11    trial?

12              INMATE MOORE:  Yeah.

13              PRESIDING COMMISSIONER ST. JULIEN:  Did you get

14    offered a plea?

15              INMATE MOORE:  Yeah.

16              PRESIDING COMMISSIONER ST. JULIEN:  Isn't

17    that --

18              INMATE MOORE:  That -- we…

19              PRESIDING COMMISSIONER ST. JULIEN:  I'm

20    still -- okay.  Okay.  So -- I'm going did go through

21    these first.  So in terms of your letters here --

22              INMATE MOORE:  Uh-huh.

23              PRESIDING COMMISSIONER ST. JULIEN:  -- we have

24    a letter from your older brother, and his name is

25    Willy G. Moore, and lives in Sacramento.  And he says,

26    I can affirm the change in my brother's character.

27    He's no longer the same person that committed the

43

1   crime nearly 20 years ago, and is a changed man.   And
2   he also extends -- he says, I would be -- I will bring
3   him home -- bring him to my home where I can provide a
4   stable environment, housing, assisting in retaining
5   counseling required, provide employment in landscaping
6   or janitorial until he can secure his own employment.
7   I'm willing to assist him in any way possible.   Okay.
8   And then I -- this must be his son?
9           INMATE MOORE:   Is there a name?
10          PRESIDING COMMISSIONER ST. JULIEN:   Willy
11   Moore.
12          INMATE MOORE:   Uh-huh.
13          PRESIDING COMMISSIONER ST. JULIEN:   You know a
14   Willy -- Willy Moore?
15          INMATE MOORE:   Willy R.
16          PRESIDING COMMISSIONER ST. JULIEN:   Oh, R.
17   Yeah.
18          INMATE MOORE:   Uh-huh.
19          PRESIDING COMMISSIONER ST. JULIEN:   I see, a
20   proper name.   Okay.   That's like he's signing junior.
21   Okay.  And he's your nephew.   And he says, I've known
22   my uncle my whole life, and I've seen him change
23   gradually from the person he was to the positive
24   person he is now.   He is a counselor and advisor in my
25   youth, which allowed me to avoid many pitfalls in
26   life.   Should you allow him a second chance, I will
27   provide housing, assistance in securing employment,

44

1    and stability as he reorients himself into society.

2    Okay. And then Evelyn Moore and -- your mother?

3              INMATE MOORE:  Uh-huh.

4              PRESIDING COMMISSIONER ST. JULIEN:  And she

5    says, my son has taken some wrong turns in life, but I

6    believe he has put forth the effort to get his life

7    back together.  I remain in constant contact with him,

8    and he has shown dramatic improvement.  I continue to

9    offer my support, housing, and any other assistance my

10   son would require should you release him.  He can help

11   care for me, and I will take full responsibility for

12   him.  I am certain that he will be positive,

13   productive, an asset to our family, and, given the

14   opportunity, to the community.  Okay.  And then for

15   your 3042 notices -- and those are notices that go to

16   the courts and law enforcement -- letting them know of

17   the hearing.  We have a letter from the San Mateo

18   Police Department.  And it's signed by Susan Manheimer

19   who's the chief of police, M-A-N-H-E-I-M-E-R.  And she

20   says this letter is to express my agency's strong

21   opposition to parole -- a parole granted at this time.

22   Okay.  And on -- okay.  So before we move on, is there

23   anything you'd like to add about the commitment crime

24   and your future plans?

25             INMATE MOORE:  No.

26             PRESIDING COMMISSIONER ST. JULIEN:  Okay.

27   Okay.  Then Commissioner Johnson?

45

1        DEPUTY COMMISSIONER JOHNSON:  Mr. Moore, during

2    this portion of the hearing, we'll cover what you've

3    done since your last board appearance, and I prepared

4    for this by reviewing your Central File.  If there's

5    any -- once I've finished, if there's anything that

6    I've left out, you or your attorney will have the

7    opportunity to add that on.  The last hearing was June

8    of '02 here at San Quentin.  It was your initial

9    hearing.  The decision was a three-year denial.  The

10   recommendation was to upgrade vocationally and become

11   involved in self-help.  Classification score is 19,

12   Level two.  Custody Medium A.  Assignment is PIA.

13       INMATE MOORE:  Uh-huh.

14       DEPUTY COMMISSIONER JOHNSON:  And academics

15   since the last Board Report: August of '02,

16   communications; September of '03, algebra; June of

17   '04, pastoral care.  That was a college course.

18       INMATE MOORE:  These are all college courses.

19       DEPUTY COMMISSIONER JOHNSON:  Yeah.  May of

20   '05, Old Testament survey.  Self-help.  How long have

21   you been involved in AA this time?

22       INMATE MOORE:  A little over two years.

23       DEPUTY COMMISSIONER JOHNSON:  Counselor

24   Reports, AA.  Impact Module Three, October of '04,

25   January of '05, February of '05, and March of '05.

26   AA, each quarter since your last board appearance.

27   And laudatory chronos are in -- going back to the last

46

1 . board appearance.  Attended classes in college

2   program.  Oh, God, I think I covered that and -- most

3   of the laudatory chronos are AA participation and

4   education; is that correct?

5 .          INMATE MOORE:  Uh-huh.

6           DEPUTY COMMISSIONER JOHNSON:  I noticed your

7   work grades.  I was looking at those.  The most recent

8   one dated June of this year and probably the most

9   recent one isn't in here because of the file system,

10  but June of this year.  Work grades, one above average

11  and four exceptional.  And the length of the

12  supervision was 60 months.  How long have you been in

13  that job?  60 months, that's five --

14          INMATE MOORE:  Five years.

15          DEPUTY COMMISSIONER JOHNSON:  Five years.

16          INMATE MOORE:  Yeah.

17          DEPUTY COMMISSIONER JOHNSON:  Okay.  A

18  Psychological Evaluation dated June of '02 offered by

19  Eric Rueschenberg, R-E -- R-U-E-S-C-H-E-N-B-E-R-G,

20  Ph.D. and doctor -- mental health and medical history,

21  Mr. Moore does not have a mental health history either

22  in prison or the community.  Current mental status,

23  Mr. Moore arrived for the interview promptly, was

24  appropriately groomed and dressed, shaved head,

25  closely trimmed mustache; demeanor was mild-mannered

26  and easygoing.  He was alert and well-oriented in the

27  three spears.  His speech was normal and his responses

1    were well-articulated.  His mood was eurythmic.  And

2    effect was broad and appropriate.  He did not endorse

3    any primary systems of depression or hypromania --

4    hypomania.  His thinking was well-integrated and

5    purposeful.  There are no indications of paranoid

6    ideation.  Memory and concentration were intact.

7    Judgment was questionable, and insight was only

8    partial.  He denied any thoughts or ideations of harm

9    to self or others.  Diagnostic impression, Access One,

10   poly-substance abuse in full remission; Access Two,

11   diagnosis deferred; Three, none; Four, incarceration;

12   Access Five, GAF of 85.  Risk for violence.  I'm going

13   to defer to the conclusion on that.  He -- he explains

14   -- Mr. -- or doctor explains the current research that

15   supports empirical-based risk assessment, and his

16   assessment is, overall, Mr. Moore appears to have low

17   to moderate rest -- risk for violence in the

18   community.  At the time of the index offense, his

19   criminal record was minor, and he had no violent

20   offenses.  However, he was heavily emerged in cocaine

21   use and the drug subculture.  According to the POR, he

22   was financially supported by the victim.  And while

23   she was at work, he rented out their room to drug

24   users.  It appeared that his life was headed in a

25   downward spiral.  In the present interview, he seemed

26   to have difficulty identifying the factors that

27   contributed to the crime.  His institutional

48

1   adjustment in prison has been favorable.  He has

2   exhibited a prosocial orientation, resuming his

3   college education, and receiving exceptional ratings

4   from his supervisors for his work performance.  He has

5   not received any CDC 115s.  He has also been an active

6   participant in religious activities.  He seems to be

7   demonstrating a level of maturity and motivation that

8   was lacking at the time of his offense.  His primary

9   concern is his lack of participation in recovery

10  programming, especially considering the circumstance

11  of his crime.  He also needs to formulate a more

12  complete parole plan that includes strategies for

13  relapse prevention.  I note in reference to that last

14  statement that this report was written in June of '02,

15  and since then, you had taken and done the positive

16  programming.  Is there anything I've left out?

17          ATTORNEY HANDLEMAN:  You -- the -- you missed a

18  couple of the college courses.  Because under the

19  lauditary (sic) -- laudatory chronos, there's actually

20  one, two, three, four, five, seven college courses

21  since spring of 2002.  I think you missed the one on

22  church leadership and administration in the summer of

23  2004.

24          DEPUTY COMMISSIONER JOHNSON:  Okay.  I think we

25  missed this one, too.

26          ATTORNEY HANDLEMAN:  Oh, yes.  Administrative

27  Services Certificate.  And there's a Ministry

49

1    Certificate, apparently.  Within -- what -- when do

2    you think that was from?

3              INMATE MOORE:  No.  It was this fall.

4              ATTORNEY HANDLEMAN:  Okay.

5              DEPUTY COMMISSIONER JOHNSON:  It was that

6    pass -- okay.  Anything else?  I return to the chair.

7              PRESIDING COMMISSIONER ST. JULIEN:  Okay.  Did

8    you strangle Claire?

9              INMATE MOORE:  Yes.

10             PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

11   why didn't you tell me that?

12             INMATE MOORE:  Excuse me?

13             PRESIDING COMMISSIONER ST. JULIEN:  So why

14   didn't you mention that?  When I was talking to you

15   about what happened during -- you know, how she died,

16   how she was killed, you didn't mention that you

17   strangled her.

18             INMATE MOORE:  Oh, I'm sorry.

19             PRESIDING COMMISSIONER ST. JULIEN:  Well, don't

20   be sorry.  I mean, I'm just wond -- wondering why you

21   didn't mention it.

22             INMATE MOORE:  I assumed you knew.

23             PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

24   it must have been a pretty bad fight.  Did she hit you

25   back at all or --

26             INMATE MOORE:  Yeah.  It was -- it was mutual

27   exchanges.

50

1        PRESIDING COMMISSIONER ST. JULIEN:  Okay.  So

2   just explain the insight component for another a

3   minute.  Do you know what -- beside the drug

4   influence, which I know is very significant, but

5   you're not being violent before or after?  Do you know

6   what possessed you at that point in time to become

7   that violent that you would strangle Claire and then

8   knock her into a wall or to wherever?  I mean, I know

9   you said that night was foggy, but you said -- also

10  you said that you're trying out -- to find, you know,

11  to find out what really happened, you know, to delve

12  deep inside and figure out what happened.

13       INMATE MOORE:  From my recollection, I believe

14  that -- that we were on the bed and we were arguing.

15  I believe she struck me with something.  And I have no

16  proof of that.  I have no medical anything to -- to

17  corroborate that or anything.

18       PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

19       INMATE MOORE:  All I know is that I felt a

20  painful sensation in my head.

21       PRESIDING COMMISSIONER ST. JULIEN:  Uh-huh.

22       INMATE MOORE:  I don't know if I blacked out.

23  I know if I -- I don't know.

24       PRESIDING COMMISSIONER ST. JULIEN:  Okay.  And

25  I -- it looks like they had the same trouble in the

26  last hearing, because one of commissioners then is

27  saying, without copies of the Autopsy Report, which I

51

1    had asked to be provided for this hearing.  Not that

2    they're there.  We have a bit -- so that we need a

3    better understanding of the injuries to the victim.

4    Okay.  In there she says that there was some bruising.

5    Did you hit her -- had you hit her before?

6            INMATE MOORE:  No.

7            PRESIDING COMMISSIONER ST. JULIEN:  Okay.

8    Okay.  And I also, when I went over to get this

9    transcript, there's an envelope with a letter, and I

10   guess it's from your attorney.

11           ATTORNEY HANDLEMAN:  I thought you had that.  I

12   thought you had already had that.

13           PRESIDING COMMISSIONER ST. JULIEN:  Oh.  No, I

14   didn't.  I mean, I just read it now, but --

15           ATTORNEY HANDLEMAN:  Okay.

16           PRESIDING COMMISSIONER ST. JULIEN:  It's --

17   now, do you work with the prison -- California Prison

18   (indiscernible)?

19           INMATE MOORE:  Yeah.  It's a nonprofit --

20           PRESIDING COMMISSIONER ST. JULIEN:  Okay.  I

21   never heard of it before.  So -- okay.  So you wrote

22   the letter --

23           INMATE MOORE:  Right.

24           PRESIDING COMMISSIONER ST. JULIEN:  -- on

25   behalf of (indiscernible) and you're also

26   representing --

27           INMATE MOORE:  Right.

1　　　　PRESIDING COMMISSIONER ST. JULIEN:　Okay.　And

2　this is giving an overview of the crime of your

3　position that Mr. Moore should be found suitable.

4　Okay.

5　　　　ATTORNEY HANDLEMAN:　Yes.

6　　　　PRESIDING COMMISSIONER ST. JULIEN:　Okay.

7　Okay.　Do you have any other questions?

8　　　　DEPUTY COMMISSIONER JOHNSON:　How long have you

9　been involved in -- seriously in AA?

10　　　　INMATE MOORE:　A little over two years.

11　　　　DEPUTY COMMISSIONER JOHNSON:　You know the

12　steps?

13　　　　INMATE MOORE:　Pardon me?

14　　　　DEPUTY COMMISSIONER JOHNSON:　Do you know the

15　steps?

16　　　　INMATE MOORE:　I don't know them by memory, but

17　I know that they're all biblically based and that I

18　have -- I have a general understanding of what they

19　mean.

20　　　　DEPUTY COMMISSIONER JOHNSON:　Do you think it's

21　important to memorize them?　Isn't that one of the --

22　one of the steps of the 12 steps?

23　　　　INMATE MOORE:　Yeah.　I think it's important,

24　and I'm -- I'm beginning to.

25　　　　DEPUTY COMMISSIONER JOHNSON:　Do you remember

26　any of them?

27　　　　INMATE MOORE:　I can remember three.

53

1        DEPUTY COMMISSIONER JOHNSON:  Number 3?

2        INMATE MOORE:  Uh-huh.

3        DEPUTY COMMISSIONER JOHNSON:  What is it?

4        INMATE MOORE:  Make a conscious decision to

5    turn my will and my life over to the care of God.

6        INMATE MOORE:  You said that -- Miss --

7    Miss St. Julienne asked you about why you didn't

8    mention that you had strangled her, and your response

9    was, you thought we knew; is that correct?

10       INMATE MOORE:  Uh-huh.

11       DEPUTY COMMISSIONER JOHNSON:  If my memory

12   serves me correct, the questioning -- as she was

13   questioning -- questioning you about that was a

14   general questioning of you to find out what happened

15   to the victim in this case.

16       INMATE MOORE:  Uh-huh.

17       DEPUTY COMMISSIONER JOHNSON:  Wouldn't you

18   think it would be important that we know in this fight

19   that you strangled her?

20       INMATE MOORE:  Yeah.

21       DEPUTY COMMISSIONER JOHNSON:  Or attempted to?

22       INMATE MOORE:  Yes.

23       DEPUTY COMMISSIONER JOHNSON:  All right.  I

24   don't have anything further.

25       INMATE MOORE:  I'm -- like I said, I'm sorry

26   about that.  I thought that you had probably read

27   over.

54

1          DEPUTY COMMISSIONER JOHNSON:  Let me make a

2     suggestion to you.  Don't make any assumptions.

3          INMATE MOORE:  Okay.

4          PRESIDING COMMISSIONER ST. JULIEN:  Okay?

5          DEPUTY COMMISSIONER JOHNSON:  Okay.

6          INMATE MOORE:  Okay.

7          DEPUTY COMMISSIONER JOHNSON:  All right.

8          PRESIDING COMMISSIONER ST. JULIEN:  Because

9     some of the stuff we get ahead of the time, and some

10    of the stuff we don't.  And I'm looking for the appeal

11    in here.

12         DEPUTY COMMISSIONER JOHNSON:  Yeah.  Did you

13    appeal your case, because I can't -- I can't find it.

14         PRESIDING COMMISSIONER ST. JULIEN:  Yeah.  And

15    usually, that's the first thing I look for, and I

16    don't see it in here, but I know in the transcript it

17    talks about an appeal.

18         INMATE MOORE:  I --

19         PRESIDING COMMISSIONER ST. JULIEN:  So your

20    file is in -- incomplete.

21         INMATE MOORE:  I have it here.

22         PRESIDING COMMISSIONER ST. JULIEN:  Because you

23    appealed, right?

24         INMATE MOORE:  I went through the -- the normal

25    appeal process.

26         PRESIDING COMMISSIONER ST. JULIEN:  Yeah,

27    that's right, yeah.

55

1            INMATE MOORE:  Yeah.  That one was done.

2            PRESIDING COMMISSIONER ST. JULIEN:  Because I

3   don't have it in here.  I don't know why it's not in

4   here.  But I don't think any of us had one.  But just

5   reading in this transcript --

6            DEPUTY DISTRICT ATTORNEY GALLAGHER:  Yeah, it's

7   here.

8            PRESIDING COMMISSIONER ST. JULIEN:  -- it said

9   that you --

10           DEPUTY DISTRICT ATTORNEY GALLAGHER:  May I just

11  clarify, after the last hearing, I see a note from the

12  district attorney who attended having both the

13  appellant decision and a copy of the Autopsy Report

14  forwarded to the CDC File.

15           PRESIDING COMMISSIONER ST. JULIEN:  Yeah.  So

16  maybe they just didn't put it in the other reports.

17  It looks like it's in the C File but not anywhere

18  else, which doesn't do us any good when we're, you

19  know, reviewing at home.  So -- okay.  Well, this is

20  Heather Dun.  This is the last case, Commissioner

21  Johnson.

22           DEPUTY COMMISSIONER JOHNSON:  Shame on me.

23           PRESIDING COMMISSIONER ST. JULIEN:  That's

24  okay.

25           DEPUTY COMMISSIONER JOHNSON:  It's in his file

26  here.

27           PRESIDING COMMISSIONER ST. JULIEN:  Actually,

56

1  this wasn't -- now that you mention it, this wasn't in

2  the last case either, because I wasn't here so.  Okay.

3  Well -- we'll have to ask everybody before we start if

4  they've had an appeal this week if they appealed the

5  decision previously.  Anyway, because usually the

6  appeal would give a more vivid description of what the

7  Autopsy Report said or, you know, whatever.  But --

8  yeah, I don't think we have it.

9         **DEPUTY COMMISSIONER JOHNSON:**  Yep.

10        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

11  Because there -- which is strange, because in the last

12  hearing, they quoted from the appeal.  So, I don't

13  know.  Okay.  Oh -- oh, he says the district

14  attorney's reading the appellant decision which I

15  haven't seen.  Yes, I guess we -- maybe the DA had one

16  and nobody else had one, too.  So -- okay.  It just

17  makes us a little -- it's a little confusing for us,

18  because we don't have, you know, we don't have all the

19  information that we should have.

20        **DEPUTY DISTRICT ATTORNEY GALLAGHER:**  Right.

21  And I think that was the reason, obviously, for

22  forwarding those two things, and his note indicates

23  that it was sent to the parole board but --

24        **PRESIDING COMMISSIONER ST. JULIEN:**  Probably

25  should be sent to --

26        **DEPUTY COMMISSIONER JOHNSON:**  It should be sent

27  to the institution --

1          **PRESIDING COMMISSIONER ST. JULIEN:**  Yeah.

2          **DEPUTY COMMISSIONER JOHNSON:**  -- for placement

3    into the Central File.

4          **PRESIDING COMMISSIONER ST. JULIEN:**  Yeah.

5          **ATTORNEY HANDLEMAN:**  That could be it.

6          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

7    Okay.  Okay.  And Commissioner Johnson just mentioned

8    to us but I'll say it again, it's not that, you know,

9    anybody here's interested in stepping you up or, you

10   know, or accusing you of not being forthcoming, you

11   know, or whatever, but it's very important to be, I

12   think, really clear about the crime and what happened

13   even if it's something that you have to recount from a

14   transcript even if it's something you can't remember,

15   because, like I said, I having trouble grasping how

16   knocking somebody against the wall could lead to their

17   death.  You know, and now I find out there's bruises

18   and strangulation and all kinds of things which, you

19   know, makes much more sense.  So often, I think, it

20   makes or -- you know, it's hard for you.  It might

21   even be very hard for you to come to grips with what

22   happened.  But until you can come to grips, good, bad

23   or ugly, you know, you can't move on from it.  So as

24   awful as this crime was and, you know, the injuries

25   suffered by the victim, they have to be brought out in

26   the open, and they have to be discussed, because,

27   otherwise, you know, you're not going to be able to

58

1   face them and confront them and then move on.  Okay?

2           INMATE MOORE:  Okay.

3           PRESIDING COMMISSIONER ST. JULIEN:  Okay.

4   Okay.  Mr. Gallagher, do you have questions for

5   Mr. Moore?

6           DEPUTY DISTRICT ATTORNEY GALLAGHER:  I do.  I

7   just have a few if I might.

8           PRESIDING COMMISSIONER ST. JULIEN:  Okay.

9           DEPUTY DISTRICT ATTORNEY GALLAGHER:  Would the

10  board ask the inmate if he recalls the act of

11  strangulation, if he did it with his hands or with an

12  instrument?

13          PRESIDING COMMISSIONER ST. JULIEN:  Do you

14  recall that?

15          INMATE MOORE:  Hands.

16          PRESIDING COMMISSIONER ST. JULIEN:  Did you

17  hear that?

18          DEPUTY DISTRICT ATTORNEY GALLAGHER:  Good.  He

19  said hands.

20          PRESIDING COMMISSIONER ST. JULIEN:  Hands.

21  Yeah.

22          DEPUTY DISTRICT ATTORNEY GALLAGHER:  And if

23  the -- will the board ask the inmate if he recalls

24  the -- the acts actually causing death by his

25  strangulation and the infliction of the head injuries?

26  Does he also recall the specific acts of beating that

27  led up to the acts causing death?

59

1          **PRESIDING COMMISSIONER ST. JULIEN:** Did you
2     hear is that?

3          **INMATE MOORE:** What did he say?

4          **PRESIDING COMMISSIONER ST. JULIEN:** I'm sorry.
5     Can you repeat the question?

6          **DEPUTY DISTRICT ATTORNEY GALLAGHER:** Sure.
7     If -- if the board would ask the inmate if he recalls
8     the acts causing death, the strangling -- the
9     strangulation and the beating that caused the head
10    injury? Does he also recall the beating of the victim
11    that led up to the acts that caused death, the
12    strangulation? Does he --

13         **PRESIDING COMMISSIONER ST. JULIEN:** Maybe
14    make it -- make it -- can you make that two -- two
15    questions. It's kind of a compound question there.

16         **DEPUTY DISTRICT ATTORNEY GALLAGHER:** If you
17    would ask the inmate if he recalls beating the victim.

18         **INMATE MOORE:** Somewhat, yes.

19         **DEPUTY DISTRICT ATTORNEY GALLAGHER:** If the
20    board would ask the inmate how he recalls beating her.

21         **INMATE MOORE:** I mentioned before that the
22    events that led up to this are -- are sketchy. I know
23    that there was a fight. I know that it was brutal.
24    And I know that I had a part in that. And all of the
25    events I'm not that clear on, but I know that I'm
26    responsible for what happened in that room.

27         **PRESIDING COMMISSIONER ST. JULIEN:** Would the

60

1    board ask the inmate why he described the fight as

2    brutal?  What made it brutal?

3         **INMATE MOORE:**  Why I describe the fight as

4    brutal?

5         **DEPUTY DISTRICT ATTORNEY GALLAGHER:**  Yes.

6         **PRESIDING COMMISSIONER ST. JULIEN:**  Uh-huh.

7         **INMATE MOORE:**  Because she's dead.

8         **DEPUTY DISTRICT ATTORNEY GALLAGHER:**  Would the

9    board ask the inmate if he would describe this fight

10   as brief or a long fight?  A short one or a long one?

11        **INMATE MOORE:**  As far -- as far as the duration

12   of the fight, I'm not that clear on how long it went

13   on.  By what was done in the transcripts and what was

14   brought out in court, I'm assuming that it was quite

15   extensive.

16        **DEPUTY DISTRICT ATTORNEY GALLAGHER:**  And would

17   the board ask the inmate if by extensive does me mean

18   that it was long over a period of time and of such

19   level that other people would have heard it?

20        **INMATE MOORE:**  Yes.

21        **DEPUTY DISTRICT ATTORNEY GALLAGHER:**  Would the

22   board ask the inmate if his inability or -- or being

23   unable to remember certain aspects of what happened is

24   due, in his belief, to the drugs that he had used?

25        **INMATE MOORE:**  Yes.

26        **DEPUTY DISTRICT ATTORNEY GALLAGHER:**  Would the

27   board ask the inmate if he has an explanation for why

1    when his blood was tested after arrest that it showed

2    a fairly low level of drugs in his system, and the

3    police officers didn't note that he appeared to be

4    under the influence of drugs?

5    **INMATE MOORE:**  I can't --

6    **ATTORNEY HANDLEMAN:**  I would clarify that or

7    object to clarify or point out that it was, according

8    to Probation Officer's Report, it was a good number of

9    hours after the actually assault had taken place when

10    the defendant was tested for drug use.

11    **DEPUTY DISTRICT ATTORNEY GALLAGHER:**  Let's

12    clarify that.  Would the board ask the inmate if he

13    has an explanation for why the police officers didn't

14    note he appeared to be under the influence of a

15    controlled substance when he was arrested at the

16    motel?

17    **INMATE MOORE:**  Would I -- could you ask that

18    again?

19    **DEPUTY DISTRICT ATTORNEY GALLAGHER:**  Sure.  Do

20    you have an explanation for why the police officers

21    would say that you did not appear to be under the

22    influence?

23    **INMATE MOORE:**  I don't know.  I can't answer

24    for them.  All I can -- all I know is that I know we

25    had done cocaine and we were on -- we had done alcohol

26    before the events that led -- during the events that

27    led up to this.  And we were both under the influence

62

1    of both alcohol and cocaine.

2        **DEPUTY DISTRICT ATTORNEY GALLAGHER:**  Would the

3    board ask the inmate why he called the paramedics if

4    he had just finished strangling her?

5        **INMATE MOORE:**  I didn't want her to die, and I

6    knew that she was beyond my help.

7        **DEPUTY DISTRICT ATTORNEY GALLAGHER:**  Is --

8    would the board ask the inmate if he is aware of the

9    fact that the first degree murder conviction is based

10   on a torture theory?

11       **INMATE MOORE:**  Yes.

12       **DEPUTY DISTRICT ATTORNEY GALLAGHER:**  And would

13   the board ask the inmate if -- if drugs had been such

14   a significant part of how he came to be in custody,

15   why he didn't start narcotics anonymous until two

16   years ago.

17       **INMATE MOORE:**  I explained that before.

18       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

19       **INMATE MOORE:**  Because --

20       **PRESIDING COMMISSIONER ST. JULIEN:**  Answer.  Go

21   ahead.

22       **INMATE MOORE:**  Okay.  Because I wasn't

23   already -- I was doing it for the wrong reason, and I

24   thought that I could help myself, and I didn't think

25   that I needed those types of programs to help myself.

26       **DEPUTY DISTRICT ATTORNEY GALLAGHER:**  Okay.

27   That's all I have then.  Thank you.

63

1            **PRESIDING COMMISSIONER ST. JULIEN:**    Okay.    And

2    Mr. Handleman?    Questions?

3            **ATTORNEY HANDLEMAN:**    When -- when -- when you

4    were -- also directed through the board?

5            **PRESIDING COMMISSIONER ST. JULIEN:**    No.

6            **ATTORNEY HANDLEMAN:**    No.    Mr. Moore, when you

7    were -- on the night of the commitment offense or the

8    day of commitment offense, how many days or how

9    long -- for how long of a time did you say you had

10    been using drugs and crack cocaine and alcohol?

11            **INMATE MOORE:**    We'd been up for at least five

12    days doing drugs and alcohol.

13            **ATTORNEY HANDLEMAN:**    And had you gone to sleep

14    during those five days?

15            **INMATE MOORE:**    No.

16            **ATTORNEY HANDLEMAN:**    That's -- that's all.    No

17    further questions.

18            **PRESIDING COMMISSIONER ST. JULIEN:**    Okay.

19    Okay.    And Mr. Gallagher, do you have a closing

20    statement, please?

21            **DEPUTY DISTRICT ATTORNEY GALLAGHER:**    I do.    I

22    think it's instructive, the -- the way in which some

23    of the evidence was discovered at the hearing.    I had,

24    obviously, the information as to the cause of death as

25    to how some of the other physical aspects of the

26    victim were documented and found it interesting that

27    the defendant hadn't noted anything prior to the

64

1    court, and had every intention of doing that and

2    asking why he hadn't brought forward some of the

3    specifics, because I frankly think that he is at the

4    same place that he was in 2000 and two in terms of the

5    acceptance of responsibility and understanding how he

6    came to be, where he -- where he is now and where he

7    was then.  The board, I think, had indicated the last

8    time that he needed to be more forthcoming about his

9    crime to demonstrate insight, that there was an

10   inability or unwillingness to learn how to deal with

11   stress and how to cope with it and these things made

12   him an unpredictable threat to society and, I think

13   frankly, we're still in that same place where this

14   vicious crime that went for by witness's testimony,

15   over a period of hours before the phone call was made

16   to 911 is without known motive.  There's no indication

17   what would have caused this type of violent rage, and

18   there's no information to help us, I think at this

19   point, in determining what would have caused such a

20   violent act by the defendant.  Now we're 19 years down

21   the road, it doesn't provide any type of security for

22   the public when the defendant -- I'm sorry, when the

23   inmate exhibits such little insight into himself and

24   into the certain senses of his crime.  And I'll

25   submit.

26            **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

27   Thank you.  And, Mr. Gallagher -- I'm sorry.

1  Mr. Handleman?

2      **ATTORNEY HANDLEMAN:**  Yeah.  I think that Mr. --

3  Mr. -- first let me address the district attorney's

4  observations that there was no known motive, no

5  acceptance of responsibility.  Mr. Moore is -- has

6  been -- has looked into his offense and has seen the

7  primary role of drugs.  And a lot of what we heard

8  discussed today is crack cocaine and the fact that he

9  had a deep level of addiction to crack as did his

10  girlfriend, the Victim Claire Miller.  The -- the --

11  so there has been certainly an acceptance of

12  responsibility for becoming a drug addict and the

13  result and consequences of his drug addiction.  The

14  motive -- if argue where there's motive that's because

15  he was, as he himself stated, he was in an irrational,

16  deranged state of mind owing to the drug use.  And

17  when one is addicted to drugs, there's not a clear,

18  rational motive for one's behavior.  I -- I think that

19  looking positively about at -- at what Mr. Moore's

20  behavior here, it's his -- the tremendous amount of

21  programming that he's done since 2002, the Alcoholics

22  A the impact, the 7 college classes, most of them

23  related to, in one way or another, to bible study, all

24  points to his remorsefulness and his interest in

25  improving himself and his commitment to self

26  awareness.  I would also say as far as remorse and

27  regret go, that in addressing the matter of taking

1    responsibility, I would quote his most recent

2    Counselor's Report.  Moore appears very remorseful and

3    expressed his deep regret for his actions.  He

4    acknowledges his responsibility for the crime.  He

5    does not attempt to make any excuses for his actions.

6    And according to his next previous Counselor's Report

7    in June 2002, Moore appears remorseful.  He was

8    tearful throughout the interview, and he was sweating

9    profusely when talking about the details of the crime.

10   Again, he does not attempt to make any excuses for his

11   actions.  I think in addressing the question of

12   Mr. Moore's suitability, also, it's necessary to look

13   at him as a total individual, not -- not solely at the

14   commitment offense.  I mean, and when you look at his

15   life history, you see that he lacks any significant

16   history of violent crime.  That's a -- which is a

17   factor of supporting the finding of suitability.  And

18   his lack of violence is -- is attested to that, and

19   there's a letter from his wife in his C File that he's

20   never been a violent man.  That's from his

21   preincarceration wife, Marilyn Moore.  So it would

22   also be necessary that no one would deny it, least of

23   all Mr. Moore would deny it, the commitment offense --

24   that the commitment offense was, you know, was a

25   tragic episode in which somebody lost their life.  A

26   woman lost her life.  And no one in this room, I

27   think, more than Mr. Moore would want to undue that.

67

1    But one circumstance still should be noted in

2    mitigation which is that Mr. Moore tried to conduct

3    CPR on his victim when he noticed that she wasn't

4    breathing.  He called for assistance and waited for

5    the a police to arrive.  So it wasn't a premeditated

6    murder.  It was an episode which Mr. Moore has been

7    open about -- completely open about that there was

8    some -- there was some beating that went on, there was

9    various wounds which were inflicted, and the totality

10   of these wounds resulted in Miss Miller's death.  I

11   don't think that Mr. Moore has tried to be -- I think

12   he has been evasive in any way regarding the episode

13   which is that he's been clear with the fact that over

14   the course of an evening in -- in which he was in a

15   drug (indiscernible) state.  He was repeatedly violent

16   to her, and she died from one blunt force injury or

17   another.  So -- so all these factors in addition to

18   those which I've enumerated in this letter, support --

19   support finding his suitability.

20           **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

21   Thank you, sir.  And Mr. Moore, do you have anything

22   to add regarding your parole suitability?

23           **INMATE MOORE:**  Just that I -- I know that what

24   I did, I mean, it -- I have to live with that every

25   day.  And I'm not trying to mitigate anything that

26   I've done, and I'm not trying to sidestep anything

27   that I've done.  I did a terrible thing.  And I am

68

1   doing everything I can to come to terms with that.

2   I'm doing everything I can to make sure that that

3   doesn't happen again.  In any situation -- in any

4   situation and any circumstance, I'm trying to make

5   sure that -- that -- that whoever that guy was -- that

6   guy there -- doesn't come back.  That's it.

7          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay, sir.

8   Okay.  Thank you very much.  We will recess now for

9   deliberations.

10                        **R E C E S S**

11                        --oOo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

69

1         **CALIFORNIA BOARD OF PAROLE HEARINGS**

2               **D E C I S I O N**

3      **DEPUTY COMMISSIONER JOHNSON:**  We're back on the

4  record.

5      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.  So

6  we put them in the file.

7      **DEPUTY COMMISSIONER JOHNSON:**  They might get

8  lost.

9      **PRESIDING COMMISSIONER ST. JULIEN:**  Yeah.

10     **DEPUTY COMMISSIONER JOHNSON:**  We're not

11  authorized to put stuff in the file.

12     **PRESIDING COMMISSIONER ST. JULIEN:**  So you

13  want -- yeah, so you want -- you want to make sure you

14  give them to your counsel.

15     **INMATE MOORE:**  Okay.

16     **DEPUTY COMMISSIONER JOHNSON:**  To be -- to be

17  placed in your Central File.

18     **INMATE MOORE:**  Okay.

19     **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.  All

20  parties have returned to the room for the hearing for

21  Mr. Ronald Moore, and, Mr. Moore, we are going to deny

22  you parole at this time.  The panel's reviewed all the

23  information received from the public and relied on the

24  followed circumstances in -- including that the inmate

25  is not yet suitable for parole and would pose an

26  unreasonable risk of danger to society or a threat to

27  **RONALD MOORE    D-92538    DECISION PAGE 1    11/28/05**

70

1    public safety if released from prison.  Specifically,

2    as it regards the commitment offense, the offense was

3    carried out in an especially cruel and callous manner.

4    And that the victim who was the inmate's girlfriend,

5    Claire Miller, age 34 at the time, was beaten to death

6    and strangled and this took place following a -- a

7    seemingly prolonged physical altercation between the

8    two parties.  The offense was carried out in a manner

9    which demonstrates an exceptionally callous disregard

10   for human suffering in that apparently the victim had

11   several bruises and, again, was strangled and hit or

12   suffered a blow to the head which caused her to become

13   unconscious and succumb to those injuries.  And the

14   motive for the crime is inexplicable or very trivial

15   in relation to the offense, and then apparently was

16   over -- the death occurred during a fight over drug

17   use.  And these conclusions are drawn from the

18   statement of facts as they appear in the summary of

19   the crime in the November 2000 and five Board Report

20   wherein it states that the police officers were called

21   to a motel in -- on Bay Shore Boulevard in San Mateo,

22   and they found Ronald Moore who's the -- the inmate

23   with the Victim Claire Miller who was unconscious and

24   appeared to have been beaten.  At first, Mr. Moore

25   told the police that he returned home to the motel and

26   found the victim nude, unconscious and apparently

27   **RONALD MOORE      D-92538     DECISION PAGE 2     11/28/05**

71

1    beaten.  He said that the victim occasionally engaged

2    in acts of prostitution and, when she did so,

3    Mr. Moore left the room.  He said that he left on this

4    date for that reason.  The victim, who had been

5    transported to the hospital soon after the arrival of

6    the police, died of a brain injury suffered during the

7    assault.  Eventually, Mr. Moore changed his story and

8    told the officer that he and the victim used crack

9    cocaine by smoking it and became engaged in an

10    argument.  The inmate then said that the victim lied

11    to him about her use of cocaine and seeing other men

12    and having sexual relations with them in order to

13    obtain crack cocaine.  Moore stated that the argument

14    became a physical altercation between Miller and

15    himself.  As a result, the victim became unconscious

16    and Moore eventually had to give her CPR.  Later, he

17    determined that he could do nothing more to help her.

18    And while your -- in regards to the previous record,

19    there's no juvenile record.  And, however, there was a

20    failed attempt at adult probation, and there was also

21    a county jail term and this was for petty theft and

22    grand theft.  And the inmate also has a history of

23    unstable social history that includes the extents and

24    narcotics -- illegal narcotics use.  And in terms of

25    your incarceration, the inmate although you are now

26    starting to program a little more wholeheartedly and

27    **RONALD MOORE    D-92538    DECISION PAGE 3    11/28/05**

1    better, but since you've been here 19 years, you're

2    programmed in a limited manner while incarcerated and

3    specifically not sufficiently participated in the

4    official -- beneficial self-help and therapy programs.

5    And the Psychology Report dated May 7, 2000 and 2

6    authored by  Dr. Rueschenberg is not totally

7    supportive of release and that he gives you a low to

8    moderately low rate of future violence, and we would

9    like to see that at a low.  And in terms of your

10   parole plans, you do have viable residential plans.

11   Not in the county of last single residence, but that's

12   no longer an issue.  The board likes to parole people

13   where they would do best, so Sacramento County where

14   your family is probably the best choice for you.  And

15   you do have a marketable skill, and you do have some

16   options for employment, but we would like to see -- if

17   you could firm those up as much as possible to get

18   some -- you know, try -- I know a job offer is hard to

19   get, but perhaps you can, you know, send out letters

20   and just kind of see what response you get in your

21   chosen field.  And the hearing panel notes that in

22   response to Penal Code Section 3042 notices,

23   opposition has been expressed by the district attorney

24   of San Mateo County.  And the panel makes the

25   following findings.  The inmate needs therapy in order

26   to face, discuss, understand, and cope with stress in

27   **RONALD MOORE**      **D-92538**      **DECISION PAGE 4**      **11/28/05**

73

1    a nondestructive manner.  Until progress is made, the

2    ·inmate continues to be unpredictable and a threat to

3    others.  And the inmate need to (indiscernible) recent

4    needs to demonstrate the ability to demonstrate these

5    needs over an extended period of time.  Nevertheless,

6    we would like to commend you for being disciplinary

7    free throughout your entire incarceration and that is,

8    indeed, an exceptional accomplishment.  And you are to

9    be commended for that as well as your work in the

10   Prison Industries Authority where you're doing – where

11   you're a certified computer operator, and as well as

12   taking numerous college classes and ,again, you're --

13   you have breaking barriers and that goes back to '90,

14   '91, and '92.  And you have done the Project Impact

15   Module 3 and that's been in -- that's 2004, 2005.

16   You're AA work, and we notice you have chronos from

17   2003 to 2005, and we would encourage you to, indeed,

18   step that up and become as focused as you can.  And we

19   also see a list of probably 15 or so educational --

20   higher educational classes that you have been taking,

21   so we would definitely commend you for that and,

22   again, on your certification in computer operator and

23   as a computer operator and data entry operator.

24   However, these positive aspects of behavior do not

25   outweigh the factors of unsuitability.  And in a

26   separate decision we find that the inmate has been

27   **RONALD MOORE**    **D-92538**    **DECISION PAGE 5**    **11/28/05**

74

1    convicted of murder, and it is not reasonable to

2    expect that parole be granted at a hearing during the

3    next two years. And specific reasons for that again,

4    the severity of the commitment crime, the crime was

5    committed in an especially cruel manner and that the

6    inmate and the Victim Claire Miller, 34 years old at

7    the time was beaten to death. She was beaten,

8    strangled by the inmate. And this was apparently over

9    the use of drugs. The inmate was high on crack

10   cocaine, and an argument ensued between he and the

11   victim. And apparently this victim, I mean, this

12   argument lasted quite some time. It escalated to the

13   point of the victim being strangled, knocked to the

14   point of unconsciousness and then finally succumbing

15   to those injuries. And we will note also for the

16   record that the inmate did not leave the victim for

17   dead, but did try to secure help. So that would be a

18   mitigating factor. And, however, the offense was

19   carried out in a dispassionate manner and a manner

20   which demonstrates an exceptionally callous disregard

21   for human suffering and, again, also the motive for

22   the crime is inexplicable and very trivial in relation

23   to the offense and that apparently was over the use of

24   drugs and other relationship issues. And the inmate

25   has a history of illegal drug use, specifically crack

26   cocaine. And the recent Psychological Report dated

27   **RONALD MOORE    D-92538    DECISION PAGE 6    11/28/05**

75

1    May of 2000 and two by Dr. Rueschenberg indicates a

2    need for a long period of observation, evaluation or

3    treatment.  Ad we're going to see the inmate complete

4    additional self-help and therapy programming which is

5    essential to his adjustment, and we feel that he needs

6    the additional time to gain such programming.

7    Therefore, I want your period of observation and

8    evaluation of the inmate as required before the board

9    should find that he is suitable for parole.  And we

10   would recommend that you remain disciplinary free,

11   and, if available, participate in self-help and

12   therapy programming and also cooperate with clinicians

13   in the completion of a new Psychological Evaluation

14   which we have ordered the department to do prior to

15   your next hearing.  Commissioner?

16       **DEPUTY COMMISSIONER JOHNSON:**  Additionally,

17   the -- if the DA would send to the Department of

18   Corrections the -- the appeal decision and the Autopsy

19   Report.  And personally, Mr. Moore, I think, you know,

20   I feel personally like you are remorseful, but you

21   haven't articulated that if you know what I mean.  So

22   in doing -- in participating in the Psychology

23   Evaluation, you need to take a look at -- you know,

24   because you haven't told, I mean, you're -- you're

25   responses to the a DA's questions -- to Commissioner's

26   questions were totally inadequate, and -- but I -- but

27   **RONALD MOORE**     D-92538     **DECISION PAGE 7**     11/28/05

1    I believe you are -- you are remorseful.  You just

2    don't know how to articulate that so work on doing

3    that.  And I -- as she said, I commend you for your

4    programming, it's absolutely excellent.  You know,

5    I -- I worked longer in corrections than you've been

6    here and -- and to see somebody go that long without

7    disciplinaries, that's -- that's remarkable.  So good

8    luck to you.

9         **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.  And

10   I concur in those comments, too.  Okay.  Good luck to

11   you, sir.  And now we will adjourn the hearing now.

12   And it is 6:20 p.m.

13                          --oOo--

14

15

16

17

18

19

20

21

22   **PAROLE DENIED TWO YEARS**                **MAR 2 8 2006**

23   **THIS DECISION WILL BE FINAL ON:**_____

24   **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

25   **DATE, THE DECISION IS MODIFIED.**

26   **RONALD MOORE    D-92538    DECISION PAGE 8    11/28/05**

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, CAROL CHASE, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 76, and which

recording was duly recorded at CALIFORNIA STATE

PRISON, SAN QUENTIN, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING of RONALD

MOORE, CDC NO. D-92538, on NOVEMBER 28, 2005, and that

the foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated DECEMBER 19, 2005, at Sacramento,

California.


CAROL CHASE
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

E X H I B I T   B

BOARD OF PRISON TERMS' INITIAL HEARING DECISION

```
 1                   CALIFORNIA BOARD OF PRISON TERMS
 2                         D E C I S I O N
 3           PRESIDING COMMISSIONER WELCH:  Okay.  The
 4      Panel reviewed all information received from the
 5      public and relied on the following circumstances,
 6      Mr. Moore, in concluding that at this time that
 7      you're not suitable for parole and would pose an
 8      unreasonable risk of danger to -- threat to society
 9      if released from prison.  One of the reasons is
10      that the offense was carried out in an especially
11      cruel and callous manner.  The offense was carried
12      out in a dispassionate manner.  The victim was
13      abused and the offense was carried out in a manner
14      which demonstrates an exceptionally callous
15      disregard for human suffering.  The motive for the
16      crime was inexplicable or very trivial in
17      relationship to the offense.  And that's one of the
18      things that the Panel was struggling with, is to
19      try to come up with motive for this crime.  The
20      conclusion was drawn from the Statement of Facts
21      wherein on November the 10th, 1986, the San Mateo
22      Police Department received a report from -- of a
23      disturbance on North Bayshore Boulevard at a motel.
24      They responded and the found the victim had been --
25      she was nude and had been badly beaten, and she
26      succumbed to those wounds.  She died of injuries
27      RONALD MOORE    D-92538    DECISION PAGE 1    6/18/02
```

1    suffered to her brain during the assault.  And it

2    was determined that the prisoner was responsible

3    for -- And it should also be noted that originally

4    the prisoner indicated that she had received these

5    injuries some other way.  The prisoner did have a

6    history of criminal activity.  He has an escalating

7    pattern of criminal behavior.  He had failed

8    previous grants of probation and could not be

9    counted upon to avoid criminality.  He failed to

10    profit from society's previous attempts to correct

11    his criminality.  Such attempts included adult

12    probation and county jail.  Under unstable social

13    history there does not appear to be too many

14    unstabilizing factors, it appears, in his formative

15    years that the Board could ascertain.  There are

16    some indications that the prisoner did use a wide

17    variety of drugs and that he used alcohol also.

18    Under prior criminal history the prisoner have

19    arrests or convictions for such things as grand

20    theft auto, burglary, Health and Safety violations,

21    possession of drugs, and petty theft and, of

22    course, the commitment offense of murder first.

23    The prisoner has programmed very well in prison.

24    Recent psychiatric report dated 6/8/02 by

25    Dr. Rueschenberg, R-U-E-S-C-H-E-N-B-E-R-G, was

26    somewhat of a supportive report.  There was some

27    **RONALD MOORE    D-92538    DECISION PAGE 2    6/18/02**

1    areas that he indicated that the prisoner hadn't

2    fully come to terms with. One of them was the

3    crime and that he hasn't fully come to terms with

4    that -- with that aspect of his crime. So we would

5    say -- But he did overall say that the prisoner

6    appears, and I quote, "Overall, Mr. Moore appears

7    to have a low to moderate risk for violence in the

8    community." So it means that you've made some

9    progress but there's still concerns, even that the

10    doc -- even the doctor has at this time. So in

11    terms of whether or not you'd be a threat to the

12    community, the people of California, I would say it

13    rests somewhere between -- It's not totally

14    supportive at this time for release, but it does

15    show that you've made progress. The prisoner does

16    have some parole plans. There's an indication in

17    one letter that he could live with his mom. Of

18    course, he lack acceptable employment plans in the

19    community. The hearing Panel notes that in

20    response to Penal Code 3042 notices indicate an

21    opposition of a finding of suitability. That

22    specifically the Deputy District Attorney of San

23    Mateo spoke in opposition of a finding of

24    suitability at this time. The Panel makes the

25    following findings. The prisoner still needs to

26    develop insight into the crime and the ability to

27    **RONALD MOORE    D-92538    DECISION PAGE 3    6/18/02**

1    face, discuss, and cope with -- and cope with

2    stress in a nondestructive manner, particularly in

3    this case. Until progress is made, the prisoner

4    continues to be unpredictable and a threat to

5    others. Nevertheless, sir, there are some things

6    that the Panel wants to commend you for. One, for

7    being disciplinary-free in the structural

8    environment. That's a good accomplishment and we

9    certainly want to give you some accolades for that.

10   We want to give you some accolades for the self-

11   help kinds of things that you've been involved in

12   and your work that you perform in prison. And we

13   certainly want to -- want to compliment you for

14   that. However, these positive aspects of your

15   behavior at this time does not outweigh the factors

16   of unsuitability. Therefore, your parole is going

17   to be denied for three years. In a separate

18   decision the hearing Panel finds that the prisoner

19   has been convicted of murder first-degree and it's

20   not reasonable to expect that parole would be

21   granted at a hearing during the following three

22   years. And the specific reasons is, one, the crime

23   was committed in an especially cruel and callous

24   manner, particularly when the officers

25   responded to the area they found the victim was

26   laying nude on the floor. She had been very badly

27   RONALD MOORE    D-92538    DECISION PAGE 4    6/18/02

1    beaten and she died and she succumbed to brain

2    injuries that was inflicted by you.  The offense

3    was carried out in a dispassionate manner.  The

4    victim was abused and I started to say mutilated

5    before and I thought about it, but it appears that

6    she may have been -- be from some of the injuries

7    that she had sustained during this incident.  The

8    offense was carried out in a manner which

9    demonstrates an exceptionally callous disregard for

10.  human suffering.  The motive for the crime was

11   inexplicable or very trivial in relationship to the

12   offense.  And one of the problems that the Panel

13   had, we couldn't come up with a motive in terms of

14   why you did that.  And when you gave a historical

15   perspective of what happened, you were not very

16   forthcoming and we were not able to ascertain in

17   terms of what your motive was and why you committed

18   this crime.  And that's necessary for the Board to

19   be able to do that in order to make some type of

20   reasonable prediction in terms of your suitability

21   for parole, in terms of whether or not you will

22   reoffend.  So that's one of the things that you

23   need to really think about doing in the next three

24   years.  The prisoner had a prior record of

25   criminality -- an escalating pattern of

26   criminality.  A recent psychiatric report showed

27   **RONALD MOORE    D-92538    DECISION PAGE 5    6/18/02**

1    improvement but it also indicates there's a need
2    for a longer period of observation.  The prisoner
3    has not completed -- and maybe even treatment also.
4    The prisoner have not completed necessary
5    programming which is essential to his adjustment
6    and needs additional time to gain such programming.
7    Participation in substance abuse or self-help
8    program is very imperative for you, sir.
9    Therefore, a longer period of observation and
10   evaluation of the prisoner is required before the
11   Board shall find that the prisoner is suitable for
12   parole.  The Panel recommends that you remain
13   disciplinary-free.  And we have already
14   complimented you for that.  We think that's a good
15   accomplishment.  And we also recommend that, if
16   available, that you get another vocation.  You have
17   one vocation, there was some -- in Auto Mechanics,
18   I believe it is.  And, if available, get another
19   vocation.  And certainly, if available, participate
20   in self-help program.  And with that -- (inaudible)
21   psych report.
22        **DEPUTY COMMISSIONER HARMON**:  The most recent
23   one is current.
24        **PRESIDING COMMISSIONER WELCH**:  And with that
25   we do wish you good luck, sir.  Commissioner
26   Harmon, do you have any comments?
27   **RONALD MOORE    D-92538    DECISION PAGE 6    6/18/02**

1          DEPUTY COMMISSIONER HARMON:  Yes, just to

2    correct one thing.  The vocation that has been

3    completed -- I want to make sure we get the name

4    correct here, it's not the Auto Body.

5          PRESIDING COMMISSIONER WELCH:  Oh, it's not

6    the Auto?

7          DEPUTY COMMISSIONER HARMON:  No.  Data Entry

8    Operator, and that is the vocation that's been

9    completed.

10          PRESIDING COMMISSIONER WELCH:  So that

11    Automo -- Auto Body has not been --

12          DEPUTY COMMISSIONER HARMON:  There is no

13    Auto Body vocation completed.

14          PRESIDING COMMISSIONER WELCH:  Okay.  All

15    righty.  Any other comments?

16          DEPUTY COMMISSIONER HARMON:  Just to wish

17    you luck.  You're a very intelligent man.  You have

18    a tremendous amount of skills.  If you use those

19    skills to -- maybe even spend some time in the

20    library in doing some self-help so that you have

21    better insight into this crime -- and crime and be

22    able to address the questions more thoroughly.  Do

23    you know what I'm saying?  Because they're going to

24    be asked of you again.  There's a lot that has to

25    be dealt with here.  Anyway, I want to wish you

26    luck.

27    RONALD MOORE    D-92538    DECISION PAGE 7    6/18/02

74

1          PRESIDING COMMISSIONER WELCH:   Okay.   Good

2     luck to you, sir.   And this hearing is concluded at

3     approximately 16:10.

4          DEPUTY DISTRICT ATTORNEY BOESSENECKER:   Do

5     you want those?

6          PRESIDING COMMISSIONER WELCH:   Oh

7     absolutely.

8          DEPUTY DISTRICT ATTORNEY BOESSENECKER:

9     Okay.

10          PRESIDING COMMISSIONER WELCH:   I was

11     intending to give those back to you.

12          DEPUTY DISTRICT ATTORNEY BOESSENECKER:   Oh,

13     okay.

14          PRESIDING COMMISSIONER WELCH:   Good luck to

15     you, sir.

16          INMATE MOORE:   Thank you.

17                    --o0o--

18

19

20

21

22

23

24

25     PAROLE DENIED THREE YEARS

26     EFFECTIVE DATE OF THIS DECISION_____JUL 2 2 2002_____

27     RONALD MOORE    D-92538    DECISION PAGE 8    6/18/02

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, CAROL A. EDWARDS, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 74, and which recording was duly recorded at CALIFORNIA STATE PRISON, SAN QUENTIN, at SAN QUENTIN, CALIFORNIA, in the matter of the INITIAL PAROLE CONSIDERATION HEARING of RONALD MOORE, CDC No. D-92538, on JUNE 18, 2002, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated July 1, 2002, at Sacramento County, California.

Carol A. Edwards
Transcriber
**CAPITOL ELECTRONIC REPORTING**